## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH BAILEY *et ux.*                    :
                                         :
    Plaintiffs,                      :
                                         :
    v.                               :        Case No.: 1:08-cv-00644-RMC
                                         :        Judge Rosemary M. Collyer
J & B TRUCKING SERVICES, INC., *et al.* :
                                         :
                                         :
    Defendants.                      :

### PLAINTIFFS' OPPOSITION TO DEFENDANT SERGIO ROLANDO SANABRIA'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)

COME NOW the Plaintiffs, by and through counsel, and respectfully request this honorable Court to deny Defendant Sergio Rolando Sanabria's Motion to Dismiss for Lack of Personal Jurisdiction. The deposition testimony of Mr. Sanabria himself demonstrates that he has been consistently making deliveries in the District of Columbia at least several times a month in the course of his employment over the past seven years. Moreover, at the time this action was filed, and indeed for the past year to two years, he has no longer been an employee of the corporate Defendant J&B Trucking. He nevertheless has continued to work regularly in the District two to three days a week delivering twenty to thirty-five household appliances every week. Those contacts have been completely independent of his former employer, the corporate Defendant J&B Trucking Services. Therefore, Defendant Sanabria has had ample ongoing contacts with the District of Columbia over the past seven years to justify this Court's personal jurisdiction over him for purposes of this instant action. Moreover, his contacts with the District at the time of the filing of this action and for the past one to two years have not been on behalf of

corporate Defendant J&B Trucking Services. When they were, however, those contacts still constituted grounds for this Court's personal jurisdiction over him. For these and other reasons, Defendant Sanabria's instant Motion should be denied, and the Plaintiffs should be granted leave to amend their pleading accordingly.

## I.     Facts

### A.     Defendant Sanabria's Contacts with the District of Columbia

At his deposition on this matter, Defendant Sanabria testified to working regularly in the District on a weekly to monthly basis since 2001, even though he resides in suburban Maryland. Defendant Sanabria testified that he has been living at 5615 Queen's Chapel Road, Hyattsville, Maryland (20782) since 2003. (Sanabria Dep. 3:14-22, May 27, 2008, Ex. 1.) Prior to that, he had been living in Gaithersburg, Maryland since October 1999, then, prior to that, in Arlington, Virginia since 1999. (Sanabria Dep. 4:5-5:10, Ex. 1.) Mr. Sanabria has therefore been living in the Washington D.C. metropolitan area since October 1999, and was living in Hyattsville, Maryland, at the time of the alleged incidents out of which this case arises.

He testified that he is currently working for Donis Truck Service, delivering and installing household appliances such as dishwashers, microwave ovens, and refrigerators. (Sanabria Dep. 6:7-15, Ex. 1.) He said that he has been working for Donis Trucking Service for approximately two years. (Sanabria Dep. 8:1-4, Ex. 1.) While he has been employed by Donis Trucking, Mr. Sanabria has been working "five days a week, sometimes three, sometimes four." (Sanabria Dep. 10:11-13, Ex. 1.) Donis has one truck, which he and one other coworker use to make deliveries. (Sanabria Dep. 8: 6-17, Ex. 1.) At the beginning of each work day, Mr. Sanabria drives his own car over to a designated meeting place, either at Democracy Boulevard and Old Georgetown Road, or in Silver Spring at Georgia Avenue and East-West Highway.

(Sanabria Dep. 9:8-20, Ex. 1.) He parks his car and waits for his coworker. His coworker (or someone else) drives the truck down from Gaithersburg to meet Mr. Sanabria. (Sanabria Dep. 9:4-7, Ex. 1.) From there, Mr. Sanabria and his coworker drive together in the Donis Truck up to a warehouse near Baltimore run by a company called HBI to pick up the day's order of appliances for them to deliver and install. (Sanabria Dep. 10:14-22, Ex. 1.) HBI is a distributor for several home appliance retailers such as Home Depot and General Electric. (Sanabria Dep. 11:1-3, Ex. 1.) Mr. Sanabria and his coworker deliver the appliances to each customer's home, removing the old appliance and installing the new one. (Sanabria Dep. 12:1-4, Ex. 1.)

They make deliveries throughout the Washington, D.C. metropolitan area, including in the District of Columbia itself. (Sanabria Dep. 12:5-9, Ex. 1.) In the District, they make deliveries two to three separate times a week. (Sanabria Dep. 12:10-12, Ex. 1.)

> A: When the truck goes to D.C. it takes 12 deliveries, sometimes 14. So 10 to 20 to 30. Maybe 35 deliveries a week.
>
> Q: Into D.C.?
>
> A: Into D.C., yes.
>
> Q: And this is something you do every week in DC?
>
> A: Every week. But other days, they also send us elsewhere.

(Sanabria Dep. 12:18-13:4, Ex. 1.) Mr. Sanabria testified that both he and his colleague drive the truck: "Q: Do you drive the truck? A: We both carry [sic] the truck, both of us. When I am tired, he drives. When he is tired, I drive." (Sanabria Dep. 15:10-13, Ex. 1.) As a result, he knows many of the roads in the District (though he still needs a map occasionally). (Sanabria Dep. 15:16-19, Ex. 1.) He agreed again that he has been working like this for approximately the past two years. (Sanabria Dep. 15:6-9, Ex. 1.)

3

In addition to driving the company truck around the District for his employer, Defendant Sanabria testified that he also sometimes drives through the District *on his own time* on Riggs Road. "Sometimes I take Riggs Road when I am not going to work." (Sanabria Dep. 34:7-8, Ex. 1.) His driving in the District is sufficiently extensive that he received a traffic ticket in approximately March 2008 for using a cell phone while he was driving the Donis truck. (Sanabria Dep. 21:16-22:4, Ex. 1.) Mr. Sanabria therefore utilizes District roads on a regular basis both on and off the job.

Prior to working for Donis Trucking, Mr. Sanabria worked for about eight months as a repairman for an air conditioning company named Ebenezer. (Sanabria Dep. 15:20-16:6, Ex. 1.) He removed and installed air conditioners and cleaned air conditioning ducts and units. (Sanabria Dep. 16:20-17:1, Ex. 1.) Though Ebenezer was located in suburban Maryland, he nevertheless went to the District "probably three or four times" during the course of that job. (Sanabria Dep. 16:6-12; 17:2-5; Ex. 1.)

Prior to the air conditioning repair job for Ebenezer, Mr. Sanabria worked for Defendant J&B Trucking making deliveries of furniture for a company called Belfort. (Sanabria Dep. 28:9-22, Ex. 1.) Belfort had a furniture distribution warehouse in Northern Virginia. (Sanabria Dep. 18:22-19:5, Ex. 1.) J&B was a delivery contractor for Belfort. (Sanabria Dep. 28:13-19, Ex. 1.) Mr. Sanabria received his pay check from J&B Trucking (Sanabria Dep. 30:13-15, Ex. 1.), and used a J&B truck to make the furniture deliveries (Sanabria Dep. 30:4-12, Ex. 1). Thus, while he made deliveries of Belfort furniture, and the truck had the Belfort logo on it for advertising purposes (Sanabria Dep. 30:10-12, Ex. 1), the truck belonged to J&B, and Mr. Sanabria was an employee of J&B (Sanabria Dep. 28:9-22; 30:11-12; Ex. 1).

As discussed above, Mr. Sanabria testified that he "worked for J&B from 2001 to 2007."[1] (Sanabria Dep. 28:20-22, Ex. 1.)  During that time, he "loaded the furniture, put it in the truck, and [he] delivered to the clients." (Sanabria Dep. 19:10-11, Ex. 1.)  He drove the truck. (Sanabria Dep. 19:12-13, Ex. 1.)  He made deliveries in the District of Columbia as well as throughout the Virginia and Maryland suburbs of the District.  (Sanabria Dep. 19:14-20, Ex. 1.)

> Sanabria: Three or four times a month we would go to
>      Washington.
>
> Q:  Washington, D.C. for deliveries?
>
> A:  Yes.
>
> Q:  Did you pick up at a warehouse or the company store?
>
> A:  The company's warehouse.
>
> Q:  So, is it correct, Mr. Sanabria, that you made deliveries for
>      Belfort into Washington, D.C. for almost six years three or four
>      times a month?
>
> A:  Three to four times a month.  Not every week.

(Sanabria Dep. 19:20-20:10, Ex. 1.)

Some days, if he was too tired or it had gotten too late to drop off the truck and pick up his own car, he parked the truck near his home over night.

> Q:  Okay, Mr. Sanabria, you have the picture showing us the
>      Belfort [J&B] truck at your home.

---

[1] There is some discrepancy in Mr. Sanabria's testimony as to when he started working for each of his three employers of the past two years. He did specifically testify, however, that he was working for J&B Trucking Service in January 2006, when the incident complained of allegedly occurred: "Q: Who were you working for in January, 2006? A: I was working for J&B Trucking Service." (Sanabria Dep. 27:14-17, Ex. 1; Police Report Ex. 3 (showing the stolen truck to have been in the name of a J&B principal).)  According to his testimony, however, he must have left J&B no later than some time in 2007, and probably early in 2006 (i.e., at no point did he offer any testimony indicating that he was working for Defendant J&B Trucking at any time in 2008). (Sanabria Dep. 27:14-20; 28:20-22; Ex. 1.)

> A: It is not my home. But it is where I used to park the truck
> because I leave late from work and it was too tiring to go get
> the car to the place where I used to park it so I would go home.
>
> Q: Because it was a long workday?
>
> A: Yes.
>
> Q: So, where is this located? What city is the house in?
>
> A: Hyattsville.

(Sanabria Dep. 29:13-30:3, Ex. 1.) Thus, Mr. Sanabria had been entrusted by J&B with the use

of J&B's truck, and he used that truck to make three to four deliveries a month in the District

from 2001 to approximately 2006 or 2007, including January 2006 when the incident in question

arose. (Sanabria Dep. 27:14-17, Ex. 1.) The quality of his present contacts with the District are

therefore highly similar to his District contacts back in January 2006 with J&B: working as a

delivery man, operating a truck entrusted to him by his employer, making several deliveries a

month in the District. The major difference is that the quantity of his contacts has now

increased: in January 2006, he regularly made three to four deliveries a month in the District,

while now he makes two to three deliveries *a week*, to multiple customers each time.

## B.    Procedural History

This action arises out of injuries the Plaintiffs suffered on January 7, 2006, when

Defendant Sanabria, then an employee of Defendant J&B Trucking Services, left the truck

entrusted to him by J&B running and unattended, and Onorio T. Cifuentes stole the truck, fled

from Maryland (the forum of the theft) into the District, and collided with Mr. Bailey, causing

him significant physical and psychological harm. The Plaintiffs filed this instant action in the

Superior Court of the District of Columbia on February 28, 2008. (Compl. Ex. 2.) On April 14,

2008, the Defendants removed the action to this honorable Court, pursuant to 28 U.S.C. §§ 1441

and 1446, based on the diversity of the parties.  On the same day, April 14, 2008, the Defendant

Sergio Rolando Sanabria filed his instant Motion to Dismiss for Lack of Personal Jurisdiction,

pursuant to Federal Rule of Civil Procedure 12(b)(2), on grounds that neither at the time of the

incident nor any time since did he reside in the District of Columbia or have sufficient contacts

with the District to warrant this Court's personal jurisdiction over him.  On motion from the

Plaintiffs, and with the consent of the Defendants, the Court granted the Plaintiffs permission to

depose Defendant Sanabria, prior to responding to his Motion, on the limited issue of personal

jurisdiction and his contacts with the District of Columbia.  *See* Order of April 25, 2008.  The

Plaintiffs subsequently deposed Defendant Sanabria on that issue on May 27, 2008.  Having

reviewed his deposition testimony, we now turn to a discussion of his Motion.

## II.     Discussion

### A.     Defendant Sanabria has sufficient contacts with the District of Columbia to support this Court's personal jurisdiction over him, pursuant to the District's long-arm statute and the Due Process Clause.

"When considering the applicability of any long-arm statute . . . . [i]t is necessary initially

to determine whether the statute by its language would permit service of process on a non-

resident defendant, and . . . whether service under the statute would nonetheless contravene the

due process clause of the federal constitution."  *Margoles v. Johns*, 483 F.2d 1212, 1220 (D.C.

Cir. 1973).  To assert personal jurisdiction over the Defendant, the Court must therefore first

determine, pursuant to the District's long-arm statute, whether Defendant Sanabria has sufficient

contacts with the District, and, second, whether the Plaintiffs' claim is sufficiently related to

those contacts.  *See* D.C. Code § 13-423(a)(4), (b) (2001).  Finally, the Court must determine

whether the assertion of personal jurisdiction based on those contacts also comports with the Due

Process Clause. Defendant Sanabria's deposition testimony demonstrates facts that meet all three tests.

> **1.      Defendant Sanabria has had sufficiently regular business activity and course of conduct in the District, along with income therefrom, to satisfy the contact requirements for personal jurisdiction under subsection 13-423(a)(4).**

In determining whether it has personal jurisdiction over a non-resident defendant in an action based on diversity, the District Court must look to the forum jurisdiction's long-arm statute. *See Gatewood v. Fiat, S. p. A.*, 617 F.2d 820, 822 n.3 (1980).[2]  In this case, the long-arm statute of the District of Columbia provides that the court

> may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . causing tortious injury *in* the District of Columbia by an act or omission *outside* the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia . . . .

D.C. Code § 13-423(a)(4) (2001) (emphasis added).  In order for the Court to assert personal jurisdiction over Mr. Sanabria, the Plaintiffs must therefore demonstrate facts showing that he either:

1.      regularly does business, or solicits business, in the District, or

2.      engages in any other persistent course of conduct in the District, or

3.      derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

---

[2] Further, "[p]rinciples of federalism bind us in diversity cases to follow the District of Columbia Court of Appeals' interpretation of the District of Columbia jurisdictional statute." *Gatewood*, 617 F.2d at 824.

*Id.*; *see also Blumenthal v. Drudge*, 992 F. Supp. 44, 53-54 (D.D.C. 1998).[3] These "plus factors" must demonstrate some "reasonable connection" between the forum court and the Defendant, "'separate from and in addition to' the injury caused in the jurisdiction." *Blumenthal*, 992 F. Supp. at 54 (*quoting Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987) (Ginsburg, J.)) "The 'plus factor' or factors need not be related to the act that caused the injury; all that is required is 'some other reasonable connection between the defendant and the forum.'" *Blumenthal*, 992 F. Supp. at 54 (*quoting Crane*, 814 F.2d at 762-63).

First, "to be transacting business within this jurisdiction some purposeful, affirmative activity within the District of Columbia is required." *Bueno v. La Compania Peruana de Radiodifusion, S.A.*, 375 A.2d 6, 8 (D.C. 1977). Regularly doing business can consist of regularly performing commercial services. *See, e.g., Guevara v. Reed*, 598 A.2d 1157, 1158 (D.C. 1991) (observing that party challenging jurisdiction under 13-423(a)(4) conceded that it regularly did business in the District by providing hotel and food services). Second, a persistent course of conduct can consist of regular visits to the District to engage in *any* conduct, even if it is in the course of the defendant's profession. For example, in *Etchebarne-Bourdin v. Radice*, 754 A.2d 322, 325 n.5 (D.C. 2000), the trial court held that two Virginia doctors engaged in a persistent course of conduct in the District where, "[c]ombining their trips into D.C. for Grand Rounds and for meetings of the Washington Gynecological Society, Dr. Gahres would appear to be entering D.C. two to three times a month and Dr. Radice would appear to be entering D.C. between one and two times a month." *Id.* The defendants did not challenge that holding on

---

[3] "Plaintiffs have the burden of establishing that this Court has personal jurisdiction over [a] defendant . . . and alleging specific facts upon which personal jurisdiction may be based." *Blumenthal*, 992 F. Supp. at 53 (*citing Cellutech Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 48 (D.D.C.1994)). The standard of proof for jurisdiction is "by a preponderance of evidence." *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936).

appeal, and the Court of Appeals did not criticize it.[4] *Etchebarne-Bourdin*, 754 A.2d at 326.

Thus, providing commercial services in the District is sufficient to constitute "regularly doing

business," and a course of conduct is "persistent" enough for purposes of subsection (a)(4) if it

brings the defendant into the District at least two to three times a month.  Finally, a defendant

need not derive his income solely, or even mostly, from the District in order for that income to be

"substantial."  It is sufficient that the defendant derive earnings from business in the District, and

that those earnings are more than negligible.  *See Tabilisierungsfonds Fur Wein v. Kaiser Stuhl*

*Wine Distributors Pty. Ltd.*, 647 F.2d 200, 206 (D.C. Cir. 1981) (holding that, while defendant's

revenues from the District were arguably only 1.3% of its overall earnings, those revenues were

nevertheless "substantial" because the District represented only 0.5% of its potential market).

     In light of the case law regarding section 13-423(a)(4), Mr. Sanabria's contacts with the

District are sufficiently regular and substantial under any of the three "plus factors" to warrant

this Court's jurisdiction over him for purposes of this action.  He regularly does business in the

District by making twenty to thirty-five deliveries of household appliances a week to District

residents' homes, two to three days a week, removing the old appliances and installing the new

ones. (Sanabria Dep. 12:18-13:4, Ex. 1.)  His activities in the District can therefore also be

construed as a persistent course of conduct.  In either case, his contacts with the District are far

more numerous and more regular that those found in *Etchebarne-Bourdin*.  *See* 754 A.2d at 325

n.5 (conduct was "persistent" where defendants regularly entered the District either one to two,

or two to three times a month).  He testified that he makes up to one hundred deliveries a week

---

[4] The Court has long held that in "'exceptional situations and when necessary to prevent a clear
miscarriage of justice apparent from the record,' we may deviate from the usual rule that our review is
limited to issues that were properly preserved." *District of Columbia v. Helen Dwight Reid Educational
Foundation*, 766 A.2d 28, 33 n.3 (D.C. 2001) (*quoting Williams v. Gerstenfeld*, 514 A.2d 1172, 1177
(D.C.1986)).  The trial court's holding regarding the defendants' persistent course of conduct in
*Etchebarne-Bourdin* therefore presumably did not strike the Court of Appeals as "a clear miscarriage of
justice."

total, usually less. (Sanabria Dep. 13:13-17.) If his income is proportioned according to where he make deliveries, his earnings based on deliveries he makes in the District therefore constitute at least twenty to thirty-five percent of his overall earnings. He has been engaging in this persistent course of conduct for two years, or at least since some time in 2007. At the time of the filing of this action in February 2008, and its removal to this Court in April 2008, he therefore had numerous, long-standing contacts with the District in which he purposefully availed himself of the District's market for home appliance delivery to make his living by making deliveries there, in addition to suburban locations.

Moreover, his employment contacts with the District stretch back to at least to 2001. While he was doing air conditioning repair for eight months, he was working in the District three to four times. Then, when he worked for J&B Trucking, he regularly made furniture deliveries to District customers three to four times a month for approximately six years. This rate is still in excess of the rate constituting persistent course of conduct in *Etchebarne-Bourdin*. *See* 754 A.2d at 325 n.5 (two to three times a month). Also, the quality of those contacts (driving a company truck and making furniture deliveries) is substantially similar to his present contacts. Therefore, even when the incident at issue in this case arose, January 2006, he had sufficient contacts with the District to warrant personal jurisdiction.

2.    **There is a sufficient connection between the alleged tort and Defendant Sanabria's contacts with the District to satisfy the nexus requirement under section 13-423(b).**

Subsection 13-423(b) provides that "[w]hen jurisdiction over a person is based solely upon this section [i.e., 13-423(a)], only a claim for relief arising from acts enumerated in this section may be asserted against him." This does not mean that the "plus factor" contacts had to have been the direct, "but for" cause of the injury alleged, but only that the Plaintiff's claim must

"be related to or substantially connected with" those "plus factor" activities. *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 335 (D.C. 2000) (holding that a Maryland defendant's extensive advertising in the District inviting District residents into its Maryland store was sufficiently related to the plaintiff's claim for damages from slipping and falling in that store as to warrant the District's personal jurisdiction over the defendant). Thus, the Plaintiff's claim in this instant case simply has to be substantially related to the *type* of activity Defendant Sanabria has carried on in the District. *See id.*

The Plaintiff alleges that he was injured because Defendant Sanabria negligently left his delivery truck running and unattended. (Compl. ¶¶ 13-17 Ex. 2; Police Report Ex. 3.) As a result, a thief stole the delivery truck, and, while in flight into the District, collided with Mr. Bailey. (Compl. ¶¶ 18-20.) This instant action therefore arises out of Defendant Sanabria's operation of a delivery truck for J&B Trucking. His operation of that delivery truck is substantially related to his commercial delivery work in the District. He used J&B's truck to make furniture deliveries in the District three to four times a month. (Sanabria Dep. 19:20-20:10; 30:4-7; Ex. 1.) In his current job, he shares driving the company delivery truck when making deliveries of appliances in the District. "We both carry [sic] the truck, both of us. When I am tired, he drives. When he is tired, I drive." (Sanabria Dep. 15:10-13, Ex. 1.) Since Sanabria's operation of a commercial delivery truck has always been a significant part of his delivery activities in the District, there is a substantial relation between the plaintiff's claim of negligent operation of such a delivery truck and Defendant Sanabria's contacts with the District. *See Shoppers Food Warehouse*, 746 A.2d at 335. There is thus a sufficient nexus between the Plaintiff's claim and the Defendant's in-forum activities to satisfy the relation requirement of subsection 13-423(b).

### 3. Personal Jurisdiction over Defendant Sanabria in this instant action also comports with the Due Process Clause.

In addition to determining whether the District's long-arm statute provides personal jurisdiction over the defendant, the court must also consider whether such jurisdiction comports with the Due Process Clause. *See Margoles*, 483 F.2d at 1220. The evidence from Defendant Sanabria's own testimony, reviewed above, shows that he has purposefully availed himself of the market for home delivery of furniture and appliances in the District by earning his living over most of the past seven years making such deliveries to District residents, from three to four times a month to presently two to three times a week. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("there [must] be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws"). Defendant Sanabria did not have to perform that type of work: he could have taken a job in a business in Maryland that did not involve any travel. Also, since his delivery work has involved being entrusted with the operation of a company delivery truck, it has been reasonably foreseeable that Defendant Sanabria could be sued in the District for a cause of action alleging negligent operation of such a truck. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (holding that a defendant's contacts with the forum must be such that "he should reasonably anticipate being haled into court there")[5]; *see also Kopff v. Battaglia*, 425 F. Supp. 2d 76, 82-83 (D.D.C. 2006) ("Due Process Clause requires that plaintiffs demonstrate a sufficiently close connection between their asserted injuries and the defendant's contacts with the forum so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice'") (*quoting, inter alia, Int'l Shoe Co. v. Washington*, 326 U.S. 310,

---

[5] Nor is this a case, as in *World-Wide Volkswagen*, in which the matter bears little relation to the forum. To the contrary, the Plaintiffs live in the District, Mr. Bailey was treated in the District for his injuries, and the District authorities investigated and prosecuted the related theft.

316 (1945)). Personal jurisdiction over Defendant Sanabria in this instant action therefore
comports not only with section 13-423, but also with the Due Process Clause itself.

**B.    His having been an employee of corporate Defendant J&B Trucking Services
does not preclude personal jurisdiction over Defendant Sanabria himself.**

Despite his numerous contacts with the District, Defendant Sanabria nevertheless raises a
corporate fiduciary shield defense to this Court's personal jurisdiction over him. (Mot. Mem. ¶
10-11.) That defense is both inapposite and invalid. First, he is no longer an employee of J&B
Trucking. Second, the fiduciary shield doctrine is contrary to District law. Third, even if it were
consistent with District law, that defense could be properly asserted only in claims arising out of
business transactions, and would not be available in a tort claim based on negligent operation of
a truck.

**1.    At the time of the filing of this action (and for one to two years prior)
Defendant Sanabria was not an employee of corporate Defendant
J&B Trucking.**

Defendant Sanabria misconstrues the case law, and in particular *Wiggings, Jr. v. Equifax
Inc.*, 853 F. Supp. 500 (D.D.C.1994), when he argues that an employee's or agent's in-forum
activities on behalf of a corporate defendant cannot be used to assert personal jurisdiction over
that employee or agent individually. (Mot. Mem. ¶ 10-11.) To begin with, the Defendant's
argument is inapposite to the facts, because Defendant Sanabria's own unchallenged testimony is
that he stopped working for J&B Trucking Services a year to two years ago, and at least well
before 2008. (Sanabria Dep. 15:6-9 (working for present employer, Donis, for two years);
28:20-22 ("worked for J&B from 2001 to 2007").) Defendant Sanabria had therefore long since
left J&B Trucking's employment when this instant action was filed in Superior Court on
February 28, 2008, and was removed to this Court on April 14, 2008. Thus, at the time of the
filing of this action and since, Defendant Sanabria has had extensive contacts with the District

over the prior year two years, and continuing, that are completely independent of Defendant J&B

Trucking. "The [longarm] statute makes the test of jurisdiction in the *present* circumstances,"

*Chase v. Pan-Pacific Broadcasting, Inc.*, 617 F. Supp. 1414, 1423 (D.D.C. 1985) (*quoting*

*Groom v. Margulies*, 265 A.2d 249, 255 (Md. 1970) (*emphasis in the original*), as the statute is

written in the *present* tense: "regularly *does* or solicits business, *engages* in any other persistent

course of conduct, or *derives* substantial revenue from goods used or consumed, or services

rendered, in the District of Columbia," § 13-423(a)(4) (emphasis added). As discussed above, it

is clear that Defendant Sanabria does these things now, independently of his one-time

relationship with J&B, and that the Court therefore has ample grounds for asserting personal

jurisdiction over Sanabria himself *now*.

### 2.    The Defendant's argument misconstrues the case law regarding the fiduciary shield defense against personal jurisdiction.

The Defendant relies heavily on the holding in *Wiggings* that personal jurisdiction over

employees "of a corporation in their individual capacities . . . must be based on their personal

contacts with the forum and not their acts and contacts carried out solely in a corporate

capacity." Mot. Mem. ¶ 10 (*quoting Wiggings, Jr.*, 853 F. Supp. at 503). The facts on which the

*Wiggings* Court based its holding are far different than those in this instant case. In *Wiggings*,

the plaintiff argued for personal jurisdiction over employees of a defendant corporation based

solely on the fact that (a) they worked from Virginia, supervising Virginia and District

employees, and (b) the corporation itself had sufficient contacts with the District to support

personal jurisdiction over *it*. *See* 853 F. Supp. at 503. The individual employees, however,

never entered the District as part of their work, and had no other contacts of their own with the

District. *See id.* The *Wiggings* plaintiff, in essence, was attempting to "boot strap" the

employees up under this Court's personal jurisdiction based solely on their *employer's* contacts

with the District. The *Wiggings* court observed that it "does not have jurisdiction over individual officers and employees of a corporation just because the court has jurisdiction over the corporation." *Id.* (*citing Quinto v. Legal Times*, 506 F. Supp. 554, 558 (D.D.C.1981)). It is against this factual and legal background that the *Wiggings* court held, unsurprisingly, that it did not have personal jurisdiction over the defendant employees. The holding in *Wiggings* is therefore not, as Sanabria argues, that an employee's actions on behalf of an employer cannot be considered at all in evaluating the court's personal jurisdiction over *him*, but rather that only an employee's *own* contacts with the District can justify personal jurisdiction over the employee himself. *See Wiggings, Jr.*, 853 F. Supp. at 503. This is simply a specific application of the general principle that personal jurisdiction of one party cannot be based solely on the actions of another party. *See, e.g., Hanson*, 357 U.S. at 253.

This interpretation of *Wiggings* comports with this Court's holding in *Chase v. Pan-Pacific Broadcasting, Inc.*, 617 F. Supp. 1414, 1423 (D.D.C. 1985). In *Chase*, the Plaintiff sued an out-of-forum corporation, Pan-Pacific, and several of its employees, Iwasaki, Kinoshita, and Olson. *See* 617 F. Supp. at 1418. This Court declined to assert personal jurisdiction over some out-of-forum corporate employees, but sustained it for another. The deciding factor was each employee's level of personal contacts with the District. Olsen and Kinoshita, two of the defendant employees of Pan-Pacific, were found to have had so few contacts with the District that the court could not assert jurisdiction over them. *See* 617 F. Supp. at 1422. They were never in the District, and had little to no contact directly with company personnel in the District. *See id.* As with the defendant employees in *Wiggings*, the *Chase* court declined to assert personal jurisdiction over Olson and Kinoshita. *See id.* The *Chase* court did hold, however, that the third employee, Iwasaki, did have sufficient contact with the District to justify personal

jurisdiction over *him*. *See id.* Iwasaki "initiated the business relationship" on behalf of the defendant corporation, and hired the plaintiff. *Id.* Iwasaki directed the work in the District that was at issue in this case, made frequent telephone calls into the District on the corporation's business, and made two trips to the District to discuss the business out of which the case arose. *See id.* On these facts, the court held that Iwasaki had "purposely directed his activities at the residents of the District of Columbia and therefore maintained the necessary minimum contacts with this forum" to warrant personal jurisdiction over him *in his individual capacity*. *Id.*

Iwasaki raised the same fiduciary defense as Defendant Sanabria does in the instant case. *See Chase*, 617 F. Supp. at 1423. The *Chase* court observed that "[u]nder that doctrine, if a person acts for a corporation, and not for himself, the jurisdiction over the individual cannot be predicated on those acts." *Id.* The *Chase* court, however, rejected this defense. [6] The court observed that the District did not have any case law on this defense, and therefore looked to Maryland law to determine whether the defense was applicable. *See* 617 F. Supp. at 1420 ("in construing the District of Columbia longarm statute, federal and local courts often adopt the statutory constructions which the Virginia and Maryland courts place on their longarm statutes"); 617 F. Supp. at 1423 (finding no case law on the issue in the District or Virginia, but finding relevant authority in Maryland). The *Chase* court found that the Maryland Court of Appeals rejected the fiduciary shield doctrine in *Groom v. Margulies*, 265 A.2d at 255 (cited above) for the following reasons:

> The [longarm] statute makes the test of jurisdiction in the *present* circumstances, the transaction of *any* business without any qualification. [The defendant] did transact business in Maryland and Maryland has personal jurisdiction over him. His defense that he is not liable because he was acting for a disclosed corporate

---

[6] *Chase* did not specifically decide whether the fiduciary shield is valid in the case of a tort outside the District causing injury inside the District, but its reasoning is equally applicable under that scenario.

> principal goes to the merits of the case, not to the power of the
> court to make the adjudication.

*Chase*, 617 F. Supp. at 1423 (*quoting Groom*, 265 A.2d at 255) (emphasis in the original).  As in

*Chase*, the Defendant's argument here confuses and conflates a *defense on the merits* (i.e.,

defendant was acting as an agent of the employer and therefore not responsible) with the issue of

the Court's *authority* over the Defendant to adjudicate the dispute.  As the *Chase* court held, the

fiduciary shield doctrine is not a valid defense under District law against personal jurisdiction.

    Moreover, Defendant Sanabria's contacts with the District make this case easily

distinguishable from *Wiggings*, and more analogous to defendant Iwasake in *Chase*.  Unlike the

employee defendants in *Wiggings*, who never went into the District, Defendant Sanabria testified

that even as an employee of J&B Trucking, he went regularly into the District to deliver furniture

three to four times a month for approximately six years.  (Sanabria Dep. 19:20-20:10; 27:14-17,

Ex. 1.)  Indeed, his contacts with the District as an employee of J&B are far more extensive than

*Chase* defendant Iwasake's few meetings and telephone calls.  The holding in *Wiggings* is

therefore inapplicable to the facts of this instant case.

    Finally, even if the fiduciary shield doctrine were held to be a valid defense under District

law, it would be inapplicable on the facts of this instant case for the further reason that the

alleged tort did not arise out of a business transaction.  The fiduciary shield doctrine properly

applies (if at all) only to transactions of business in which the defendant employee is acting only

as the agent of the corporation, e.g., in entering into contracts.  "[T]he courts applying the

fiduciary shield doctrine hold that it is the corporation - and not the individual who acts for the

corporation - which is 'transacting business' under the relevant longarm statute."  *See id.* (*citing*

*Washington Scientific Industries v. American Safeguard Corp.*, 308 F. Supp. 736, 739

(D.Minn.1970) (agent does not "transact business")).  The Plaintiff's alleged injuries in this

instant case arose not out of a business transaction but rather out of Defendant Sanabria's neglect of Defendant J&B Trucking's vehicle. Since Defendant Sanabria was not transacting business as a fiduciary of J&B when he left the truck unattended, the fiduciary shield doctrine would be inapplicable in his case (even if it were a valid defense in the District).

### C.    The Plaintiffs should be granted leave to amend the pleadings consistent with the specific facts adduced from Defendant Sanabria's testimony.

Finally, the Defendant complains that the Plaintiff has failed to plead sufficiently specific facts to support this Court's personal jurisdiction. (Mot. Mem. ¶¶ 12-13.) The Plaintiff has now adduced more than sufficient facts from Defendant Sanabria's own testimony to support the Court's assertion of personal jurisdiction over him. "Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend pleadings 'shall be freely given when justice so requires.'" *Sinclair v. Kleindienst*, 645 F.2d 1080, 1085 (D.C. Cir. 1981) (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that a plaintiff should ordinarily be afforded "an opportunity to test his claim on the merits")). The proper remedy in this instant case would therefore not be dismissal, but rather leave to amend the pleadings accordingly.

## III.    Conclusion

For the foregoing reasons, the Plaintiffs respectfully request the Court to deny Defendant Sanabria's Motion to Dismiss for Lack of Personal Jurisdiction, and to grant the Plaintiffs leave to amend their Complaint accordingly.

Respectfully,

**KARP, FROSH, LAPIDUS, WIGODSKY & NORWIND, P.A.**


_____/s/_____
Steven VanGrack, Esq., D.C. Bar No. 223-339
Edward L. Norwind, Esq., D.C. Bar No. 936-393
Murray D. Scheel, Esq. D.C. Bar No. 490-012
2273 Research Boulevard
Suite 200
Rockville, Maryland 20850
Telephone: (301) 948-3800
Facsimile: (301) 948-5449

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH BAILEY *et ux.*                          :
                                               :
    Plaintiffs,                             :
                                               :
    v.                                      :          Case No.: 1:08-cv-00644-RMC
                                               :          Judge Rosemary M. Collyer
J & B TRUCKING SERVICES, INC., *et al.* :
                                               :
                                               :
    Defendants.                             :

## ORDER

This matter is before the Court on the Defendant Sanabria's Motion to Dismiss for Lack

of Personal Jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  Having considered the

Motion, the Opposition thereto, and the facts of the case, it is this _____ day of

_____, 2008,

**ORDERED**, that Defendant Sanabria's Motion to Dismiss for Lack of Personal

Jurisdiction under Federal Rule of Civil Procedure 12(b)(2) is hereby **DENIED**, and it is further

**ORDERED**, that the Plaintiffs have leave to amend the Complaint regarding the

allegations of fact concerning this Court's personal jurisdiction over Defendant Sanabria.


                                      _____

                                       Rosemary M. Collyer, Judge

cc:

Steven VanGrack, Esq.
Karp, Frosh, Lapidus, Wigodsky &  Norwind, P.A.
2273 Research Boulevard
Suite 200
Rockville, Maryland 20850

Neil J. MacDonald, Esquire
Hartel, Kane, Desantis, MacDonald & Howe, LLP
101 South Washington Street
Rockville, Maryland 20850

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


KEITH BAILEY, et al.          :

                              :

            Plaintiffs :

                              :

      vs.                     : Civil Action No.

                              : 1:08-cv-00644-RMC

J&B Trucking Service, Inc.,: Judge R. Collyer

et al.                        :

                              :

            Defendants :


                    Beltsville, Maryland

                    Tuesday, May 27, 2008


Deposition of:


       SERGIO R. SANABRIA

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the offices

of Hartel, Kane, DeSantis, MacDonald, & Howie,

LLP, 11720 Beltsville Drive, Suite 500,

Beltsville, Maryland 20705, before Renee A.

Feder, CSR, a Notary Public in and for the

State of Maryland, beginning at 1:08 p.m.,

when were present on behalf of the respective

parties:

**EXHIBIT**

tabbies®

1

Page 2

1  On behalf of the Plaintiffs:
2
3    BY:  EDWARD L. NORWIND, ESQ.
3       Karp, Frosh, Lapidus, Wigodsky
3       & Norwind, P.A.
4       2273 Research Boulevard, Suite 200
4       Rockville, Maryland 20850
5       (301)948-3800
5
6
7  On behalf of the Defendants:
8    BY:  MICHAEL A. DESANTIS, ESQ.
8       Hartel, Kane, DeSantis, MacDonald
9       & Howie, LLP
9       11720 Beltsville Drive, Suite 500
10      Beltsville, Maryland 20705
10      (301)486-1200
11
11
12  Also Present:  Claudine Varesi, Interpreter
12
13           + + +
14
14          C O N T E N T S
15
15  WITNESS:  SERGIO R. SANABRIA
16
17  EXAMINATION BY:          PAGE:
18    MR. NORWIND              3
19    MR. DeSantis            32
20        E X H I B I T S
21  DEPOSITION NO.    MARKED FOR IDENTIFICATION
22    None.

Page 3

1        P-R-O-C-E-E-D-I-N-G-S
2      (Thereupon, the interpreter was sworn to
3  translate the questions and answers accurately
4  and completely.)
5  Thereupon,
6        SERGIO R. SANABRIA
7  was called for examination by counsel and,
8  after having been duly sworn by the Notary,
9  was examined and testified as follows:
10    EXAMINATION BY COUNSEL FOR PLAINTIFFS
11    BY MR. NORWIND:
12    Q.    What is your name, sir?
13    A.    It is Sergio Rolando Sanabria.
14    Q.    And where do you live?
15    A.    I live in Hyattsville.  The whole
16  address would you like?
17    Q.    Please.
18    A.    5615 Queens Chapel Road,
19  Hyattsville P.G.  Zip code 20782.
20    Q.    How long have you lived there?
21    A.    I have lived there, I believe,
22  since 2003.

Page 4

1    Q.    What is your country?
2    A.    Guatemala.
3    Q.    When did you come to the United
4  States?
5    A.    I came in '99.
6    Q.    When you came to the United States
7  in 1999, where did you first live?
8    A.    The first place where I lived, I
9  lived for some time in Virginia, for some
10  months.  After that I came to Gaithersburg, to
11  live in Gaithersburg.
12    Q.    Where in Virginia did you live?
13    A.    I don't remember, to be very
14  honest.
15    Q.    What city?
16    A.    Arlington.
17    Q.    Who did you live with then?
18    A.    With some friends.
19    Q.    And then you moved to
20  Gaithersburg?
21    A.    Yes, I did move afterwards to
22  Gaithersburg.

Page 5

1    Q.    When did you move to Gaithersburg?
2    A.    I moved to Gaithersburg in -- I
3  will make a correction.  Like October of '99.
4    Q.    To Gaithersburg?
5    A.    Yes.  Gaithersburg.
6    Q.    And where in Gaithersburg did you
7  live?
8    A.    At Queen Orchard Boulevard.
9    Q.    Quince?
10    A.    Yes, Quince Orchard Boulevard.
11      THE INTERPRETER:  Mistake by
12  interpreter.
13      THE WITNESS:  I don't remember the
14  apartment number exactly.
15      BY MR. NORWIND:
16    Q.    And did you have that same address
17  in Gaithersburg until you moved to
18  Hyattsville?
19    A.    Yes.  I only lived at that place.
20    Q.    Do you have children who live with
21  you?
22    A.    No, my children are not living

Page 6

1  with me.
2      Q.   Are they in Guatemala?
3      A.   Yes.
4      Q.   Do you understand English?
5      A.   I understand fairly.  Not too
6  much.
7      Q.   Where do you work, sir?
8      A.   Right now I work in a company, an
9  installation company of, like, electronics,
10 dishwashers, microwaves, refrigerators.  We
11 take the deliveries and we make the
12 installations.
13     Q.   What is the name of the company
14 you work for?
15     A.   Donis Trucking Service.
16         THE INTERPRETER:  The interpreter
17 is asking the spelling of it.
18         THE WITNESS:  Donis Trucking
19 Service.  This is not the card, this is just
20 to show the name.  That is the way you write
21 Donis, D-O-N-I-S, Trucking Service.
22         BY MR. NORWIND:

Page 7

1      Q.   Is that the company card?
2      A.   No.
3      Q.   What was that?
4         MR. DeSANTIS:  You can show it to
5  him.
6         THE WITNESS:  It is the name of a
7  pastor but because she has the same name I am
8  showing it just for the spelling.
9         MR. DeSANTIS:  Now I understand,
10 too.
11        MR. NORWIND:  I get it.
12        BY MR. NORWIND:
13     Q.   Is this company owned by the
14 pastor or the pastor's husband?
15     A.   Yes.  The name of the company is
16 the pastor's name, but this is a personal
17 card.  But the company's name is Donis
18 Trucking Service.
19     Q.   So help me understand, who owns
20 the company?
21     A.   I do believe it is her, it is her.
22 She is the owner of the company.

Page 8

1      Q.   I see.  How long have you worked
2  for Donis Trucking?
3      A.   For them?  October, two years.
4  Approximately, two years.
5      Q.   Does this company have an office?
6      A.   It is just one truck.  Just one
7  truck that they have.  But they don't have an
8  office.
9      Q.   Who owns this truck?
10     A.   I work for a company but I am not
11 sure since I work with one of the assistants.
12 But I don't really, I am not -- I do not know
13 the relationship or how the business works.
14     Q.   Where do you report to work?
15     A.   With the person I work with, he
16 comes from Gaithersburg.  He comes and picks
17 me up.  Because I take the car to Democracy
18 Boulevard, or sometimes to Silver Spring and
19 he picks me up.
20     Q.   Help me understand.  You drive to
21 meet him?
22     A.   Yes, I drive from my house, from

Page 9

1  my home to go and meet him.
2      Q.   I see.  And sometimes you leave
3  the truck by Democracy Boulevard?
4      A.   The truck, somebody brings it from
5  Gaithersburg.  And when we finish working, he
6  takes the truck back and I take my car and go
7  back home.
8      Q.   So where do you meet the truck?
9      A.   On Democracy Boulevard, at Old
10 Georgetown Road.  I meet him on Democracy
11 Boulevard and Old Georgetown.
12     Q.   You park your car there?
13     A.   Yes, I park my car behind some
14 businesses.
15     Q.   Do you meet this truck in other
16 places like Silver Spring?
17     A.   Yes, sometime in Silver Spring, at
18 Georgia Avenue and East West Highway.  I park
19 my car there.  There is a church where I go,
20 so I leave my car there at the church.
21     Q.   What route do you take when you
22 are driving from your house to Democracy

Page 10

1  Boulevard to meet this truck?
2      A.  I take Queens Chapel Road and it
3  turns into Adelphi.  And Adelphi turns onto
4  University Boulevard.  I take 495 and then I
5  exit by Old Georgetown Road.
6      Q.  What route do you take from your
7  house to Georgia Avenue and East West Highway?
8      A.  I come from Queen Chapel Road.  I
9  take East West Highway.  That takes me to
10  Georgia Avenue.
11      Q.  Now, do you work full time?
12      A.  I work five days a week, sometimes
13  three, sometimes four.  Depending.
14      Q.  Where do you pick up the
15  appliances that you deliver and install?
16      A.  We go to the warehouse that is
17  close to Baltimore on Route 100.  I don't
18  remember the road but it is 170, because there
19  are some warehouses that are in that location,
20  in that area.
21      Q.  Whose warehouse is it?
22      A.  It is a delivery company, HBI.

Page 11

1  They distribute it to Home Depot, General
2  Electric, and some other companies that I
3  don't remember their names.
4      Q.  Tell me how it works with
5  deliveries.  For example, are these Home Depot
6  customers that you deliver to?
7      A.  Yes, they are clients from Home
8  Depot.
9          What I want to say is, the people
10  that are going to buy at Home Depot, they
11  offer -- some offers of installation and
12  people buy.  And when they buy, the delivery
13  arrives like three or four days after.
14      Q.  Other than Home Depot customers,
15  what other customers are you delivering to?
16      A.  General Electric Online on the
17  website.
18      Q.  Other companies, Maytag,
19  Whirlpool.  Any others?
20      A.  It is the brands that we deliver.
21  We deliver but for the other names I don't
22  remember.

Page 12

1      Q.  So, you, for Home Depot, for
2  example, you take out the old appliance and
3  you install the new one?
4      A.  Yes, that is correct.
5      Q.  Do you have a specific delivery
6  area?
7      A.  We deliver in all areas of
8  Baltimore, Frederick, West Virginia, and
9  sometimes in D.C., Washington.
10      Q.  How often do you deliver in D.C.?
11      A.  Sometimes three times a week.
12  Sometimes twice.  Depending because we don't
13  have specific routes.
14      Q.  On the average, are you making two
15  or three deliveries a week into D.C.?
16      A.  More.
17      Q.  How many more?
18      A.  When the truck goes to D.C. it
19  takes 12 deliveries, sometimes 14.  So 10 to
20  20 to 30.  Maybe 35 deliveries a week.
21      Q.  Into D.C.?
22      A.  Into D.C., yes.

Page 13

1      Q.  And is this something you do every
2  week in DC?
3      A.  Every week.  But other days, they
4  also send us elsewhere.
5      Q.  So, help me understand something.
6  Every week, on average, how many things do you
7  deliver?
8      A.  It is hard to tell to give you an
9  exact number.  There are clients that have
10  five appliances, maybe dishwasher, microwave.
11  It is several, maybe several for one client.
12  So I can't tell you a specific number.
13      Q.  On average, are you delivering 100
14  things per week?
15      A.  It is possible, yes.
16      Q.  Sometimes more and sometimes less?
17      A.  It would be less than 100.
18      Q.  What size truck is this?
19      A.  It is a 24 foot truck.  And 12,
20  6 feet and the length is 24 feet.
21      MR. DeSANTIS:  Is that 12 feet, 6
22  inches?

Page 14

```
1           THE WITNESS:  12 feet and
2   6 inches, correct.
3           BY MR. NORWIND:
4      Q.   So, sir, how many dishwasher boxes
5   can you fit on this truck at one time?
6      A.   Sometimes they give us 30, 30
7   pieces, and the truck goes full because they
8   go -- it takes several refrigerators and they
9   fill up the space.  When there are dishwashers
10  and smaller machines, it is possible there is
11  more space.  But, normally, there is whatever
12  the truck can carry, maybe 30 pieces.
13     Q.   And when they load the truck for
14  you --
15     A.   We fill it up.
16     Q.   So when you load the truck, are
17  these the deliveries for that one day?
18     A.   Yes.  For that same day.
19     Q.   And then you empty the truck?
20     A.   Yes, until we finish the route.
21     Q.   And then next day all over again?
22     A.   The next day we unload the old
```

Page 15

```
1   machines and we load the new ones.
2      Q.   I understand.
3           Are you understanding my questions
4   in English?
5      A.   Yes.
6      Q.   So, have you been working like
7   this, like you have told us about, for the
8   past two years or so?
9      A.   Yes.
10     Q.   Do you drive the truck?
11     A.   We both carry the truck, both of
12  us.  When I am tired, he drives.  When he is
13  tired, I drive.
14     Q.   So two guys?
15     A.   Yes.
16     Q.   And you know the streets in the
17  District of Columbia?
18     A.   We need to see the map.  However,
19  there are many roads that I do know.  We know.
20     Q.   Before working for Donis Delivery,
21  where else did you work?
22     A.   I was working for a company, an
```

Page 16

```
1   air conditioning company.  But because I did
2   some air conditioning -- I did some training
3   for air conditioning and I was like eight
4   months working.
5      Q.   And the name of that company?
6      A.   It is Ebenezer.
7      Q.   Where is it located?
8      A.   Route 95 and -- it is north.  It
9   is the road --
10     Q.   Laurel, Columbia?
11     A.   No.  Fulton.  Let me check.  I
12  have a card right here.
13          MR. NORWIND:  Fulton is 108.
14  Howard County, I think.
15          BY MR. NORWIND:
16     Q.   What kind of work did you do
17  there?
18     A.   I did there?
19     Q.   Yes.
20     A.   I used to help them pull the air
21  conditioner units, install them, install the
22  ducts, the air ducts, and the cleaning of the
```

Page 17

```
1   units, of the air units.
2      Q.   Did you go into the District of
3   Columbia for that job?
4      A.   Yes.  We went, probably three or
5   four times we went there.
6      Q.   Do you have any part time work?
7      A.   No.
8      Q.   So, full time with Donis now.  And
9   full time with the air conditioning company?
10     A.   Yes.
11     Q.   Did you have any part time work
12  when you worked for the air conditioning
13  company?
14     A.   No.
15     Q.   Now, before the air conditioning
16  company, where did you work?
17     A.   I worked with Belfort Furniture.
18     Q.   B-E-L-F-O-R-T?
19     A.   There is a picture here.
20          MR. DeSANTIS:  Counsel, he brought
21  a photograph of the -- it wasn't of the truck,
22  it was the house that he lived in.  But it has
```

Page 18

1  a photograph of the truck parked to the side.
2          MR. NORWIND: Okay. Thank you.
3  BY MR. NORWIND:
4      Q.    What kind of work for Belfort did
5  you do?
6      A.    **We delivered new furniture to the**
7  **houses.**
8      Q.    When did you work for Belfort?
9      A.    **I started working for Belfort in**
10  **2001. 2001.**
11          MR. DeSANTIS: Until when?
12          THE WITNESS: Until I started
13  working for the air conditioning company. May
14  I write it? Until 2007.
15          BY MR. NORWIND:
16      Q.    About six years?
17      A.    **That I worked for the company,**
18  **yes.**
19      Q.    Did you bring their truck home
20  with you all the time?
21      A.    **Sometimes.**
22      Q.    So, where is Belfort Company

Page 19

1  located?
2      A.    **It is route -- I am not sure if it**
3  **is --**
4      Q.    In Northern Virginia?
5      A.    **Yes, Northern Virginia.**
6      Q.    And you made deliveries for them?
7      A.    **In Virginia?**
8      Q.    Well, I am asking what type of
9  work exactly did you do for them.
10      A.    **I loaded the furniture, put it in**
11  **the truck, and I delivered to the clients.**
12      Q.    Did you drive the truck?
13      A.    **Yes, I did drive the truck.**
14      Q.    Where did you make these
15  deliveries?
16      A.    **I did these deliveries in**
17  **Manassas, Arlington, Warrenton. We went to**
18  **Southern Maryland, like La Plata. All the way**
19  **to parts of Frederick. And times we would go**
20  **into Washington. Three or four times a month**
21  **we would go to Washington.**
22      Q.    Washington, D.C. for deliveries?

Page 20

1      A.    **Yes.**
2      Q.    Did you pick up at a warehouse or
3  the company store?
4      A.    **The company's warehouse.**
5      Q.    So, is it correct, Mr. Sanabria,
6  that you made deliveries for Belfort into
7  Washington, D.C. for almost six years three or
8  four times a month?
9      A.    **Three to four times a month. Not**
10  **every week.**
11      Q.    Now, sir, I want to ask you a few
12  personal questions. Please don't take offense
13  because there is some information we need for
14  the lawsuit.
15          Okay?
16      A.    **Yes.**
17      Q.    So, Number 1, do you have a
18  driver's license?
19      A.    **Yes.**
20      Q.    From what state?
21      A.    **From the State of Maryland.**
22      Q.    Do you have a commercial driver's

Page 21

1  license?
2      A.    **No.**
3      Q.    Do you have any -- have there been
4  any criminal charges against you?
5      A.    **No.**
6      Q.    Have you ever been arrested?
7      A.    **No.**
8      Q.    Have you ever gotten parking
9  tickets?
10      A.    **Yes.**
11      Q.    Have you ever gotten traffic
12  tickets for speeding, not stopping at red
13  lights, things like that?
14      A.    **The traffic tickets in Virginia**
15  **with the radar.**
16      Q.    I see. Any tickets from the
17  District of Columbia?
18      A.    **In what time? Which time are you**
19  **referring to?**
20      Q.    2001 to now.
21      A.    **Only one that they gave me two**
22  **months ago. I was talking with somebody and**

Page 22

1  the moment he came out he saw me, he saw me
2  with the telephone.
3      Q.    A cell phone in the truck?
4      A.    Yes.
5      Q.    It happened to me, too.
6          Are you a citizen of the United
7  States?
8      A.    No.
9      Q.    Do you have a green card?
10     A.    No.
11     Q.    Have you applied for citizenship
12  or green card?
13     A.    No. I am waiting for the law
14  because I do pay my taxes, have a tax ID. So
15  I am basically waiting.
16     Q.    All right. Are there -- well,
17  what is your status?
18         MR. DeSANTIS: I am going to
19  object and I am going to assert a Fifth
20  Amendment privilege based on what has been
21  said to date.
22         Do not answer the question.

Page 23

1          THE WITNESS: Okay.
2          BY MR. NORWIND:
3      Q.    Have you ever contacted the INS in
4  Washington D.C. for any reason?
5      A.    No.
6      Q.    Have you ever applied for
7  citizenship to an office in Washington, D.C.?
8      A.    No.
9      Q.    Have you ever applied for a green
10  card to an office in Washington, D.C.?
11     A.    No, I have not applied.
12     Q.    Have you ever been asked to leave
13  this country by the government?
14     A.    No.
15     Q.    Okay, Mr. Sanabria, we have talked
16  about some of your work activities. Let me
17  ask you now about some of your personal
18  activities.
19         Do you ever go into the District
20  of Columbia?
21     A.    Only when I work.
22     Q.    Do you have any family members in

Page 24

1  the District of Columbia?
2      A.    No.
3      Q.    Do you ever go to visit friends in
4  Washington, D.C.?
5      A.    No, I do not have any.
6      Q.    Do you go to church in Washington,
7  D.C.?
8      A.    No, not in D.C.
9      Q.    Do you go to ballgames, soccer
10  games, D.C. United, baseball, anything in
11  D.C.?
12     A.    No. No.
13     Q.    Do you ever drive through the
14  District of Columbia when you are not working?
15     A.    No. No. I do not.
16     Q.    In going to any of your jobs, have
17  you ever taken 295 or 395 to get to work?
18         MR. DeSANTIS: I object.
19         Through the District?
20         MR. NORWIND: Yes.
21         MR. DeSANTIS: Through the
22  District.

Page 25

1          THE WITNESS: To get to work?
2          MR. NORWIND: Yes.
3          THE WITNESS: No.
4          BY MR. NORWIND:
5      Q.    Have you ever taken Rhode Island
6  Avenue to get to work in the District?
7      A.    No. No, not Rhode Island. I
8  don't take that road -- to get to the
9  District?
10     Q.    Yes.
11         MR. DeSANTIS: To get to work.
12         THE WITNESS: In the mornings or
13  evening?
14         MR. NORWIND: Morning or evening.
15         THE WITNESS: When we are going to
16  work. When we are going to work we take Riggs
17  Road. This one takes us all the way to D.C.
18         BY MR. NORWIND:
19     Q.    Riggs Road into Northeast D.C.?
20     A.    Yes, Northeast.
21     Q.    So, when you are traveling on
22  Riggs Road, is that when you go to work?

Page 26

1      A.    When we are coming with a loaded
2  truck, we travel on that road.
3      Q.    And this is for which job?
4      A.    For this, for the appliance job.
5           MR. DeSANTIS:  I will just put on
6  the record that the answer was not responsive
7  to the question as the answer seems to
8  indicate that he was working at the time he is
9  traveling on Riggs Road.
10          BY MR. NORWIND:
11     Q.    Sir, have you ever gotten medical
12 care from a hospital in D.C.?
13     A.    Medical treatment, no.
14     Q.    Has a doctor ever treated you in
15 D.C.?
16     A.    No.
17     Q.    Have you ever been hurt on the
18 job?
19     A.    Yes.
20     Q.    Did you have worker's comp
21 benefits?
22     A.    No.

Page 27

1      Q.    Did you ever get hurt in D.C.?
2      A.    No.  When I got hurt it was when I
3  was working at the warehouse in Belfort, at
4  Belfort.
5      Q.    We have talked about your full
6  time jobs.  We have talked about no part time
7  work.  Do you have any personal business?
8      A.    No.
9      Q.    You don't sell anything.  Correct?
10     A.    I do not sell anything.
11     Q.    Do you shop in stores in the
12 District of Columbia?
13     A.    No.
14     Q.    Who were you working for in
15 January, 2006?
16     A.    I was working for J&B Trucking
17 Service.
18     Q.    What period of time did you work
19 for J&B?
20     A.    From 2001 to 2007.
21     Q.    Did J&B do deliveries for Belfort?
22     A.    Yes.

Page 28

1      Q.    So please help me understand
2  something.  For the entire time that you made
3  deliveries for Belfort, were you working for
4  J&B?
5      A.    In Belfort?  Could you please
6  repeat the question?
7      Q.    Okay.  I will try.  Let me
8  regroup.
9           When you made deliveries for
10 Belfort, is that when you were working for J&B
11 Trucking?
12     A.    Yes.
13     Q.    So J&B did the deliveries for
14 Belfort.  Is that right?
15     A.    For Belfort.
16     Q.    Like a delivery contractor?
17     A.    Yes, like a contractor.
18     Q.    Is that correct?
19     A.    Yes.
20     Q.    So you worked for J&B from 2001 to
21 2007.  Is that right?
22     A.    Yes.

Page 29

1      Q.    Are you a member of a union?
2      A.    No.  A union is like a syndicate,
3  a workers union?
4      Q.    Yes.
5      A.    No, I am not a member.
6      Q.    Sir, do you pay taxes for the
7  District of Columbia?
8      A.    I write my taxes.  I do.
9      Q.    To the District?
10     A.    But I couldn't tell you -- I do
11 not know if it is for the District or for
12 where.
13     Q.    Okay, Mr. Sanabria, you have the
14 picture showing us the Belfort truck at your
15 home.
16     A.    It is not my home.  But it is
17 where I used to park the truck because I leave
18 late from work and it was too tiring to go get
19 the car to the place where I used to park it
20 so I would go home.
21     Q.    Because it was a long workday?
22     A.    Yes.

Page 30

1    Q.   So, where is this located?  What
2  city is the house in?
3    A.   Hyattsville.
4    Q.   So, on your picture -- help your
5  lawyer understand something.  Does this truck
6  belong to J&B?
7    A.   That truck, yes, it does.
8    Q.   So it says Belfort on the truck,
9  but it is a J&B truck.  Is that correct?
10   A.   The name of Belfort, they just put
11 it as an advertisement.  But the truck belongs
12 to J&B.
13   Q.   Okay.  So, your paycheck came from
14 J&B and not from Belfort?
15   A.   Yes, my check.
16   Q.   You told us that Belfort is in
17 Chantilly or Reston.  Is that correct?
18   A.   Herndon or Reston, but I don't
19 remember exactly.
20   Q.   Tell us the route you took from
21 home to work at Belfort.
22   A.   Because we used to go to different

Page 31

1  locations, sometimes I would take 495 to
2  take -- to drop my companion off at Georgia
3  Avenue, and from there I would go home.
4  Sometimes I would end up by Frederick, but I
5  had to come down here, and then I would go
6  and -- I would either park the truck or go
7  home.
8    Q.   So, 495, you started on 495, to go
9  to work at Belfort?
10   A.   In the morning, yes.  I take 495.
11   Q.   And where do you get off of 495?
12   A.   I exit on the toll road, taking
13 the toll road, and then 28 North.  Until -- I
14 would take another road but I don't remember
15 the name exactly to get to the warehouse.
16       MR. NORWIND:  That might be all I
17 have.  Let me just regroup with my notes.  We
18 will take a short break.
19       MR. DeSANTIS:  Do you mind if I
20 clarify a couple of things while you look at
21 your notes?
22       MR. NORWIND:  No.

Page 32

1        EXAMINATION BY COUNSEL FOR DEFENDANTS
2          BY MR. DeSANTIS:
3      Q.   Have you ever lived in the
4  District of Columbia since coming from
5  Guatemala?
6      A.   No, I have not.
7      Q.   When you say you didn't know
8  whether you pay taxes to the District or
9  whoever, were you paying income taxes?
10     A.   I pay my taxes.  I know that I
11 send two letters, one for one, side one to the
12 other, but I don't know exactly.
13     Q.   When you pay taxes, is that for
14 the money that you earn?
15     A.   How is that?
16     Q.   Do you know what federal income
17 taxes are?
18     A.   No.
19     Q.   You had been asked about --
20       THE INTERPRETER:  Can I rephrase
21 it so he will understand?
22       The taxes that you pay?

Page 33

1        THE WITNESS:  They give me a form
2  from the company so I go to -- somebody does
3  the taxes for me.  I report my expenses,
4  everything that I spend, my tools and
5  everything.  And so they do the taxes for me,
6  the accountant does the taxes for me.
7          BY MR. DeSANTIS:
8      Q.   Okay.  All right.  And this Riggs
9  Road, you testified previously that you
10 traveled on Riggs Road in Washington on your
11 deliveries?
12     A.   Yes, usually we take Riggs Road.
13     Q.   I want to clarify, did you ever
14 take Riggs Road, did you ever take Riggs Road
15 leaving home or going back home after you
16 finished work?
17       THE INTERPRETER:  The interpreter
18 is going to repeat.
19       MR. DeSANTIS:  Let me rephrase.
20          BY MR. DeSANTIS:
21     Q.   Did you ever use Riggs Road in
22 D.C. other than when you were making

Page 34

1. deliveries?
2.    **A.    I can take Riggs Road in parts.**
3. **But I am trying to say at this time --**
4.        THE INTERPRETER:  The attorney is
5. not asking when he is going to work, like he
6. is going on his free time to D.C.?
7.        THE WITNESS:  Sometimes I take
8. Riggs Road when I am not going to work.
9.        MR. DeSANTIS:  That clarifies it.
10.        MR. NORWIND:  I don't have
11. anything else.
12.        Thank for your time, Mr. Sanabria.
13.        (Whereupon, at 2:01 p.m., the
14. deposition was concluded.)
15.            + + +
16.
17.
18.
19.
20.
21.
22.

Page 35

1    CERTIFICATE FOR READING AND SIGNING
2
3        I hereby certify that I have read
4  and examined the within transcript and the
5  same is a true and accurate record of the
6  testimony given by me.
7        Any corrections I have listed on
8  the separate errata sheet enclosed, indicating
9  the page and line number of each correction.
10
11
12
13
13        _____
14        SERGIO R. SANABRIA
14
15
15        _____
16        Date
16
17
18
19
20
21
22

Page 36

1                    CERTIFICATE OF NOTARY PUBLIC

2                         I, Renee A. Feder, the officer

3        before whom the foregoing deposition was

4        taken, do hereby certify that the witness,

5        whose testimony appears in the foregoing

6        deposition, was duly sworn by me; that the

7        testimony of said witness was taken by me in

8        shorthand and thereafter reduced to computer

9        type under my direction; that said deposition

10       is a true record of the testimony given by

11       said witness; that I am neither counsel for,

12       related to, nor employed by any of the parties

13       to which this deposition was taken; and

14       further, that I am not a relative or employee

15       of any attorney or counsel employed by the

16       parties hereto, nor financially or otherwise

17       interested in the outcome of the action.

18

19                         _____

19                         Notary Public in and for

20                         The State of Maryland

21       My Commission Expires:

21       September 1, 2008

22

## A

accountant 33:6
accurate 35:5
accurately 3:3
action 1:5 36:17
activities 23:16,18
address 3:16 5:16
Adelphi 10:3,3
advertisement 30:11
ago 21:22
air 16:1,2,3,20,22 17:1
  17:9,12,15 18:13
al 1:3,7
Amendment 22:20
answer 22:22 26:6,7
answers 3:3
apartment 5:14
appears 36:5
appliance 12:2 26:4
appliances 10:15 13:10
applied 22:11 23:6,9
  23:11
Approximately 8:4
area 10:20 12:6
areas 12:7
Arlington 4:16 19:17
arrested 21:6
arrives 11:13
asked 23:12 32:19
asking 6:17 19:8 34:5
assert 22:19
assistants 8:11
attorney 34:4 36:15
Avenue 9:18 10:7,10
  25:6 31:3
average 12:14 13:6,13

## B

B 2:20
back 9:6,7 33:15
BAILEY 1:3
ballgames 24:9
Baltimore 10:17 12:8
baseball 24:10
based 22:20
basically 22:15
beginning 1:19
behalf 1:20 2:1,7
Belfort 17:17 18:4,8,9
  18:22 20:6 27:3,4,21
  28:3,5,10,14,15
  29:14 30:8,10,14,16
  30:21 31:9
believe 3:21 7:21
belong 30:6
belongs 30:11
Beltsville 1:9,16,17 2:9
  2:10
benefits 26:21

Boulevard 2:4 5:8,10
  8:18 9:3,9,11 10:1,4
boxes 14:4
brands 11:20
break 31:18
bring 18:19
brings 9:4
brought 17:20
business 8:13 27:7
businesses 9:14
buy 11:10,12,12
B-E-L-F-O-R-T 17:18

## C

C 2:14
called 1:13 3:7
car 8:17 9:6,12,13,19
  9:20 29:19
card 6:19 7:1,17 16:12
  22:9,12 23:10
care 26:12
carry 14:12 15:11
cell 22:3
CERTIFICATE 35:1
  36:1
certify 35:3 36:4
Chantilly 30:17
Chapel 3:18 10:2,8
charges 21:4
check 16:11 30:15
children 5:20,22
church 9:19,20 24:6
citizen 22:6
citizenship 22:11 23:7
city 4:15 30:2
Civil 1:5
clarifies 34:9
clarify 31:20 33:13
Claudine 2:12
cleaning 16:22
client 13:11
clients 11:7 13:9 19:11
close 10:17
code 3:19
Collyer 1:6
Columbia 1:2 15:17
  16:10 17:3 21:17
  23:20 24:1,14 27:12
  29:7 32:4
come 4:3 10:8 31:5
comes 8:16,16
coming 26:1 32:4
commercial 20:22
Commission 36:21
comp 26:20
companies 11:2,18
companion 31:2
company 6:8,9,13 7:1
  7:13,15,20,22 8:5,10

10:22 15:22 16:1,5
  17:9,13,16 18:13,17
  18:22 20:3 33:2
company's 7:17 20:4
completely 3:4
computer 36:8
concluded 34:14
conditioner 16:21
conditioning 16:1,2,3
  17:9,12,15 18:13
contacted 23:3
contractor 28:16,17
correct 12:4 14:2 20:5
  27:9 28:18 30:9,17
correction 5:3 35:9
corrections 35:7
counsel 1:13 3:7,10
  17:20 32:1 36:11,15
country 4:1 23:13
County 16:14
couple 31:20
COURT 1:1
criminal 21:4
CSR 1:18
customers 11:6,14,15

## D

date 22:21 35:16
day 14:17,18,21,22
days 10:12 11:13 13:3
DC 13:2
Defendants 1:8 2:7
  32:1
deliver 10:15 11:6,20
  11:21 12:7,10 13:7
delivered 18:6 19:11
deliveries 6:11 11:5
  12:15,19,20 14:17
  19:6,15,16,22 20:6
  27:21 28:3,9,13
  33:11 34:1
delivering 11:15 13:13
delivery 10:22 11:12
  12:5 15:20 28:16
Democracy 8:17 9:3,9
  9:10,22
Depending 10:13
  12:12
deposition 1:10 2:21
  34:14 36:3,6,9,13
Depot 11:1,5,8,10,14
  12:1
DeSantis 1:15 2:8,8,19
  7:4,9 13:21 17:20
  18:11 22:18 24:18,21
  25:11 26:15 31:19
  32:2 33:7,19,20 34:9
different 30:22
direction 36:9

dishwasher 13:10 14:4
dishwashers 6:10 14:9
distribute 11:1
District 1:1,2 15:17
  17:2 21:17 23:19
  24:1,14,19,22 25:6,9
  27:12 29:7,9,11 32:4
  32:8
doctor 26:14
Donis 6:15,18,21 7:17
  8:2 15:20 17:8
drive 1:16 2:9 8:20,22
  15:10,13 19:12,13
  24:13
driver's 20:18,22
drives 15:12
driving 9:22
drop 31:2
ducts 16:22,22
duly 3:8 36:6
D-O-N-I-S 6:21
D.C 12:9,10,15,18,21
  12:22 19:22 20:7
  23:4,7,10 24:4,7,8,10
  24:11 25:17,19 26:12
  26:15 27:1 33:22
  34:6

## E

E 2:14,20
earn 32:14
East 9:18 10:7,9
Ebenezer 16:6
EDWARD 2:2
eight 16:3
either 31:6
Electric 11:2,16
electronics 6:9
employed 36:12,15
employee 36:14
empty 14:19
enclosed 35:8
English 6:4 15:4
entire 28:2
errata 35:8
ESQ 2:2,8
et 1:3,7
evening 25:13,14
exact 13:9
exactly 5:14 19:9 30:19
  31:15 32:12
examination 1:13 2:17
  3:7,10 32:1
examined 3:9 35:4
example 11:5 12:2
exit 10:5 31:12
expenses 33:3
Expires 36:21

## F

fairly 6:5
family 23:22
Feder 1:18 36:2
federal 32:16
feet 13:20,20,21 14:1
Fifth 22:19
fill 14:9,15
financially 36:16
finish 9:5 14:20
finished 33:16
first 4:7,8
fit 14:5
five 10:12 13:10
follows 3:9
foot 13:19
foregoing 36:3,5
form 33:1
four 10:13 11:13 17:5
  19:20 20:8,9
Frederick 12:8 19:19
  31:4
free 34:6
friends 4:18 24:3
Frosh 2:3
full 10:11 14:7 17:8,9
  27:5
Fulton 16:11,13
furniture 17:17 18:6
  19:10
further 36:14

## G

Gaithersburg 4:10,11
  4:20,22 5:1,2,4,5,6
  5:17 8:16 9:5
games 24:10
General 11:1,16
Georgetown 9:10,11
  10:5
Georgia 9:18 10:7,10
  31:2
give 13:8 14:6 33:1
given 35:6 36:10
go 9:1,6,19 10:16 14:8
  17:2 19:19,21 23:19
  24:3,6,9 25:22 29:18
  29:20 30:22 31:3,5,6
  31:8 33:2
goes 12:18 14:7
going 11:10 22:18,19
  24:16 25:15,16 33:15
  33:18 34:5,6,8
gotten 21:8,11 26:11
government 23:13
green 22:9,12 23:9
Guatemala 4:2 6:2
  32:5
guys 15:14

## H

H 2:20
happened 22:5
hard 13:8
Hartel 1:15 2:8
HBI 10:22
help 7:19 8:20 13:5
    16:20 28:1 30:4
hereto 36:16
Herndon 30:18
Highway 9:18 10:7,9
home 9:1,7 11:1,5,7,10
    11:14 12:1 18:19
    29:15,16,20 30:21
    31:3,7 33:15,15
honest 4:14
hospital 26:12
house 8:22 9:22 10:7
    17:22 30:2
houses 18:7
Howard 16:14
Howie 1:15 2:9
hurt 26:17 27:1,2
husband 7:14
Hyattsville 3:15,19
    5:18 30:3

## I

ID 22:14
IDENTIFICATION
    2:21
inches 13:22 14:2
income 32:9,16
indicate 26:8
indicating 35:8
information 20:13
INS 23:3
install 10:15 12:3
    16:21,21
installation 6:9 11:11
installations 6:12
interested 36:17
interpreter 2:12 3:2
    5:11,12 6:16,16
    32:20 33:17,17 34:4
Island 25:5,7

## J

January 27:15
job 17:3 26:3,4,18
jobs 24:16 27:6
Judge 1:6
J&B 1:6 27:16,19,21
    28:4,10,13,20 30:6,9
    30:12,14

## K

Kane 1:15 2:8
Karp 2:3

## KEITH 1:3
kind 16:16 18:4
know 8:12 15:16,19,19
    29:11 32:7,10,12,16

## L

L 2:2
La 19:18
Lapidus 2:3
late 29:18
Laurel 16:10
law 22:13
lawsuit 20:14
lawyer 30:5
leave 9:2,20 23:12
    29:17
leaving 33:15
length 13:20
letters 32:11
license 20:18 21:1
lights 21:13
line 35:9
listed 33:7
live 3:14,15 4:7,11,12
    4:17 5:7,20
lived 3:20,21 4:8,9
    5:19 17:22 32:3
living 5:22
LLP 1:16 2:9
load 14:13,16 15:1
loaded 19:10 26:1
located 16:7 19:1 30:1
location 10:19
locations 31:1
long 3:20 8:1 29:21
look 31:20

## M

MacDonald 1:15 2:8
machines 14:10 15:1
making 12:14 33:22
Manassas 19:17
map 15:18
MARKED 2:21
Maryland 1:9,17,19
    2:4,10 19:18 20:21
    36:20
Maytag 11:18
medical 26:11,13
meet 8:21 9:1,8,10,15
    10:1
member 29:1,5
members 23:22
MICHAEL 2:8
microwave 13:10
microwaves 6:10
mind 31:19
Mistake 5:11
moment 22:1

money 32:14
month 19:20 20:8,9
months 4:10 16:4
    21:22
morning 25:14 31:10
mornings 25:12
move 4:21 5:1
moved 4:19 5:2,17

## N

N 2:14,14
name 3:12 6:13,20 7:6
    7:7,15,16,17 16:5
    30:10 31:15
names 11:3,21
need 15:18 20:13
neither 36:11
new 12:3 15:1 18:6
normally 14:11
north 16:8 31:13
Northeast 25:19,20
Northern 19:4,5
Norwind 2:2,3,18 3:11
    5:15 6:22 7:11,12
    14:3 16:13,15 18:2,3
    18:15 23:2 24:20
    25:2,4,14,18 26:10
    31:16,22 34:10
Notary 1:18 3:8 36:1
    36:19
notes 31:17,21
notice 1:14
number 5:14 13:9,12
    20:17 35:9

## O

O 2:14
object 22:19 24:18
October 5:3 8:3
offense 20:12
offer 11:11
offers 11:11
office 8:5,8 23:7,10
officer 36:2
offices 1:14
Okay 18:2 20:15 23:1
    23:15 28:7 29:13
    30:13 33:8
old 9:9,11 10:5 12:2
    14:22
ones 15:1
Online 11:16
oral 1:13
Orchard 5:8,10
outcome 36:17
owned 7:13
owner 7:22
owns 7:19 8:9

## P

page 2:17 35:9
park 9:12,13,18 29:17
    29:19 31:6
parked 18:1
parking 21:8
part 17:6,11 27:6
parties 1:21 36:12,16
parts 19:19 34:2
pastor 7:7,14
pastor's 7:14,16
pay 22:14 29:6 32:8,10
    32:13,22
paycheck 30:13
paying 32:9
people 11:9,12
period 27:18
person 8:15
personal 7:16 20:12
    23:17 27:7
phone 22:3
photograph 17:21 18:1
pick 10:14 20:2
picks 8:16,19
picture 17:19 29:14
    30:4
pieces 14:7,12
place 4:8 5:19 29:19
places 9:16
Plaintiffs 1:4,14 2:1
    3:10
Plata 19:18
please 3:17 20:12 28:1
    28:5
possible 13:15 14:10
present 1:20 2:12
previously 33:9
privilege 22:20
probably 17:4
Public 1:18 36:1,19
pull 16:20
pursuant 1:14
put 19:10 26:5 30:10
P-R-O-C-E-E-D-I-N...
    3:1
P.A 2:3
P.G 3:19
p.m 1:19 34:13

## Q

Queen 5:8 10:8
Queens 3:18 10:2
question 22:22 26:7
    28:6
questions 3:3 15:3
    20:12
Quince 5:9,10

## R

R 1:6,12 2:15 3:6 35:14
radar 21:15
read 35:3
READING 35:1
really 8:12
reason 23:4
record 26:6 35:5 36:10
red 21:12
reduced 36:8
referring 21:19
refrigerators 6:10 14:8
regroup 28:8 31:17
related 36:12
relationship 8:13
relative 36:14
remember 4:13 5:13
    10:18 11:3,22 30:19
    31:14
Renee 1:17 36:2
repeat 28:6 33:18
rephrase 32:20 33:19
report 8:14 33:3
Research 2:4
respective 1:20
responsive 26:6
Reston 30:17,18
Rhode 25:5,7
Riggs 25:16,19,22 26:9
    33:8,10,12,14,14,21
    34:2,8
right 6:8 16:12 22:16
    28:14,21 33:8
road 3:18 9:10 10:2,5,8
    10:18 16:9 25:8,17
    25:19,22 26:2,9
    31:12,13,14 33:9,10
    33:12,14,14,21 34:2
    34:8
roads 15:19
Rockville 2:4
Rolando 3:13
route 9:21 10:6,17
    14:20 16:8 19:2
    30:20
routes 12:13

## S

S 2:14,20
Sanabria 1:12 2:15 3:6
    3:13 20:5 23:15
    29:13 34:12 35:14
saw 22:1,1
says 30:8
see 8:1 9:2 15:18 21:16
sell 27:9,10
send 13:4 32:11
separate 35:8
September 36:21
Sergio 1:12 2:15 3:6,13

35:14
Service 1:6 6:15,19,21
    7:18 27:17
sheet 35:8
shop 27:11
short 31:18
shorthand 36:8
show 6:20 7:4
showing 7:8 29:14
side 18:1 32:11
SIGNING 35:1
Silver 8:18 9:16,17
sir 3:12 6:7 14:4 20:11
    26:11 29:6
six 18:16 20:7
size 13:18
smaller 14:10
soccer 24:9
somebody 9:4 21:22
    33:2
Southern 19:18
space 14:9,11
specific 12:5,13 13:12
speeding 21:12
spelling 6:17 7:8
spend 33:4
Spring 8:18 9:16,17
started 18:9,12 31:8
state 1:19 20:20,21
    36:20
States 1:1 4:4,6 22:7
status 22:17
stopping 21:12
store 20:3
stores 27:11
streets 15:16
Suite 1:16 2:4,9
sure 8:11 19:2
sworn 3:2,8 36:6
syndicate 29:2

---
**T**
---
T 2:14,14,20
take 6:11 8:17 9:6,21
    10:2,4,6,9 12:2 20:12
    25:8,16 31:1,2,10,14
    31:18 33:12,14,14
    34:2,7
taken 24:17 25:5 36:4
    36:7,13
takes 9:6 10:9 12:19
    14:8 25:17
talked 23:15 27:5,6
talking 21:22
tax 22:14
taxes 22:14 29:6,8 32:8
    32:9,10,13,17,22
    33:3,5,6
telephone 22:2

tell 11:4 13:8,12 29:10
    30:20
testified 3:9 33:9
testimony 35:6 36:5,7
    36:10
Thank 18:2 34:12
things 13:6,14 21:13
    31:20
think 16:14
three 10:13 11:13
    12:11,15 17:4 19:20
    20:7,9
tickets 21:9,12,14,16
time 4:9 10:11 14:5
    17:6,8,9,11 18:20
    21:18,18 26:8 27:6,6
    27:18 28:2 34:3,6,12
times 12:11 17:5 19:19
    19:20 20:8,9
tired 15:12,13
tiring 29:18
told 15:7 30:16
toll 31:12,13
tools 33:4
traffic 21:11,14
training 16:2
transcript 35:4
translate 3:3
travel 26:2
traveled 33:10
traveling 25:21 26:9
treated 26:14
treatment 26:13
truck 8:6,7,9 9:3,4,6,8
    9:15 10:1 12:18
    13:18,19 14:5,7,12
    14:13,16,19 15:10,11
    17:21 18:1,19 19:11
    19:12,13,22 26:2
    29:14,17 30:5,7,8,9
    30:11 31:6
Trucking 1:6 6:15,18
    6:21 7:18 8:2 27:16
    28:11
true 35:5 36:10
try 28:7
trying 34:3
Tuesday 1:9
turns 10:3,3
twice 12:12
two 8:3,4 12:14 15:8
    15:14 21:21 32:11
type 19:8 36:9

---
**U**
---
understand 6:4,5 7:9
    7:19 8:20 13:5 15:2
    28:1 30:5 32:21
understanding 15:3

union 29:1,2,3
United 1:1 4:3,6 22:6
    24:10
units 16:21 17:1,1
University 10:4
unload 14:22
use 33:21
usually 33:12

---
**V**
---
Varesi 2:12
Virginia 4:9,12 12:8
    19:4,5,7 21:14
visit 24:3
vs 1:5

---
**W**
---
waiting 22:13,15
want 11:9 20:11 33:13
warehouse 10:16,21
    20:2,4 27:3 31:15
warehouses 10:19
Warrenton 19:17
Washington 12:9
    19:20,21,22 20:7
    23:4,7,10 24:4,6
    33:10
wasn't 17:21
way 6:20 19:18 25:17
website 11:17
week 10:12 12:11,15
    12:20 13:2,3,6,14
    20:10
went 17:4,5 19:17
West 9:18 10:7,9 12:8
Whirlpool 11:19
Wigodsky 2:3
witness 2:15 5:13 6:18
    7:6 14:1 18:12 23:1
    25:1,3,12,15 33:1
    34:7 36:4,7,11
work 6:7,8,14 8:10,11
    8:14,15 10:11,12
    15:21 16:16 17:6,11
    17:16 18:4,8 19:9
    23:16,21 24:17 25:1
    25:6,11,16,16,22
    27:7,18 29:18 30:21
    31:9 33:16 34:5,8
workday 29:21
worked 8:1 17:12,17
    18:17 28:20
workers 29:3
worker's 26:20
working 9:5 15:6,20
    15:22 16:4 18:9,13
    24:14 26:8 27:3,14
    27:16 28:3,10
works 8:13 11:4

write 6:20 18:14 29:8

---
**X**
---
X 2:20

---
**Y**
---
years 8:3,4 15:8 18:16
    20:7

---
**Z**
---
Zip 3:19

---
**1**
---
1 20:17 36:21
1:08 1:19
1:08-cv-00644-RMC
    1:6
10 12:19
100 10:17 13:13,17
108 16:13
11720 1:16 2:9
12 12:19 13:19,21 14:1
14 12:19
170 10:18
1999 4:7

---
**2**
---
2:01 34:13
20 12:20
200 2:4
2001 18:10,10 21:20
    27:20 28:20
2003 3:22
2006 27:15
2007 18:14 27:20
    28:21
2008 1:9 36:21
20705 1:17 2:10
20782 3:19
20850 2:4
2273 2:4
24 13:19,20
27 1:9
28 31:13
295 24:17

---
**3**
---
3 2:18
30 12:20 14:6,6,12
301)486-1200 2:10
301)948-3800 2:5
32 2:19
35 12:20
395 24:17

---
**4**
---
495 10:4 31:1,8,8,10,11

---
**5**
---

500 1:16 2:9
5615 3:18

---
**6**
---
6 13:20,21 14:2

---
**9**
---
95 16:8
99 4:5 5:3

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KEITH BAILEY                                          )
and JACQUELINE BAILEY                                 )
4837 12th Street, NE                        )
Washington, DC  20017                                 )
                                                      )
                        *Plaintiffs,*                 )
                                                      )
        v.                                            )        Civil Action No._____
                                                      )
J & B TRUCKING SERVICES, INC.                         )
8622 Watershed Court                                  )
Gaithersburg, MD  20877,                              )
                                                      )
SERVE:      Jose B. Lainez                            )
            8622 Watershed Court                      )
            Gaithersburg, MD 20877                    )
            [Registered Agent]                        )
                                                      )
        and                                           )
                                                      )
SERGIO ROLANDO SANABRIA                               )
535 Summit Hall Road                                  )
Gaithersburg, MD  20877                               )
                                                      )
                        *Defendants.*                 )


## COMPLAINT

### I.        NATURE AND SUMMARY OF THE ACTION

COME NOW the Plaintiffs, Keith Bailey and Jacqueline Bailey, by and through

their attorneys, Edward L. Norwind, Esquire, Steven VanGrack, Esquire, Murray D.

Scheel, Esquire, and the law firm of Karp, Frosh, Lapidus, Wigodsky & Norwind, P.A.,

and hereby file this action against the above named Defendants.  The action arises out of

the negligent conduct of J&B Trucking Services, Inc., by and through its agent and

1

EXHIBIT
2

employee, Sergio Rolando Sanabria, a commercial vehicle driver who, during the performance of his duties as driver of a large moving truck belonging to J&B Trucking, left the vehicle unattended and running outside his home in Maryland. During that time, Onorio T. Cifuentes stole the truck, drove it into the District of Columbia, and crashed it in the District into Plaintiff Keith Bailey's vehicle, directly and proximately causing serious and permanent injuries to Mr. Bailey.

Plaintiffs Keith Bailey and Jacqueline Bailey, through their undersigned counsel, hereby allege the following:

## II.  JURISDICTION, PARTIES, AND FORUM

1.     This Court has jurisdiction over this matter pursuant to D.C. Code § 11-921(a)(6) (2001).

2.     Upon information and belief, Defendant J&B Trucking Services, Inc., is a corporation organized and existing under the laws of Maryland with its principal place of business in Gaithersburg, Maryland.

3.     Upon information and belief, Defendant Sergio Rolando Sanabria has been a resident of the state of Maryland in Hyattsville at all material times.

4.     Upon further information and belief, Defendant J&B Trucking Services, Inc., has at all material times conducted its business, in part, by regularly driving in and through the District of Columbia, making contracts to deliver goods to District residents, and making regular deliveries in the District, and has other regular and substantial contact with the District of Columbia. In this instant case, it also caused injury in the District through the negligence of its agent or employee Sergio Rolando Sanabria outside the

2

District.

5.      Upon further information and belief, Defendant Sergio Rolando Sanabria, as an employee or agent of Defendant J&B Trucking Services, Inc., has at all material times regularly driven in and through the District of Columbia and has made regular deliveries in the District in the course of his employment or agency, and has had other substantial contacts with the District of Columbia. Further, in this instant case he caused severe injury and damages in the District because of his negligence outside the District.

6.      This Court therefore has personal jurisdiction over Defendants J&B Trucking Services, Inc., and Sergio Rolando Sanabria, pursuant to D.C. Code Sec. 13-423(a)(1), (2), and (4) (2001), because, at all times relevant through to the present, they have regularly transacted business and have contracted to supply services in the District, and in this instant case caused tortious injury in the District by an act or omission outside the District, and have had other substantial contacts with the District.

7.      Plaintiffs Keith Bailey and Jacqueline Bailey have been residents of the District of Columbia at all times material to this case.

8.      Many of the acts alleged in this Complaint arose in the District of Columbia, including the violent collision, the resulting injuries and damages to residents of the District of Columbia, and the ongoing related medical treatment of Plaintiff Keith Bailey.

9.      The related criminal action of *United States v. Onorio T. Cifuentes* (Case No. F-155-06) has been finally adjudicated in this Court's Criminal Division.

10.      Application of the District of Columbia's law is appropriate due to the District of Columbia's prevailing governmental interest in this case, arising, in part, out of

3

the dangerous and tortious nature of the Defendants' alleged conduct, and the resulting serious injuries and damages occurring in the District to District residents.

11.     For the forgoing reasons, this Court is the proper and convenient forum for this action.

### III.     FACTUAL ALLEGATIONS

12.     On January 7, 2006, Defendant Sergio Rolando Sanabria was the agent or employee of J&B Trucking Services, Inc., acting within the scope of his employment or agency and with the permission of Defendant J & B Trucking Services, Inc.

13.     Upon information and belief, at approximately 4:00 a.m., the same date, Mr. Sanabria was at his home on the 1600 block of Queens Chapel Road in Hyattsville, Maryland, preparing to begin his delivery route for J&B Trucking Services, Inc.  For purposes of making those deliveries, he was in possession of a white Isuzu box truck (Maryland license plate number 83L092), owned by J&B Trucking Services, Inc.

14.     At around the same time and date, upon information and belief, Mr. Sanabria entered the truck in question, started the ignition, then exited the truck while it warmed up and went back inside his home, leaving the vehicle running while unattended, with the keys in the ignition.

15.     It was reasonably foreseeable that the truck could and would be stolen under such circumstances.

16.     While Mr. Sanabria was in his home, Onorio T. Cifunetes stole the truck, and fled from the scene at a high rate of speed into the District of Columbia, westbound on Michigan Avenue, N.E.

17.     When Mr. Sanabria came back later to where he had left the truck, he found

4

that the truck had been taken.

18.    Subsequently, Mr. Cifuentes, while still operating the Defendants' vehicle, approached the intersection of Michigan Avenue and Dakota Avenue, N.E., in the District of Columbia.

19.    At about the same time and place, Plaintiff Keith Bailey was lawfully crossing the same intersection in his 1992 Dodge pickup truck.  As he did so, Mr. Cifuentes unlawfully passed a solid red stop light and struck Mr. Bailey's vehicle, then went over the curb, flipped over, and came to rest lying on the passenger side of the stolen truck, on the sidewalk along Michigan Avenue.

20.    Plaintiff Keith Bailey was seriously injured, unconscious and unresponsive, with a Glasgow Coma Scale of 15, when emergency personnel arrived on the scene.  He was transported in critical condition to Washington Hospital Center MedSTAR Unit – Surgical Critical Care Services, at which time he came under the care of Dr. Bikram Paul.

21.    Mr. Bailey's injuries were extensive, including, but not limited to: a severe pneumocephaly (closed depressed skull fracture); multiple mid-face fractures, including a left zygomatic complex (ZMC) fracture; a left temporal bone fracture; a left orbital medial floor and lateral fracture; a right zygomatic temporal junction fracture; a five-centimeter laceration above the left eye, including a laceration to his eyelid; a periorbital edema with chemosis of the left eye; a five-centimeter laceration to his right knee; bleeding out of his right ear canal; multiple brain contusions; and micro hemorrhages.

22.    Plaintiff Bailey's left eye lacerations were surgically repaired upon arrival. In addition, Plaintiff Bailey underwent a cognitive evaluation which revealed serious cognitive injuries, including difficulty with long and short-term memory, problem solving,

and basic motor skills, along with weakness in verbal memory and conceptual fluency, headaches, dizziness and disorientation.

## IV.    COUNT ONE

### (Motor Vehicle Negligence)

23.    The allegations of Paragraphs 1 through 22 of this Complaint are by reference incorporated herein as allegations of this Count.

24.    At all relevant times, Defendants J&B Trucking Services, Inc., and Sergio Rolando Sanabria owed a continuing duty to other motorists, and to Plaintiff Keith Bailey specifically, to exercise ordinary care in maintaining and operating the vehicle in their custody and control in a lawful and responsible manner such that it did not present an unreasonable risk to other vehicles and drivers on the roads.

25.    Defendants Sergio Rolando Sanabria and J&B Trucking Services, Inc., through its agent or employee Sergio Rolando Sanabria, breached their duty to Plaintiff Keith Bailey by:

a.    Failing to turn off the engine of the vehicle;

b.    Failing to remove the keys from the vehicle;

c.    Failing to maintain custody and control of the vehicle during the period of time while the vehicle was warming up;

d.    Failing to foresee that the truck could be stolen under the circumstances;

e.    Failing to take the steps a reasonably prudent person in the same or similar circumstances would have taken to secure the vehicle and protect against its theft;

6

f.    Failing to park the vehicle in a secure location;

g.    Failing to obey the rules and regulations of the State of Maryland and the District of Columbia, then and there in full force and effect;

j.    Defendants J&B Trucking Services, Inc. and Sergio Rolando Sanabria were negligent in other ways.

26.    As a direct and proximate result of the aforementioned negligent acts and omissions of Defendants J&B Trucking Services, Inc., and Sergio Rolando Sanabria, Plaintiff Keith Bailey sustained serious and permanent injuries and damages, has and will in the future incur medical, hospital, and therapy expenses; has suffered and in the future will suffer permanent pain of the body and mind; has lost and will in the future lose, earnings and earning capacity; and has suffered and will in the future suffer other losses and damages.

WHEREFORE, the Plaintiff, Keith Bailey, demands judgment against Defendants J&B Trucking Services, Inc., and Sergio Rolando Sanabria, jointly and severally, in the sum of Three Million Dollars ($3,000,000.00), plus interest and costs, and such other and further relief as the nature of this cause may require and which this Honorable Court deems just and proper.

## V.    COUNT TWO

### (Loss of Consortium)

27.    The allegations of Paragraphs 1 through 26 of this Complaint are incorporated herein by reference as allegations of this Count.

28.    At all relevant times, Plaintiffs Keith Bailey and Jacqueline Bailey were married and maintained a household together in the District of Columbia.

29.    As a direct result of the aforesaid negligence, the Plaintiffs have suffered, and in the future will suffer, damage to their marital relationship including loss of consortium, companionship, assistance and services.

**WHEREFORE**, Plaintiffs Keith Bailey and Jacqueline Bailey demand judgment against Defendants J&B Trucking Services, Inc., and Sergio Rolando Sanabria, jointly and severally, in the amount of One Million Dollars ($1,000,000.00) plus interest and costs, and such other and further relief as the nature of this cause may require and which this Honorable Court deems just and proper.

Respectfully submitted,

**KARP, FROSH, LAPIDUS, WIGODSKY & NORWIND, P.A.**

Steven VanGrack, Esquire, Bar No. 223339
SVangrack@karpfrosh.com

Edward L. Norwind, Esquire, Bar No. 936393
LNorwind@karpfrosh.com

Murray D. Scheel, Esquire, Bar No. 490012
MScheel@karpfrosh.com

2273 Research Boulevard
Suite 200
Rockville, Maryland 20850
(301) 948-3800

*Attorneys for Plaintiffs,*
*Keith Bailey and Jacqueline Bailey*

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a trial by jury on all issues so triable.

Steven VanGrack, Esquire

8

01/12/2006   11:33   GEICO DIRECT CU CLAIMS → 91202693973656089   NO.171   D03
JAN-10-2006 09:46 FROM:   TO:17052212037   P.3/6

**EXHIBIT 3**

01/12/2006    11:33    GEICO DIRECT CU CLAIMS → 91202693973656089

JAN-10-2006 09:47 FROM:

TO:17862212037

NO.171    D05
P.4/6



01/12/2006   11:33   GEICO DIRECT CU CLAIMS → 91202693973656089   NO.171   D02

JAN-10-2006 09:48 FROM:   TO:17862212837   P.5/6

Complaint No. 06/002-835

Charge (Brief/Most read report on the charge.)
Aggravated Assault/U.U.V.

Traffic light

DPW 40-1 issued?   What Traffic Signs Present?

Arrest/NOI Number
080600001

Charge Certificate

REGISTRATION EXPIRY   SECOND DATE
01-09-06

No. 1
Dr./Ped. 1   N/A
Dr./Ped. 2   N/A
Dr./Ped. 3   N/A
Dr./Ped. 4   N/A

44. NARRATIVE: Give a concise statement, in your own words, of the facts that are not covered in this report, or to clarify any data that are not entirely explained. Use Continuation Sheet if report for additional space. If statements are taken, use Fm 118 (Ref./Suspect Statement), or Fm 119 (Compl./Witness Statement). If accident occurred in a construction zone, describe type of construction.

The offense occurred on Saturday, January 7, 2006 at approximately 0450 hours at the intersection of South

Dakota Avenue and Michigan Avenue N.E., Washington, D.C.

Investigation revealed that Driver #1 while operating a white 2002 Isuzu Box truck bearing MD registration

plates 83L092 at a high rate of speed westbound on Michigan Avenue N.E., passed the solid red signal at South

Dakota Avenue N.E. and struck Vehicle #2. Vehicle #2 rotated clock-wise and Driver #2, who was not wearing a

seatbelt, was ejected from the vehicle. Vehicle #1 mounted the south curb, struck Fixed Object #3 and Fixed Object

#4, before coming to rest on its passenger side in front of 1523 Michigan Avenue, N.E.

Stacy R. Hatley

Badge No.   IVO067   Unit   MCIU

2 005   Dr. Adelson   04/24/2007 15:06 FAX 2024969180

CONTINUATION SHEET (List item number of section continued with required information.)    ▶ Complaint No. 06/002-835

Driver #1 and Driver #2 were both transported to the Washington Hospital Center Medstar Unit. Driver #2

was admitted in critical condition. Driver #1 was released from the hospital and arrested for Aggravated Assault,

U.U.V., Reckless Driving and No Permit.

A routine wales check revealed that Vehicle #1 was reported stolen from Hyattsville, Maryland on 01-07-06,

OCA # 060069.

As a result of the collision, Vehicle #1 did extensive damage to the yard belonging to Mr. John F. Guay,

located at 1523 Michigan Avenue, N.E. Home telephone number: 2/526-1854 and work telephone: 2/585-8298.

This is Special #08-01 for the year 2006.