**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KEITH BAILEY *et ux.*                    :
                                         :
            Plaintiffs,                  :
                                         :
v.                                       :        Case No.: 1:08-cv-00644-RMC
                                         :        Judge Rosemary M. Collyer
J & B TRUCKING SERVICES, INC., *et al.* :
                                         :
            Defendants.                  :

<u>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AS TO DEFENDANTS' LIABILITY**</u>

The Plaintiffs, by and through counsel, and pursuant to Federal Rule of Civil Procedure 56(a) and (d)(2), respectfully move this honorable Court to grant the Plaintiffs summary judgment as to the Defendants' liability. The only matters in genuine dispute are the Plaintiffs' damages. As a result, the Court should enter an interlocutory summary judgment on liability alone, pursuant to Federal Rule of Civil Procedure 56(d)(2), and allow discovery to proceed on the issue of damages.

**I.      Material facts of liability are not in genuine dispute.**

Following are the material facts of liability, with citations to the supporting record (attached as exhibits A through N), demonstrating that the facts are not genuinely disputable.

A.      On Saturday, January 7, 2006, at approximately 4:50 a.m., Keith A. Bailey was driving his 1992 red Dodge pickup truck in a lawful manner southbound on South Dakota Avenue, N.E., in Washington, D.C. (D.C. Metropolitan Police Traffic Accident Report, Ex. A at 2, 3; Bailey Aff., Ex. N ¶ 3.)

B.      In compliance with a green traffic signal, Mr. Bailey entered South Dakota Avenue's intersection with Michigan Avenue.  (D.C. Metropolitan Police Traffic Accident Report, Ex. A at 2, 3; Bailey Aff., Ex. N ¶ 4.)

C.      At approximately the same time, Onorio Cifuentes-Lopez was driving a 2002 white Isuzu box truck in an unlawful manner westbound on Michigan Ave., N.E., Washington, D.C.  Mr. Cifuentes-Lopez was traveling at a high rate of speed and entered the intersection with South Dakota Avenue against a red traffic signal.  (D.C. Metropolitan Police Traffic Accident Report, Ex. A at 2, 3; Bailey Aff., Ex. N ¶ 5.)

D.      Onorio Cifuentes-Lopez crashed the 2002 white Isuzu box truck into the 1992 red Dodge pickup truck operated by Keith A. Bailey.  (D.C. Metropolitan Police Traffic Accident Report, Ex. A at 2, 3; Bailey Aff., Ex. N ¶ 5; Photographs of the Bailey vehicle, Ex. B.)

E.      As a result of the collision described above, Mr. Bailey suffered severe injuries, including blunt force trauma to his skull.  (D.C. Metropolitan Police Traffic Accident Report, Ex. A at 4; Washington Hospital Center Discharge Summary, Ex. D at 1; Bailey Aff. Ex. N ¶ 6.)

F.      Mr. Bailey was treated at the scene by D.C. Fire & EMS.  (D.C. Fire & E.M.S. Report, Ex. C.)  Mr. Bailey was then transported to Washington Hospital Center where he received in-patient treatment from January 7 through 17, 2006.  (Washington Hospital Center Discharge Summary, Ex. D at 1, 3, 4.)

G.      Mr. Bailey then received inpatient treatment at National Rehabilitation Hospital from January 17 through February 7, 2006. (National Rehabilitation Discharge Summary, Ex. E at 1.)

H.      The white Isuzu box truck that Onorio Cifuentes-Lopez crashed into Mr. Bailey was owned by Jose Benjamin Lainez, the owner and resident agent of J&B Trucking Services,

Inc., 8622 Watershed Court, Gaithersburg, Maryland.  (Ex. A at 1; Md. Dept. of Assessments and Taxation, Business Entity Information, Ex. F at 1.)

I.    J&B Trucking Services, Inc., employed Sergio R. Sanabria to deliver furniture in the Washington metropolitan area, including in the District of Columbia.  (Sanabria Dep. 18:4-14, 28:9-22, May 27, 2008, Ex. H.)

J.    For the purpose of making the furniture deliveries, J&B Trucking Services had entrusted Mr. Sanabria with driving and operating the 2002 white Isuzu box truck.  (Sanabria Dep. 19:10-13, Ex. H.)

K.    Moreover, Mr. Sanabria had the permission of his employer, J&B Trucking Services, Inc., to bring the 2002 white Isuzu box truck home at night in order to facilitate his deliveries the following morning.  (Sanabria Dep. 18:19-21, 29:13-30:12, Ex. H.)

L.    Mr. Sanabria parked the truck in a public area near his home.  (Sanabria Dep. 29:13-30:12, Ex. H.)

M.    Mr. Sanabria lived at the time at 5615 Queens Chapel Road in Hyattsville, Maryland.  (Sanabria Dep. 3:12-22, Ex. H.)

N.    On the morning of Saturday, January 7, 2006, before 4:50 a.m., Mr. Sanabria came out of his home and started the 2002 white Isuzu box truck in preparation for making deliveries on behalf of J & B Trucking Services, Inc.  (*United States v. Cifuentes*, CR-F155-06, D.C. Super. Ct., Prelim. Hr'g Tr. 5:1-3, Feb. 2, 2006 (Testimony of Detective Elgin Wheeler), Ex. I.)

O.    Sergio R. Sanabria then left the 2002 white Isuzu box truck running for ten to fifteen minutes, unattended, while he went back inside his home.  (Prelim. Hr'g Tr. 5:3-4, Ex. I.)

P.      He left the keys in the ignition with the engine running to warm up the vehicle for the morning's deliveries.  (Prelim. Hr'g Tr. 5:2-3, Ex. I.)

Q.      While Mr. Sanabria was in his home, Onorio Cifuentes-Lopez stole the 2002 white Isuzu box truck.  (*United States v. Cifuentes*, CR-F155-06, Findings of Fact, Conclusions of Law and Order of Detention Pending Trial, Ex. G at 1.)

R.      When Sergio R. Sanabria came out to get into the truck, he saw it heading southbound on Queens Chapel Road toward the District of Columbia.  (Prelim. Hr'g Tr. 5:3-7, Ex. I.)

S.      The intersection of South Dakota and Michigan Avenues, N.E., where the collision described above occurred, is approximately 1.8 miles away from 5615 Queens Chapel Road, Hyattsville, the location from where Mr. Cifuentes-Lopez stole the white Isuzu box truck. (Google Map, Ex. J.)

T.      The Grand Jury in the Superior Court of the District of Columbia charged Onorio Cifuentes-Lopez, *inter alia*, with Unauthorized Use of a Vehicle and Aggravated Assault, for taking the white Isuzu box truck without permission, driving it at a high rate of speed, running several red lights, including the one at the intersection of Michigan and South Dakota Avenues, N.E., and colliding with Mr. Bailey.  (*United States v. Cifuentes*, CR-F155-06, Indictment Counts One and Four, Ex. K at 2-3.)

U.      Mr. Cifuentes-Lopez pled guilty to Aggravated Assault on September 28, 2006. (*United States v. Cifuentes*, CR-F155-06, Guilty Plea and Sentence of the Court, Ex. L at 1, 2.)

V.      Keith A. Bailey is permanently injured as a result of the collision of January 7, 2006, and continues to receive medical care.  (Neurological Reports, Ex. M at 1, 3.)

W.       Keith A. Bailey and Jacqueline Bailey, his wife, have resided at 4837 12th St.,

N.E., Washington, D.C., with their four children, Jalivia, Janae, Jerrod, and Jessica, for many

years.  (Bailey Aff., Ex. N ¶ 8.)

X.       Keith A. Bailey has been employed since 1988 by W. M. Schlosser Co., Inc., a

company that does building construction in the Washington metropolitan area, including in the

District of Columbia.  (Bailey Aff., Ex. N ¶ 9.)

Y.       At the time of the collision Keith A. Bailey was an assistant superintendent for a

construction crew on a project in Blue Plains, S.E., Washington, D.C.  (Bailey Aff., Ex. N ¶ 10.)

Z.       Jacqueline Bailey has been employed since 1999 by Dr. Andrew J. Adelson, at

1145 19th St. N.W., Washington, D.C.  (Bailey Aff., Ex. N ¶ 11.)

The factual bases for liability and causation in this case are therefore beyond genuine

dispute.  J&B Trucking Services has never genuinely disputed that Defendant Sanabria was

working for it at the time of this incident, or that it had entrusted him with its truck.  The facts of

the theft on January 7 were investigated by D.C. Metropolitan Police through Detective Elgin

Wheeler, and Detective Wheeler determined the circumstances of that theft through Defendant

Sanabria's own statements.  (Prelim. Hr'g Tr. 5:1-5, Ex. I.)  Those statements are therefore

admissible against Defendant Sanabria as substantive evidence.  *See* Fed. R. Evid. 801(d)(2).

The facts of Mr. Cifuentes-Lopez's guilty plea for assaulting Mr. Bailey with the truck in

question would also be admissible against the Defendants in this case.[1]  Extensive medical

records from the time of the collision to the present (only a small selection of which are attached

---

[1] *See Miller v. Holzmann*, --- F. Supp. 2d ----, 2008 WL 2487286, at *7 n.24 (D.D.C. 2008) (recognizing
that federal courts have admitted non-parties' guilty pleas as evidence against civil defendants) (*citing
RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401, 403 (8th Cir. 1995) (non-party
employee's guilty plea and accompanying sworn statement were admissible against defendant employer
in subsequent civil case); *Newby v. Enron Corp.*, 491 F. Supp. 2d 690, 703 (S.D. Tex. 2007) (non-party's
guilty plea was admissible against defendants in subsequent civil case)).

here as exhibits) demonstrate that the collision caused Mr. Bailey extensive physical and cognitive injury, from which he continues to suffer.

Given the results of the extensive criminal investigation and prosecution that preceded this instant civil action, none of the material facts of liability or causation are genuinely disputable. There are no grounds for genuine dispute that Plaintiff Bailey, a long-time resident of the District, was seriously injured when Onorio Cifuentes-Lopez crashed into him in the District. Moreover, there are no grounds for genuine dispute that the truck Mr. Cifuentes-Lopez was driving at the time of the collision belonged to a principal of J&B Trucking Services, and that Mr. Cifuentes-Lopez had just stolen the truck from Mr. Sanabria, a J&B Trucking employee to whom the truck had been entrusted. Finally, there are no grounds for genuine dispute that, at the time it was stolen, Mr. Sanabria was using the truck in the course of his employment, and that he had left the truck unattended in a public area with the keys in the ignition and the engine running.

## II. Summary judgment in favor of the Plaintiffs on the issues of liability and causation is proper.

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). Furthermore,

> [i]f summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts--including items of damages or other relief-- are not genuinely at issue. The facts so specified must be treated as established in the action.

Fed. R. Civ. P. 56(d)(1).  "An interlocutory summary judgment may be rendered on liability

alone, even if there is a genuine issue on the amount of damages."  Fed. R. Civ. P. 56(d)(2).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Where the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'"  *Id.* at 587.

     "[I]n diversity cases the substantive law of the forum controls with respect to those issues

which are outcome-determinative. . . ."  *Steorts v. American Airlines, Inc.*, 207 U.S. App. D.C.

369, 371-72, 647 F.2d 194, 196-97 (D.C. Cir. 1981) (*citing Lee v. Flintkote Co.*, 193 U.S. App.

D.C. 121, 593 F.2d 1275 (1979) (holding that the *Erie* Doctrine applies in diversity cases before

the United States District Court for the District of Columbia) ; *Erie Railroad Co. v. Tompkins*,

304 U.S. 64 (1938) (holding that when federal jurisdiction is based on the diversity of the parties,

the federal court must apply the substantive law of the forum state in which the federal court

sits)).  The substantive law of the District of Columbia therefore controls the liability of the

Defendants in this case.

**A.    The law of the District of Columbia imposes liability on an owner of a vehicle, or his
agent, for injuries to a third party if the owner or his agent leaves the vehicle
unattended with the keys in the ignition, and a thief steals the vehicle and
subsequently causes negligent injury to the third party by means of the vehicle.**

     In the District of Columbia, an owner or operator of a vehicle can be held liable to a third

party if a thief steals the vehicle while the owner or operator leaves it negligently unattended,

with the keys in it, and the thief then injures the third party while driving the stolen car.  *See*

*Gaither v. Myers*, 131 U.S. App. D.C. 216, 222-23, 404 F.2d 216, 222-23 (1968) (*citing Ross v.*

*Hartman*, 78 U.S. App. D.C. 217, 218-19, 139 F.2d 14, 15-16 (1943)).  "[D]ecisions of the

United States Court of Appeals [for the District of Columbia] rendered prior to February 1, 1971, . . . constitute the case law of the District of Columbia," and are binding on the District of Columbia Superior Court and Court of Appeals, reversible only by the District of Columbia Court of Appeals sitting en banc. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (*citing* The District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, 84 Stat. 475 (1970)). Because the United States Court of Appeals for the District Columbia established the rule of *Ross v. Hartman* in 1943, and reaffirmed it in *Gaither v. Myers* in 1968, and the District of Columbia Court of Appeals has never reversed it, that rule remains the law of the District of Columbia. *See, e.g., St. Paul Fire & Marine Ins. Co. v. James G. Davis Const. Corp.*, 350 A.2d 751, 753 n.1 (D.C. 1976) (citing with approval the holding in *Gaither v. Myers* regarding liability); *Amicar Rentals, Inc. v. Moore*, 294 A.2d 361, 363 (D.C. 1972) (recognizing that under *Ross v. Hartman* and *Gaither v. Myers* the owner of an automobile "must respond in damages for the injuries" to a third party, where the agent of the owner of the automobile parked it in a public place and, in violation of a traffic regulation, "left the ignition unlocked and the key in the ignition switch," and "[s]ometime thereafter the automobile was stolen and operated by the thief in such a negligent manner as to cause injuries to" the third party).

In *Ross*, "[t]he facts were stipulated." *Ross*, 78 U.S. App. D.C. at 217, 139 F.2d at 14. The case involved a truck whose owner had entrusted it to the owner's agent. *See id.* The owner's agent

> violated a traffic ordinance . . . by leaving appellee's truck unattended in a public alley, with the ignition unlocked and the key in the switch. He left the truck outside a garage "so that it might be taken inside the garage by the garage attendant for night storage," but he does not appear to have notified anyone that he had left it. Within two hours an unknown person drove the truck away and negligently ran over the appellant.

*Id.* Based on earlier precedent, *Squires v. Brooks*, 44 App. D.C. 320, 1916 WL 21632 (D.C. Cir. 1916), the trial court granted a directed verdict for the owner of the truck. *See id.*

In reviewing the trial court's decision, however, the *Ross* court overruled the prior precedent in *Squires* and reversed the directed verdict for the defendant. *Ross*, 78 U.S. App. D.C. at 217, 139 F.2d at 14. The court observed that leaving the truck unattended on a public street with the keys in the ignition violated an ordinance designed to protect the public from the very harm that ensued in that case.[2] *Ross*, 78 U.S. App. D.C. at 217, 218 139 F.2d at 14, 15. The *Ross* court held that the "[v]iolation of an ordinance intended to promote public safety is negligence." 78 U.S. App. D.C. at 218, 139 F.2d at 15. Since other vehicles, such as bicycles, were not required by law to be locked, the ordinance requiring motor vehicles to be locked when unattended was apparently not designed simply to protect owners' property from theft, "but to promote the safety of the public in the streets." *Id.* "An unlocked motor vehicle creates little more risk of theft than an unlocked bicycle, or for that matter an unlocked house, but it creates much more risk that meddling by children, thieves, or others will result in injuries to the public." *Id.* Ordinances requiring the power train of motor vehicles to be locked while unattended are "intended to prevent such consequences." *Id.* Leaving a truck unattended with the keys in the ignition therefore violated "a safety measure" and constituted negligence as a matter of law. *Id.* Since "[t]his negligence created the hazard and thereby brought about the harm which the ordinance was intended to prevent," the negligent violation of the ordinance was a "legal or

_____

[2] The regulation at issue in *Ross* mandated that "no person shall allow any motor vehicle operated by him to stand or remain unattended on any street or in any public place without first having locked the lever, throttle, or switch by which said motor vehicle may be set in motion." *Ross*, 78 U.S. App. D.C. at 217 n.1, 139 F.2d at 14 (*quoting* Traffic and Motor Vehicle Regulations of the District of Columbia § 58).

The current version of that regulation states: "No persons driving or in charge of a motor vehicle shall permit it to stand unattended without first stopping the engine, locking the ignition, removing the key, and effectively setting the brake." D.C. Mun. Regs. tit. 18, § 2418.1 (March 1997).

'proximate' cause of the harm." *Id.*  Indeed, the *Ross* court held that, on the facts as stipulated by the parties, "[b]oth negligence and causation are too clear in this case, we think, for submission to a jury."  78 U.S. App. D.C. at 218-19, 139 F.2d at 15-16.

Moreover, the court went on to hold, the thief's act of stealing the truck did not break the chain of causation.  *See* 78 U.S. App. D.C. at 219, 139 F.2d at 16.  "The fact that the intermeddler's conduct was itself a proximate cause of the harm, and was probably criminal, is immaterial."  *Id.*  The *Ross* court reasoned that "the conduct of the defendant or his agent was negligent precisely because it created a risk that a third person would act improperly," and therefore "[i]n such circumstances the fact that a third person does act improperly is not an intelligible reason for excusing the defendant."  *Id.*  Moreover, imposing such liability under these circumstances, the court observed, puts the burden of the risk on the cheapest cost avoiders, i.e., the owner and the driver.  "The rule we are adopting tends to make the streets safer by discouraging the hazardous conduct which the ordinance forbids.  It puts the burden of the risk, as far as may be, upon those who create it."  *Id.*

The D.C. Circuit applied the rule of *Ross* again in *Gaither v. Myers*.  *Gaither*, 131 U.S. App. D.C. at 220, 404 F.2d at 220.  The defendant, who owned an automobile in the District, "left the keys in his parked and unattended car."  *Id.*  A person subsequently took the car without the defendant's permission, and drove off across the District border and into Maryland.  *See* 131 U.S. App. D.C. at 218, 404 F.2d at 218.  While speeding in Maryland, the driver collided with the plaintiff at a point approximately five miles over the District border, causing him serious injuries.  *See id.*  The *Gaither* court held that,

> In the present case the collision occurred at a time and place not
> substantially removed from the time and place where the owner
> left the car in the street with the keys.  As in the *Ross* case, this
> negligence caused the danger and damage that the ordinance

> intended to prevent, and the negligence is therefore the proximate
> cause of the mishap under the law of the District of Columbia.

131 U.S. App. D.C. at 221, 404 F.2d at 221.[3]  The *Gaither* court noted further that, under similar circumstances (i.e., where leaving the vehicle unattended was followed quickly by theft and then injury to the plaintiff), the *Ross* court had held that "the negligence and proximate cause were 'too clear . . . for submission to the jury.'"  131 U.S. App. D.C. at 221 n.16, 404 F.2d at 221 n.16.

The court also observed that, while Maryland statute had a similar provision requiring unattended automobiles to be locked, the Maryland Court of Appeals had nevertheless held there to be no cause of action against a negligent owner or operator where a thief causes injuries after stealing the owner's unlocked and unattended car, because the intervening acts of the thief were held to be too legally remote from the owner's negligence to be the proximate cause of the plaintiff's injuries.[4]  *See Gaither*, 131 U.S. App. D.C. at 221, 404 F.2d at 221 (*citing, inter alia, Liberto v. Holfeldt*, 221 Md. 62, 155 A.2d 698 (1959)).  Applying the District's choice-of-law jurisprudence, however, the *Gaither* court found that "[i]t is plain . . . that a legitimate and indeed powerful policy and interest of the District of Columbia is involved in this case and is furthered by application of the rule of *Ross v. Hartman*."  131 U.S. App. D.C. at 223, 404 F.2d at 223.  Even though the collision occurred in suburban Maryland, and to a Maryland resident, the court applied the District's law, in small part because the owner of the car lived in the District and had

---

[3]  The court also noted elsewhere that it had reaffirmed the rule and policy in *Ross* in several intervening cases.  *See Gaither*, 131 U.S. App. D.C. at 222, 404 F.2d at 222.

[4]  Maryland's statute on this issue is virtually identical to the District's regulation: "[A] person driving or otherwise in charge of a motor vehicle may not leave it unattended until the engine is stopped, the ignition locked, the key removed, and the brake effectively set."  Md. Code Ann., Transp. § 21-1101(a) (West 2002).

owned the car there, but more importantly because of the integrated nature of the Washington metropolitan area.  *See id*.

**B.**  **Under the rule of *Ross v. Hartman*, the Defendants in this instant case are liable to the Plaintiffs.**

The indisputable facts of this case are virtually identical to the material facts in *Ross* and *Gaither*, and therefore warrant summary judgment for the Plaintiffs as to liability and causation. Just as in *Ross* and *Gaither*, J&B Trucking Services' agent, Mr. Sanabria, "violated a traffic ordinance[5] . . . by leaving" J&B Trucking Services' white Isuzu box "truck unattended in a public [area], with the ignition unlocked and the key in the switch," and, additionally, with the engine running.  *Ross*, 78 U.S. App. D.C. at 217, 139 F.2d at 14; *see* Sanabria Dep. 29:13-30:12, Ex. H; Prelim. Hr'g Tr. 5:1-5, Ex. I.  Doing so constituted negligence *per se*.  *Ross*, 78 U.S. App. D.C. at 218, 139 F.2d at 15.  Within ten to fifteen minutes, "an unknown person [Mr. Cifuentes-Lopez] drove the truck away and negligently" collided with Plaintiff Keith Bailey by running through a red light at Michigan and South Dakota Avenues, N.E., less than two miles away from where the truck had been stolen.  *Ross*, 78 U.S. App. D.C. at 217, 139 F.2d at 14; *see* Prelim. Hr'g Tr. 5:1-5, Ex. I; Google Map, Ex. J.

That intersection is a straight drive south from Mr. Sanabria's address, and involves no turns onto other roads.  (Google Map, Ex. J.)  Mr. Cifuentes-Lopez collided with Mr. Bailey at a high rate of speed.  (Police Report, Ex. A at 4.)  The only reasonable inference, therefore, is that the theft itself occurred within ten to fifteen minutes of when Mr. Sanabria left the truck unattended, and that the collision happened within minutes, if not seconds, after the theft.  Given the close connection in time and place between the negligence and the collision, "[b]oth negligence and causation are too clear," as in *Ross* and *Gaither*, "for submission to a jury."

---

[5] *See* footnote 4, *supra*.

*Ross*, 78 U.S. App. D.C. at 218-19, 139 F.2d at 15-16 (theft and collision occurred within two hours of vehicle having been left unattended); *see Gaither*, 131 U.S. App. D.C. at 221 n.16, 404 F.2d at 221 n.16 (causation can be presumed where injury follows quickly after the negligence and the theft, i.e., within two hours, as in *Ross*, and within close proximity, i.e., within five miles, as in *Gaither*).  Regarding negligence and causation, therefore, summary judgment should be granted for the Plaintiffs.  *See id*.

>    **C.    Even though the precipitating negligence at issue occurred in Maryland, the law of the District of Columbia applies.**

"In determining which jurisdiction's law will apply to substantive issues, District of Columbia courts use a government interest analysis which requires first a court evaluation of the governmental policies underlying the applicable conflicting laws and then a determination as to which jurisdiction's policy would be most advanced by having its law applied to the facts of the case." *Valentine v. Elliott (In re Estate of Delaney)*, 819 A.2d 968, 988 (D.C. 2003) (*citing cases*).  Even assuming the District and Maryland each have an interest in applying their own law to the facts of this instant case, and that those interests conflict, "the law of the jurisdiction with the stronger interest will apply." *Valentine*, 819 A.2d at 988 (D.C. 2003) (*citing, inter alia, Gaither*, 131 U.S. App. D.C. at 222-23, 404 F.2d at 222-23).  District of Columbia courts "have recognized a strong local interest" in protecting plaintiffs who work or reside in the District and are injured in the District, even though they are injured by negligent acts that originated from one of the surrounding jurisdictions.  *Biscoe v. Arlington County*, 238 U.S. App. D.C. 206, 215, 738 F.2d 1352, 1361 (D.C. Cir. 1984) (applying District law to personal injury precipitated by negligence in Virginia but sustained in the District by a Maryland resident who merely worked in the District).  "The local law of the state *where the personal injury occurred* is most likely to be applied when *the injured person* has a settled relationship to that state, either because he is

*domiciled or resides there* or because he does business there." *Biscoe*, 238 U.S. App. D.C. at

215-16, 738 F.2d at 1361-62 (*quoting* The Restatement (Second) of Conflict of Laws, § 146,

comment e (1971) (emphasis added); *see also Gaither*, 131 U.S. App. D.C. at 223, 404 F.2d at

223 (observing that *Ross v. Hartman*'s "compensatory policy has the greatest relevance to cases

when the mishap occurs in the District and when District residents are plaintiffs"). Moreover, in

*Gaither*, the court decided to apply the District's law in large part because of the integrated

nature of Washington metropolitan area:

> to confine the benefits of the *Ross* rule to the territory ceded by the
> states of Maryland and Virginia to form the Nation's Capital would
> be to shun the present reality of the economically and socially
> integrated greater metropolitan area. It is a commonplace that
> residents of Maryland are part of the Washington metropolitan
> trading area . . . .

*Gaither*, 131 U.S. App. D.C. at 223, 404 F.2d at 223. Because commerce and traffic in the

Maryland suburbs of the District are so tightly integrated with the District itself, the *Gaither*

court reasoned that it would be absurd to limit the application of *Ross* to torts occurring

exclusively within the District borders. *See id.* Thus, *Gaither* applied *Ross* to a tort extending

across the boundary between the District and the Maryland suburbs, even though the plaintiff

was a resident of *Maryland*. *See Gaither*, 131 U.S. App. D.C. at 218, 223, 404 F.2d at 218, 223

(observing that the collision at issue in that case occurred "about five miles from the District of

Columbia line").

Conversely, when negligence in the District's Maryland suburbs causes injury in the

District, *to District residents*, the District's interest in applying its law is at its apex, and

outweighs the interests of the neighboring jurisdiction. *See Biscoe*, 238 U.S. App. D.C. at 215-

16, 738 F.2d at 1361-62; The Restatement (Second) of Conflict of Laws, § 146, comment e. In

this instant case, the Baileys are long-time residents of the District. (Bailey Aff. Ex. N ¶ 8.) Mr.

Bailey works for a Washington metropolitan area employer, and at the time of the collision in question was working at a site in Southeast Washington, D.C. (Bailey Aff. Ex. N ¶ 9.) His wife and coplaintiff, Jacqueline Bailey, has worked in the District for a District employer since 1999. (Bailey Aff. Ex. N ¶11.) Mr. Bailey was treated for his collision-related injuries by District health care providers. (Exs C,D, E.) The collision itself was investigated by D.C. Metropolitan Police, and Mr. Cifuentes-Lopez was prosecuted in the Superior Court of the District of Columbia. The impact of Mr. Sanabria's negligence was sustained entirely in the District. It would be deeply unfair to the Bailey's to deny them compensation simply because the original negligence precipitating their injuries occurred less than 1.8 miles over the District border. Moreover, given their proximity to the District, their numerous independent contacts with the District, and the integrated nature of the Washington metropolitan area, the Defendants can hardly claim surprise that they would be subject, in this instance, to the law of the District of Columbia. The rule of *Ross v. Hartman* should therefore apply in this instant case.

**III.    Conclusion**

For the foregoing reasons, the Plaintiffs respectfully request the Court to enter summary judgment in their favor on the issues of negligence and causation, and allow this case to proceed on the issue of the damages, alone.

Respectfully,

**KARP, FROSH, LAPIDUS, WIGODSKY
  & NORWIND, P.A.**


 /s/_____

Steven VanGrack, Esq., D.C. Bar No. 223-339
Edward L. Norwind, Esq., D.C. Bar No. 936-393
Murray D. Scheel, Esq. D.C. Bar No. 490-012
2273 Research Boulevard, Suite 200
Rockville, Maryland 20850
Telephone: (301) 948-3800
Facsimile: (301) 948-5449

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KEITH BAILEY *et ux.* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Case No.: 1:08-cv-00644-RMC |
| | : | Judge Rosemary M. Collyer |
| J & B TRUCKING SERVICES, INC., *et al.* | : | |
| | : | |
| Defendants. | : | |

**ORDER**

This matter is before the Court on the Plaintiffs' Motion for Summary Judgment as to

Defendants' Liability, pursuant to Federal Rule of Civil Procedure 56(d)(2).  Having considered

the Motion, the Opposition thereto, and the facts of the case, it is

this _____ day of _____, 2008,

      **ORDERED**, that the Plaintiffs' Motion for Summary Judgment as to Defendants'

Liability is hereby **GRANTED**, and it is further

      **ORDERED**, that interlocutory summary judgment be entered for the Plaintiffs on the

issues of liability and causation, and it is further

      **ORDERED**, that the case proceed on the issue of damages alone.

_____
    Rosemary M. Collyer, Judge

cc:

Steven VanGrack, Esq.
Karp, Frosh, Lapidus, Wigodsky &  Norwind, P.A.
2273 Research Boulevard, Suite 200
Rockville, Maryland 20850

Neil J. MacDonald, Esquire
Hartel, Kane, Desantis, MacDonald & Howe, LLP
101 South Washington Street
Rockville, Maryland 20850

# EXHIBIT A

01/12/2006   11:33   GEICO DIRECT CU CLAIMS → 912026939736560699    NO.171   D03

JAN-10-2006 09:46 FROM:    TO:17862212337    P.3/6

TRAFFIC ACCIDENT REPORT

01-07-06    0450 hours    Saturday    01-07-06    06/002-835

South Dakota Avenue

1. Cifuentes-Lopez, Onorio    At intersection Michigan Avenue
   4554 Banner Street, Brentwood, Maryland
   None
   Unknown    10-17-72
   Isuzu 2002 Tk White 831.092/MD/06 CL3727700502
   WMATA Bus stop sign

2. Lainez, Jose Benjamin    240/793-4703
   8622 Watershed Court, Gaithersburg, Md
   Bailey, Keith A.    05-28-53
   4837 12th Street NE, Washington, D.C.
   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 DC
   600 5th Street NW, Washington, D.C.
   Dodge 1992 Tk Red FD06084/DC/06 2EV4NSS33247    2/393-2227
   See    PD    854

   600 5th Street NW, Washington, D.C.    2/393-2227
   WMATA Transit cab    N/A

Driver #1
Driver #2

PERSONS INVOLVED



01/12/2006   11:33   GEICO DIRECT CU CLAIMS → 91202693973656089   NO.171   P02

JAN-10-2006 09:48 FROM:   TO:17062212837   P.5/6

Page 3 of 4 Pages

Complaint No. 06/002-835

Charge (Report must report the charge): Aggravated Assault/D.U.V.

Accident Number: 080600001

What Traffic Signal Present? Traffic light

01-09-06

NO. 1   N/A   N/A
Dr/Ped.3   N/A
Dr/Ped.4   N/A

The offense occurred on Saturday, January 7, 2006, at approximately 0650 hours at the intersection of South Dakota Avenue and Michigan Avenue N.E., Washington, D.C.

Investigation revealed that Driver #1 while operating a white 2002 Isuzu Box truck bearing MD registration plates 83L092 at a high rate of speed westbound on Michigan Avenue N.E., passed the solid red signal at South Dakota Avenue N.E. and struck Vehicle #2. Vehicle #2 rotated clock-wise and Driver #2, who was not wearing a seatbelt, was ejected from the vehicle. Vehicle #1 mounted the south curb, struck Fixed Object #3 and Fixed Object #4, before coming to rest on its passenger side in front of 1523 Michigan Avenue, N.E.

Sheryl R. Harley

1V0067   MCIU

01/12/2006    11:33    GEICO DIRECT CU CLAIMS → 91202693973656089                NO.171    004
JAN-10-2006 09:48 FROM:                                                TO:17862212837        P.6/6

**CONTINUATION SHEET** (List item number of section continued with required information.) ▲ Complaint No. 06/002-835

Driver #1 and Driver #2 were both transported to the Washington Hospital Center Medstar Unit. Driver #2

was admitted in critical condition. Driver #1 was released from the hospital and arrested for Aggravated Assault,

U.U.V., Reckless Driving and No Permit.

A routine wales check revealed that Vehicle #1 was reported stolen from Hyattsville, Maryland on 01-07-06,

OCA # 060069.

As a result of the collision, Vehicle #1 did extensive damage to the yard belonging to Mr. John F. Guay,

located at 1523 Michigan Avenue, N.E. Home telephone number: 2/526-1854 and work telephone: 2/585-8298.

This is Special #06-01 for the year 2006.

04/24/2007 16:07 FAX 20249693180        Dr. Adelson                ☑ 007

# EXHIBIT B

















# EXHIBIT C

DCF/08-06 EMT-RMC    DOCUMENT#:16    ENGINE 16    10:06 AM 2008    5/9

**CALL LOCATION** 26    MICHIGAN AVE & S. DAKOTA AV    **INCIDENT** 02485    **DISPATCH TIME** 0435    **INSERVICE TIME**

**PAT. LAST NAME** BAILEY    **FIRST** KEITH    **MI** A.    **DATE OF BIRTH** 05/28/1953    **AGE**    **GENDER**    **TODAY'S DATE** 011.07.2006

**STREET ADDRESS** 4857 12TH ST. NE    **APT#**    **HOME PHONE #**    **BUSINESS PHONE #**

**CITY** WASHINGTON    **STATE** DC    **ZIP** 20017    **SOCIAL SECURITY NUMBER** 578-681-9126B

**FOR ALL NON-TRANSPORTS CHECK ONE BELOW**
- ☐ Assist Only
- ☐ Call Canceled
- ☐ No Patient Found
- ☐ PDOA
- ☐ RMA-SR
- ☐ Standby

**BILL TO:** ☐ SAME AS ABOVE  ☐ FEMS or MPD POD  ☐ WORK RELATED?    **MEDICARE #**

**MEDICAID #** 70A0

**LEGAL GUARDIAN/NEXT OF KIN**    **OTHER INSURANCE**    **INSURANCE CO & POLICY #** BC/BS X1P9 0199 1844    ☐ NONE KNOWN    #7644

**CURRENT MEDICATIONS** ☐ NONE  ☐ BROUGHT W/PT

**MEDICAL HISTORY** ☐ NONE KNOWN ☐ ANGINA ☐ ASTHMA ☐ BEHAVIORAL ☐ CANCER ☐ CARDIAC/CHF ☐ CHRON. RENAL FAIL. ☐ CHRON. RESP. FAIL. ☐ CVA/TIA ☐ DIABETES ☐ DRUG/ETOH ☐ EMPHYSEMA ☐ FAMILY VIOLENCE ☐ HYPERTENSION ☐ INFECT. DISEASE ☐ MI ☐ PULM. EMBOLISM ☐ SEIZURE ☐ SPECIAL HEALTH CARE ☐ TRACHEOSTOMY ☐ TB ☐ OTHER

**CHIEF COMPLAINT** HEAD INJURY

**TRANSPORT CATEGORY** ☑1 ☐2 ☐3    **DISPATCH CODE** ☐A ☐B ☐C ☐D

Pain: First ___/10    Pain: Last ___/10    Time of Onset ___:___

**TRANSPORTED TO:** HOSPITAL # 04

ACUTE: PT. WAS A DRIVER OF A PICK-UP TRUCK WHICH WAS STRUCK ON THE DRIVER SIDE FRONT LEFT QUARTER PANNEL THE "A POST" WAS DEFORMED AND THE DRIVER'S SIDE DOOR WAS RIPPED OPEN. PT. WAS FOUND UNCONCIOUS & UNRESPONSIVE IN THE MIDDLE OF MICH. AVE APROX. 50FT. FROM HIS TRUCK. HIS TRUCK WAS HIT BY A LARGE PANNEL TRUCK PE LASR. TO FOREHEAD, LASR. TO RT. KNEE PT. LUNG SOUNDS WERE EQUAL & CLEAR. CONTUSION ACROSS UPPER ABR. QUARS.
NOTE: PT. VERY COMBATIVE MIDWAY INTO TRANSPORT
Rx O2, IV X2, 18G OPENED, LT. AC & RT. HAND.

**INJURY CODES**
1. Abrasion
2. Amputate
3. Avulsion
4. Blunt Trauma
5. Burn (chemical)
6. Burn (thermal)
7. Fracture (Dis)
8. Gunshot Wound
9. Laceration
10. Pain
11. Paralysis
12. Puncture/Stab
13.
14.

Pt. Received HIPAA NPP ___ Yes ___ No ___ N/A

**(Consider using S.O.A.P. format)** If more space is required, continue on back. When complete, photocopy the back to leave with the hospital.    ☐ Law enforcement disclosure on scene

| Time: | | | **MED/ROUTE** | **TIME** | **GCS** | | **Time** | **Skin** | | **Pupils** |
|---|---|---|---|---|---|---|---|---|---|---|
| Position: | | | | | **EYE OPEN** | | | Normal | | UA/Ref ☐ ☐ |
| B/P: | 56/P | / | | / | Spontaneous 4 | 4 | | Cool | | |
| Pulse Rate: | 120 | | | | To Verbal 3 | ③ | | Cold | | Normal |
| Resp. Rate: | 14 | | | | To Pain 2 | 2 | | | | Constrict |
| Resp. Quality: | | | | | None 1 | 1 | | Hot | | Dilated |
| 1-Normal 2-Labored 3-Increased 4-Absent | | | | | **VERBAL RESP.** | | | Normal | | Non-react |
| Rhythm: | | | | | Oriented 5 | 5 | | Dry | | Capillary Refil Within normal limits |
| Pulse Ox. | %on | %on | %on | | Confused 4 | 4 | | | | Y N Y N |
| Blood Glucose | mg/dl | mg/dl | mg/dl | | Inappropriate 3 | 3 | | Moist | | |
| ET CO2 | | | | | Incomprehensible 2 | 2 | | Diaph | | |
| | | | | | None 1 | ① | | | | |
| O2 15 lpm ☐NC ☑NRB ☐Venturi ☐BVM | | | | | **MOTOR RESP.** | | | Normal | | |
| Oral Nasal Combi-tube | ET: Size ___ mm | | | | Obeys 6 | 6 | | Pale | | |
| | | | | | Localizes 5 | 5 | | Mottled | | |
| | | | | | Withdraws 4 | 4 | | Cyanotic | | |
| IV Size AC IV Gauge: 18 IV Site HAND IV Gauge: 18 IV Site: IV Gauge: | | | | | Flexes 3 Extends 2 None 1 | 3 2 1 | | Flushed | | A = EMT ADVANCED B = EMT BASIC I = EMT INTERMEDIATE P = EMT PARAMEDIC |
| | | | | | **GCS TOTAL** | 7 / 2 | | | | |

AIRWAY: Oral ☐ Nasal ☐    Oral ☐ Nasal ☐

**SIGNATURE AUTHORIZATION**

This constitutes my authorization for the provider of emergency medical services to me to file claims on my behalf. This authorization is to be:
Life time authorization effective _____ (Date)

**AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION AND WAIVER:**

I hereby authorize any holder of medical information about me to release to the Social Security Administration and Centers for Medicare and Medicaid Services or its intermediaries or carriers, the Washington DC Fire and EMS Department or its authorized agent/agents, or any private insurance company, any information needed for this or a related medical claim. I permit a copy of this authorization to be used in place of the original and request payment of medical insurance benefits to the party who accepts assignment.

**ASSIGNMENT OF INSURANCE AND PAYMENT AGREEMENT**

I hereby authorize payment of all Insurance Benefits, including Major Medical, Title XVII Medicare, Title XIX Medicaid, or any other private insurance company to the holder of this authorization. I also acknowledge that I am responsible for all co-insurance and deductibles.

X _____
Signature of Patient or Responsible Party    Date

(Signatures should correspond with certification numbers on data sheet.)

**SIGNATURES**    **CERT. LEVEL**    **COMPLETED REPORT**

CREW MEMBER 1 AL. TRIMBLE 448    **ID #**    P

CREW MEMBER 2 A. STYLES    **ID #**    A    B

OTHER CREW MEMBER _____    **ID #**

**Specify orders received in narrative.**

MEDICAL CONSULT NAME: _____ HOSP: _____

X _____
Signature of Person Receiving Patient    Date

**QA/Billing**

840333

**RELEASE:** I hereby refuse any further services offered by the Washington DC Fire and EMS Department, and I hereby release any medical personnel and institutions involved in this EMS call from any liability which may result from failure to receive further treatment. I have been informed of the risks involved, and it has been explained that receiving further treatment or transportation to a hospital would be in my best interests.

SIGNED: _____    DATE: _____

WITNESS: _____    WITNESS: _____

**RENUNCIA:** Yo rehuso todos los servicios ofrecidos por el Departamento de Bomberos y Servicios Medicos de Emergencia de Washington DC, y absuelvo todo personal medico y instituciones asociados en esta llamada de EMS de cualquier problemas o responsibilidad que puede resultar del fracaso de recibir mas tratamientos. Me han informado los riesgos envuelto, y se me ha explicado que recibiendo mas tratamientos o transportacion ha un hospital sera en me mejor interes.

FIRMADO: _____    DATE: _____

WITNESS: _____    WITNESS: _____

## NARRATIVE CONTINUATION

Pt comp. Beans, collared, secured c spider straps
Note: management of pt's hand during transport
occupied most of our time.

## EKG STRIP

| TIME | INTERPRETATION | LEAD | BP | PULSE |
|------|----------------|------|-----|-------|
|      |                |      |     |       |

BAILEY, KEITH
PAGE 2

# EXHIBIT D

# WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

*13*

**PATIENT:** Bailey Sr, Keith A
**ADMISSION DATE:** 01/07/2006
**DISCHARGE DATE:**
**ATTENDING PHYSICIAN:** BIKRAM K PAUL, MD

**MEDICAL RECORD NO.:** 092-11-33
**DOB:** 05/28/1953
**SSN:** 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

---

**PRIMARY DIAGNOSIS:** Status post motor vehicle accident.

**SECONDARY DIAGNOSES INCLUDE**
1.   Multiple mid face fractures.
2.   Forehead laceration.
3.   Pneumocephaly.

**PROCEDURES PERFORMED:** January 7, 2006: Include a STAT exam, a FAST exam, a CT of the head, a CT of the face, a CT of the chest, abdomen and pelvis and a CT of the spine. His STAT and FAST exams were negative, so was the CT of chest, abdomen and pelvis and CT of his spine were also negative. CT of the head showed pneumocephaly, CT of the face showed multiple mid face fractures and those fractures include, he has a left ZMC fracture, minimally displaced. He has a left temporal bone fracture, minimally displaced. He has a left orbital medial floor and lateral fracture and he also has a right zygomatic temporal junction fracture and these were all revealed by the CT of the face. On January 12, 2006, a lipoma excision was done. Lipoma was of the right upper quadrant. Patient had been complaining of pain and therefore a lipoma excision was performed on January 12, 2006.

**CONSULTS INCLUDE:** Neurology, ophthalmology, oral maxillofacial surgery, physical therapy and occupational therapy.

**CHIEF COMPLAINT AND HISTORY:** This patient was involved in a T-bone motor vehicle accident and ejection. He had multiple injuries. He arrived to MedStar with a Glasgow Coma Scale of 15; however, his mental status appeared to change. Therefore, he was intubated and sedated and a C-collar was maintained and was intact and in place before, during and after intubation.

**PHYSICAL EXAMINATION:** His physical findings include a 5-cm in length laceration above the left eye. There were no steps that were palpated. He also had a small 5-mm laceration over the upper left eyelid. He had periorbital edema of the left eye. He had some chemosis of the left eye. He also had a right knee laceration, probably about 5-cm in length. He had no other obvious lesions on the scalp. He did appear to have some dried blood in his right ear canal. Left ear showed a normal tympanic membrane. Physical exam was unable to be completely performed due to patient being intubated and sedated after his mental status started to deteriorate. His pelvis was stable to compression and his FAST exam was negative, STAT exam was negative. His CT of head showed his multiple mid face fractures that were discussed as before.

**Chart Copy**

# WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

**PATIENT:** Bailey Sr, Keith A                    **MEDICAL RECORD NO.:** 092-11-33
**ADMISSION DATE:** 01/07/2006
**DISCHARGE DATE:**
**ATTENDING PHYSICIAN:** BIKRAM K PAUL, MD

PAGE 2

LABORATORY FINDINGS ON ADMISSION: Patient's labs are as follows: Sodium 139, potassium 3.6, chloride 103, bicarbonate 26, calcium 7.7, glucose 262 and BUN of 14, creatinine of 0.9. White blood cell count 6.06, hemoglobin 12.7, hematocrit 38.3, platelets 210. He was negative for alcohol. PTT was 26.4, PT was 14.4, INR of 1.1. Troponin of 0.051, CK-MB 1.0. Six hours later, troponin 0.00 and CK-MB of 1.0.

HOSPITAL COURSE: Patient's lacerations above his left eye were repaired by oral maxillofacial surgery on the evening of arrival. Ophthalmology noted no treatment indicated for his orbital floor fractures and recommended follow up in 1 week with the patient. He did have some subconjunctival hemorrhage in his left eye and some chemosis in his left eye. OT and PT saw the patient. OT recommended that his cognitive evaluation showed cognitive deficits and it was difficult to determine his activities of daily living strength and mobility and they recommended that the patient be discharged to an acute rehabilitation facility because he was having difficulty with problem-solving, difficulty with short and long-term memory when asked to recall items such as year of his birth or the president. He would state the president was Coleman and the previous one was Schneider. When asked to point to the window, he pointed in front of him instead of to the left, where the window actually was located (January 9, 2006 note). Physical therapy also recommended the patient's balance and functional mobility was impaired and they also recommended acute rehabilitation on January 9, 2006.

Patient began to describe pain of abdomen. Upon exam, a swelling was noted to the right of the umbilicus that was not able to be reduced. Patient was taken to the OR on January 12, 2006, and a lipoma was excised. Patient did continue to describe headache pain and some leg pains that were controlled with Percocet. Patient appeared to be drowsy and sleepy on daily exams and also noted by wife.

During exam, the patient was also unable to open his left eye completely. Patient on fingerstick glucose was elevated glucose stick and therefore was supplemented with insulin sliding scale. Patient does have a history of diabetes and was already on his regular course of diabetic control.

Patient again was consulted with OT and PT after his lipoma excision and was noted by occupational therapy on January 13, 2006, that patient tolerated sessions fairly. He did present with some decrease in cognition, decreased in ADLs and functional mobility decreased and again they recommended acute rehabilitation. Patient did have some issues with blood pressure

**Chart Copy**

# WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

**PATIENT:** Bailey Sr, Keith A
**ADMISSION DATE:** 01/07/2006
**DISCHARGE DATE:**
**ATTENDING PHYSICIAN:** BIKRAM K PAUL, MD

**MEDICAL RECORD NO.:** 092-11-33

PAGE 3

control while in the hospital and hydralazine was given on January 12, 2006, but after that his blood pressure remained fairly stable.

On January 15, 2006, the patient showed improved drowsiness on exam. He was awake and watching television with his wife on that date. Patient's Percocet and Vicodin had been discontinued and his pain was being controlled by Tylenol only.

Occupational therapy and physical therapy continued to recommend inpatient rehabilitation placement for the patient to help with patient's ADLs, functional mobility and cognitive improvement.

CONDITION AT DISCHARGE: Patient is stable, afebrile. Vital signs are stable. He does follow commands and memory appears to have improved from his original admission date of January 7, 2006.

DISCHARGE INSTRUCTIONS: Patient should resume his regularly scheduled medications for his hypertension and diabetes as scheduled. Use Tylenol for pain and continue to keep the left eye moist with Lacrilube and Refresh. His diet is regular, activity as tolerated and up and out of bed and ambulating as much as possible.

FOLLOW UP CARE: Patient will need to follow up with neurology 1 week after discharge, ophthalmology 1 week after discharge, oral maxillofacial surgery 1 week after discharge and trauma surgery 1 week after discharge.

FINAL DIAGNOSES: Status post motor vehicle accident and ejection, multiple nondisplaced mid facial fractures, pneumocephaly and lipoma.

**Chart Copy**

## WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

**PATIENT:** Bailey Sr, Keith A
**ADMISSION DATE:** 01/07/2006
**DISCHARGE DATE:**
**ATTENDING PHYSICIAN:** BIKRAM K PAUL, MD

**MEDICAL RECORD NO.:** 092-11-33

PAGE 4

DICTATED BY SAMIRA MEYMAND

Electronically Signed by
JACK SAVA, MD 02/24/2006 06:50

PHYSICIAN'S SIGNATURE _____ DATE

JACK SAVA, MD

cc:   SAMIRA MEYMAND
      BIKRAM K PAUL, MD
      JACK SAVA, MD

SR:mdi:mdi
D:01/17/2006
T:01/17/2006  1:13 P
Doc:608661
Job Number: 000046223

**Chart Copy**

# EXHIBIT E

# NATIONAL REHABILITATION MEDICAL NETWORK

102 Irving Street, NW
Washington, DC 20010
202-877-1000

## DISCHARGE SUMMARY

| | |
|---|---|
| **PATIENT NAME:** | BAILEY SR, KEITH A |
| **MEDICAL RECORD#:** | 73177 |
| **DOB:** | 05/28/1953 |
| **DATE OF ADMISSION:** | 01/17/2006 |
| **DATE OF DISCHARGE:** | 02/07/2006 |

**DIAGNOSIS/CONDITION:** Traumatic brain injury secondary to motor vehicle accident on the 7th of January. The patient was involved in a motor vehicle accident in which there was a T-bone type of crash.

**SIGNIFICANT COMORBIDITIES:** He sustained multiple facial fractures including a left zygomatic fracture, left temporal bone fracture, left orbital floor fracture, and right zygomatic junction fracture. He was also found to have a small amount of subarachnoid blood as well as air on his head CT. The air would signify that there was at least a basal skull fracture below the area. Other diagnoses include diabetes and hypertension. Other conditions found at the hospital center during his stay is that he had a lipoma excised on the 12th of January. He was found to have cognitive problems as well as balance problems. He was transferred to NRH on the 17th of January of this year.

**ALLERGIES:** No known drug allergies.

**MEDICATIONS:** At admission, include Amaryl 2 milligrams p.o. daily, Diovan/hydrochlorothiazide 160/25 milligrams 1 tablet daily, Avandia 4 milligrams daily, Diltiazem 300 milligrams daily, Tylenol 650 milligrams q.i.d. p.r.n., Lacrilube to left eyelid daily, artificial tears to left eye 3 times a day, and sliding scale as ordered.

**REVIEW OF SYSTEMS:** Upon coming into NRH, he had excessive thirst and polyuria that would coincide with his diabetes.

**SOCIAL HISTORY:** Lives with his wife.

**ADMISSION LABS:** He had slight increase in LFTs. They were almost normal. Hematocrit was barely within normal range. His platelets were slightly high. His CMP showed BUN of 18, creatinine 1.0, sodium 138, and again slightly increased LFTs with an AST of 61 and ALT of 64. His cholesterol was 208. His HDL was 32, triglycerides 204, and LDL measured was 161. TSH was normal.

**REHAB COURSE:** Again, the patient was admitted on the 18th of January and discharged on the 7th of February. He underwent PT, OT, and speech. Please refer to those evaluations for full details, but he actually did quite well. At time of admission, he had a complete evaluation. He was found to need contact guard for ambulation and going up and down stairs. He required close supervision for transfers

Report Generated: 04/11/2006 14:42:50 Eastern

Not Valid Unless Signed

and ambulation on even surfaces. He required contact guard on uneven surfaces. In regards to self-care, he required close supervision in most areas except toilet transfers which was contact guard and feeding, which was min assist. At time of discharge, he was close supervision in all areas of self-care. He had advanced in mobility to be independent with bed mobility, bed chair and wheelchair transfers, and wheelchair parts. He still required distant supervision for ambulation especially on uneven and community surfaces, and required close supervision on stairs. Hematocrit is 39, BUN is 18, creatinine is 1.0, sodium is 138, and K is 3.7.

**HOSPITAL COURSE:** From a medical viewpoint, we have managed his diabetes and his hypertension as well as his pain. We have managed his bowel problems. He had an ultrasound done of his lower extremities, which showed no sign of a DVT. He did have a left ptosis and ophthalmologist saw him. CT head was done and there were no new abnormalities found and we switched him to Pamelor for pain. Dr. Lu, our endocrinologist was called to manage his diabetes. The Pamelor did not seem to work as well and we switched him to trazodone on the 1st of February. On the 2nd of February, we stopped the trazodone and then put him on Benadryl and Motrin and then stopped the Lovenox. The Benadryl did not work either. We then tried him on Ambien. He generally had a problem with his sleep that we never were totally able to end. He actually did quite well. He was upset about being here, wanted to get home, which is understandable. The team felt he was ready to go home, and he went home on the 7th of February with appropriate followup planned. I would see him in 6 weeks. He is to see his primary care doctor within 6 weeks, and we are available if there are any questions.

ANDREW D MCCARTHY, MD


TR:    AM /DY
D:     04/11/2006 09:38:00
T:     04/11/2006 14:41:57
JOB:   6518077 /2097015

Not Valid Unless Signed

# EXHIBIT F

 **Maryland Department of Assessments and Taxation**

**Taxpayer Services Division**
301 West Preston Street ▦ Baltimore, MD 21201

Main Menu | Security Interest Filings (UCC) | Business Entity Information
(Charter/Personal Property) New Search | Rate Stabilization Notices | Get Forms | Certificate
of Status | SDAT Home

### Taxpayer Services Division

### Entity Name: J & B TRUCKING SERVICES, INC.
### Dept ID #: D11346608

| General Information | Amendments | Personal Property | Certificate of Status |
| --- | --- | --- | --- |

**Principal Office (Current):**   8622 WATERSHED CT.
GAITHERSBURG, MD 20877

**Resident Agent (Current):**   JOSE B. LAINEZ
8622 WATERSHED CT.
GAITHERSBURG, MD 20877

**Status:**   INCORPORATED

**Good Standing:**   No

**Business Code:**   Ordinary Business - Stock

**Date of Formation or Registration:**   06/15/2006

**State of Formation:**   MD

**Stock/Nonstock:**   Stock

**Close/Not Close:**   Not Close

---

### Link Definition

**General Information**   General information about this entity
**Amendments**   Original and subsequent documents filed
**Personal Property**   Personal Property Return Filing Information and Property Assessments
**Certificate of Status**   Get a Certificate of Good Standing for this entity

 **Maryland Department of Assessments and Taxation**

**Taxpayer Services Division**
301 West Preston Street ▓ Baltimore, MD 21201

---

**Main Menu | Security Interest Filings (UCC) | Business Entity Information (Charter/Personal Property) New Search | Rate Stabilization Notices | Get Forms | Certificate of Status | SDAT Home**

---

**Taxpayer Services Division**

**Entity Name: J & B TRUCKING SERVICES, INC.
Dept ID #: D11346608**

| General Information | Amendments | Personal Property | Certificate of Status |
|---|---|---|---|

<u>NOTICE ABOUT IMAGE AVAILABILITY AND ACCURACY</u>

Page 1 of 1

| Description | Date Filed | Time | Film | Folio | Pages | View Document | Order Copies |
|---|---|---|---|---|---|---|---|
| <u>ARTICLES OF INCORPORATION</u> | 06/15/2006 | 01:21-PM | B00971 | 1027 | 0002 | 👁 | 🗐 |

---

| **Link Definition** |
|---|

| **General Information** | General information about this entity |
|---|---|
| **Amendments** | Original and subsequent documents filed |
| **Personal Property** | Personal Property Return Filing Information and Property Assessments |
| **Certificate of Status** | Get a Certificate of Good Standing for this entity |

 **Maryland Department of Assessments and Taxation**

**Taxpayer Services Division**
301 West Preston Street ▓ Baltimore, MD 21201

Main Menu | Security Interest Filings (UCC) | Business Entity Information
(Charter/Personal Property) New Search | Rate Stabilization Notices | Get Forms | Certificate
of Status | SDAT Home

### Taxpayer Services Division

### Entity Name: J & B TRUCKING SERVICES, INC.
### Dept ID #: D11346608

### Ack #: 1000361993189020

| | |
|---|---|
| **Status:** | INCORPORATED |
| **Good Standing:** | No |
| **Business Code:** | Ordinary Business - Stock |
| **Filing Date and Time:** | 06/15/2006 01:21 PM |
| **Film:** | B 00971 |
| **Folio:** | 1027 |
| **Pages:** | 0002 |
| **Stock/Nonstock:** | Stock |
| **Close/Not Close:** | Not Close |

**Principal Office**

8622 WATERSHED CT.
GAITHERSBURG, MD 20877

**Resident Agent**

JOSE B. LAINEZ

8622 WATERSHED CT.
GAITHERSBURG, MD 20877

# CORPORATE CHARTER APPROVAL SHEET
## **EXPEDITED SERVICE**    ** KEEP WITH DOCUMENT **

DOCUMENT CODE _____    BUSINESS CODE _____

# _____

Close _____    Stock _____    Nonstock _____

P.A. _____    Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

_____

```
1000361993189020

ID # D11346608 ACK # 1000361993189020
LIBER: B00971 FOLIO: 1027 PAGES: 0002
J & B TRUCKING SERVICES, INC.

06/15/2006  AT 01:21 P WO # 0001243998
```

New Name _____

_____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | 100 |
| Org. & Cap. Fee: | 70 |
| Expedite Fee: | |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | |
| Copy Fee: | 22 |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |
| TOTAL FEES: | 212 |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name

_____ Other Change(s)

Credit Card _____    Check _____    Cash _____    Code _____

_____ Documents on _____ Checks

Approved By: _____

Keyed By: _____

COMMENT(S):

Attention: G & S ENTERPRISES of MD., INC

Mail: Name and Address
2446 REEDIE DR. #8
WHEATON, MD
20902

```
CUST ID:0001800960
WORK ORDER:0001243998
DATE:06-15-2006 01:21 PM
AMT. PAID:$212.00
```

# ARTICLES OF INCORPORATION FOR A __STOCK__ CORPORATION

**FIRST:** The undersigned _Jose B. Lainez_

whose address is _8622 Watershed Ct. Gaithersburg, MD 20877_, being at least eighteen years of age, do(es) hereby form a corporation under the laws of the State of Maryland.

**SECOND:** The name of the corporation is

_J & B Trucking Services, Inc._                                    _WM_

**THIRD:** The purposes for which the corporation is formed are as follows:

_To Provide Transportation and Delivery Services_

**FOURTH:** The street address of the principal office of the corporation in Maryland is

_8622 Watershed Ct. Gaithersburg, MD 20877_

**FIFTH:** The name of the resident agent of the corporation in Maryland is

_Jose B. Lainez_

whose address is _8622 Watershed Ct. Gaithersburg, MD 20877_

**SIXTH:** The corporation has authority to issue _100_ shares at $ _10._ par value per share.

**SEVENTH:** The number of directors of the corporation shall be _#1_ which number may be increased or decreased pursuant to the bylaws of the corporation. The name(s) of the director(s) who shall act until the first meeting or until their successors are duly chosen and qualified is/are _Jose B. Lainez_

IN WITNESS WHEREOF, I have signed these articles and acknowledge the same to be my act.

I hereby consent to my designation in this document as resident agent for this corporation.

SIGNATURE(S) OF INCORPORATOR(S): FIFTH:

SIGNATURE OF RESIDENT AGENT LISTED IN

RETURN TO:
_G&S Enterprises of MD, Inc._
_2446 Reedie Dr. Ste. 8_
_Wheaton, MD 20902_

CUST ID:0001800960
WORK ORDER:0001243998
DATE:06-15-2006 01:21 PM
AMT. PAID:$212.00

StockCorporation/Mydocs/forms



***truckdrivingcdljobs.com***

Featured Sponsor

# J & B TRUCKING SERVICE INC

## GAITHERSBURG, MD 20877

Company Name: **J & B TRUCKING SERVICE INC**

Address: **8622 WATERSHED CT**

City, ST Zip: **GAITHERSBURG, MD 20877**

Phone / Fax: **(240) 793-4701 /**

Email:

Power Units: **3**

Dot Number: **1078381**

**Click Here To Apply Now!**

Ads by Google

**Start Your Career at CFI**
Work for the Leader in Trucking Driving Careers. Join Our Family!
www.CFI-us.com

**Truck Load**
Commercial Shipping Services Only ! No Household Goods Personal Items
www.TheFreightRateCo.cc

This space for rent... Click Here!



ROADMASTER
JOB OPENINGS

This space for rent... Click Here!

This space for rent... Click Here!

Back to GAITHERSBURG MD Owner Operator Jobs
Back to Maryland MD Owner Operator Jobs

home | truck driving jobs | recruiters | drivers
trucking forum | links | links2 | links1 | advertise | contact us
© truckdrivingcdljobs.com

# EXHIBIT G

CRIMINAL DIVISION - FELONY BRANCH

UNITED STATES OF AMERICA    : Criminal Case No. 2006FEL000155

      v.             : Judge Hiram E. Puig-Lugo

ONORIO CIFUENTES           : M.O. Return: O4/24/06

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER OF DETENTION PENDING TRIAL

     This matter came before the Court on February 2, 2006, upon the motion of the United

States to hold the defendant without bond pending his trial in 100 days pursuant to 23 D.C. Code

§ 1322(b)(1)(A). Having considered the factors enumerated in 23 D.C. Code § 1322(e), the

Government's proffer of the defendant's prior record, the testimony of Detective Elgin Wheeler of

the Metropolitan Police Department ("MPD"), the report and recommendation of the Pretrial

Services Agency, and arguments of counsel for the defendant and the Government, in accordance

with 23 D.C. Code § 1322(g)(1), the Court makes the following findings of fact and conclusions

of law:

     1. There is a substantial probability that defendant committed the offense for which he is

before the Court, that is, aggravated assault, a crime of violence as defined in 23 D.C. Code §

1331. The evidence presented at defendant's detention hearing established that on January 7,

2006, at approximately 4:55 a.m., defendant was the driver of a 2002 Isuzu box truck that had

been stolen just moments before from Maryland. Defendant drove that truck at a high rate of

speed, tailgating one motorist and flashing the truck's bright lights to signal his desire to pass.

Defendant was able to pass that motorist and accelerated, running several red lights, including

that at Michigan Ave., N.E., and South Dakota Ave., N.E., in the District of Columbia.


Case: 2006 FEL 000155
MARTINEZV 03/27/2006 11:57:09 AM

As it illegally entered that intersection, the box truck driven by defendant was traveling approximately 50 to 55 miles per hour, well in excess of the posted speed limit of 25 miles per hour. In the intersection, the box truck smashed into a pickup truck driven by the victim, Keith Bailey. As a result of the collision, Mr. Bailey was ejected from his pickup and suffered a severe blunt force trauma to his skull.

Paramedics stabilized Mr. Bailey. Both Mr. Bailey and defendant were transported to the Washington Hospital Center. As a result of that injury, Mr. Bailey suffered severe short-term memory loss and continues to suffer from that loss. Further, Mr. Bailey suffers from physical weakness. Prior to the accident, Mr. Bailey suffered from neither of these conditions.

A few hours after defendant was admitted to the hospital, Detective Michael Miller was notified by the hospital staff that defendant was released and was headed to an address in Woodbridge, Virginia. Detective Miller arranged for Yellow Cab Company to contact the vehicle transporting defendant and asked it to return him to the hospital. At the hospital, he was arrested. At the time of his arrest, defendant had in his possession a key to the box truck.

Defendant stated that he had purchased the box truck from one of his relatives; however, the owner of the box truck was not related to defendant.

The Court finds that defendant intentionally or knowingly engaged in conduct that created a grave risk of serious bodily injury to the victim.

2. In determining whether there are conditions of release that will reasonably assure the safety of any other person or the community, the Court has considered the following factors:

3

a. The nature and circumstances of the offense charged. Here, there is a substantial probability that the defendant committed the crime of aggravated assault.

b. The weight of the evidence against the defendant. The Court found the evidence strong and found that there was a substantial probability that defendant committed the offense charged.

c. The history and characteristics of the defendant, including prior convictions for Fourth Degree Burglary (MD 2006), Assault & Battery Police Officer or Firefighter (VA 2001 and 2002), and Obstructing Justice (VA 2002). In this regard, the Court notes that defendant had been released from jail in Maryland just prior to committing this crime. Further, the Court notes the government's proffer that since March 1999, defendant has been arrested 12 times: twice for assault on a police officer in Virginia, twice for obstructing justice and eluding the police in Virginia, once for escape by force when a prisoner in Virginia, once for simple assault in the District of Columbia, and once for disorderly/resisting arrest in Maryland.

WHEREFORE, having considered the provisions of 23 D.C. Code § 1322, and the factors set forth in 23 D.C. Code § 1322(e), this Court finds, by clear and convincing evidence, that there is no condition or combination of conditions, as set forth in 23 D.C. Code § 1321(c), which will reasonably assure the safety of any other person or the community. Accordingly, it is this ____ day of March, 2006,

4

ORDERED, that defendant be held without bond, pending the trial or other final disposition of this matter, for a period not to exceed one hundred calendar days until the trial or other final disposition of this matter;

AND FURTHER ORDERED that defendant be committed to the custody of the Attorney General of the United States for confinement in a facility separate, to the extent practicable, from persons awaiting or serving sentences or being held pending appeal; that the defendant be afforded a reasonable opportunity for private consultation with counsel; and that, on order of a judicial officer or request of an attorney for the government, the defendant be delivered to the United States Marshal or other appropriate person for appearance in a court proceeding.

_March 21, 2006_
DATE

HIRAM E. PUIG-LUGO
ASSOCIATE JUDGE
SUPERIOR COURT
DISTRICT OF COLUMBIA

cc:

Emily Miller, Esquire
Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

Melissa Sandoval, Esquire
Public Defender Service
District of Columbia
633 Indiana Avenue, N.W.
Washington, D.C. 20004

MARTINEZV 03/27/2006 11:57:09 AM

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


KEITH BAILEY, et al.          :

                              :

            Plaintiffs :

                              :

      vs.                     : Civil Action No.

                              : 1:08-cv-00644-RMC

J&B Trucking Service, Inc.,: Judge R. Collyer

et al.                        :

                              :

            Defendants :


                        Beltsville, Maryland

                        Tuesday, May 27, 2008


Deposition of:


            SERGIO R. SANABRIA

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the offices

of Hartel, Kane, DeSantis, MacDonald, & Howie,

LLP, 11720 Beltsville Drive, Suite 500,

Beltsville, Maryland 20705, before Renee A.

Feder, CSR, a Notary Public in and for the

State of Maryland, beginning at 1:08 p.m.,

when were present on behalf of the respective

parties:

Page 2

1  On behalf of the Plaintiffs:
2
3  BY:  EDWARD L. NORWIND, ESQ.
3       Karp, Frosh, Lapidus, Wigodsky
3       & Norwind, P.A.
4       2273 Research Boulevard, Suite 200
4       Rockville, Maryland 20850
5       (301)948-3800
5
6
7  On behalf of the Defendants:
8  BY:  MICHAEL A. DESANTIS, ESQ.
8       Hartel, Kane, DeSantis, MacDonald
9       & Howie, LLP
9       11720 Beltsville Drive, Suite 500
10      Beltsville, Maryland 20705
10      (301)486-1200
11
11
12  Also Present:  Claudine Varesi, Interpreter
12
13               + + +
14
14       C O N T E N T S
15
15  WITNESS:  SERGIO R. SANABRIA
16
17  EXAMINATION BY:              PAGE:
18  MR. NORWIND                    3
19  MR. DeSantis                   32
20      E X H I B I T S
21  DEPOSITION NO.     MARKED FOR IDENTIFICATION
22      None.

Page 3

1       P-R-O-C-E-E-D-I-N-G-S
2       (Thereupon, the interpreter was sworn to
3  translate the questions and answers accurately
4  and completely.)
5  Thereupon,
6       SERGIO R. SANABRIA
7  was called for examination by counsel and,
8  after having been duly sworn by the Notary,
9  was examined and testified as follows:
10      EXAMINATION BY COUNSEL FOR PLAINTIFFS
11      BY MR. NORWIND:
12      Q.   What is your name, sir?
13      A.   It is Sergio Rolando Sanabria.
14      Q.   And where do you live?
15      A.   I live in Hyattsville.  The whole
16  address would you like?
17      Q.   Please.
18      A.   5615 Queens Chapel Road,
19  Hyattsville P.G.  Zip code 20782.
20      Q.   How long have you lived there?
21      A.   I have lived there, I believe,
22  since 2003.

Page 4

1       Q.   What is your country?
2       A.   Guatemala.
3       Q.   When did you come to the United
4  States?
5       A.   I came in '99.
6       Q.   When you came to the United States
7  in 1999, where did you first live?
8       A.   The first place where I lived, I
9  lived for some time in Virginia, for some
10  months.  After that I came to Gaithersburg, to
11  live in Gaithersburg.
12      Q.   Where in Virginia did you live?
13      A.   I don't remember, to be very
14  honest.
15      Q.   What city?
16      A.   Arlington.
17      Q.   Who did you live with then?
18      A.   With some friends.
19      Q.   And then you moved to
20  Gaithersburg?
21      A.   Yes, I did move afterwards to
22  Gaithersburg.

Page 5

1       Q.   When did you move to Gaithersburg?
2       A.   I moved to Gaithersburg in -- I
3  will make a correction.  Like October of '99.
4       Q.   To Gaithersburg?
5       A.   Yes.  Gaithersburg.
6       Q.   And where in Gaithersburg did you
7  live?
8       A.   At Queen Orchard Boulevard.
9       Q.   Quince?
10      A.   Yes, Quince Orchard Boulevard.
11      THE INTERPRETER:  Mistake by
12  interpreter.
13      THE WITNESS:  I don't remember the
14  apartment number exactly.
15      BY MR. NORWIND:
16      Q.   And did you have that same address
17  in Gaithersburg until you moved to
18  Hyattsville?
19      A.   Yes.  I only lived at that place.
20      Q.   Do you have children who live with
21  you?
22      A.   No, my children are not living

Page 18

1  a photograph of the truck parked to the side.
2        MR. NORWIND:  Okay.  Thank you.
3        BY MR. NORWIND:
4    Q.    What kind of work for Belfort did
5  you do?
6    **A.    We delivered new furniture to the**
7  **houses.**
8    Q.    When did you work for Belfort?
9    **A.    I started working for Belfort in**
10  **2001.  2001.**
11        MR. DeSANTIS:  Until when?
12        THE WITNESS:  Until I started
13  working for the air conditioning company.  May
14  I write it?  Until 2007.
15        BY MR. NORWIND:
16    Q.    About six years?
17    **A.    That I worked for the company,**
18  **yes.**
19    Q.    Did you bring their truck home
20  with you all the time?
21    **A.    Sometimes.**
22    Q.    So, where is Belfort Company

Page 19

1  located?
2    **A.    It is route -- I am not sure if it**
3  **is --**
4    Q.    In Northern Virginia?
5    **A.    Yes, Northern Virginia.**
6    Q.    And you made deliveries for them?
7    **A.    In Virginia?**
8    Q.    Well, I am asking what type of
9  work exactly did you do for them.
10    **A.    I loaded the furniture, put it in**
11  **the truck, and I delivered to the clients.**
12    Q.    Did you drive the truck?
13    **A.    Yes, I did drive the truck.**
14    Q.    Where did you make these
15  deliveries?
16    **A.    I did these deliveries in**
17  **Manassas, Arlington, Warrenton.  We went to**
18  **Southern Maryland, like La Plata.  All the way**
19  **to parts of Frederick.  And times we would go**
20  **into Washington.  Three or four times a month**
21  **we would go to Washington.**
22    Q.    Washington, D.C. for deliveries?

Page 20

1    **A.    Yes.**
2    Q.    Did you pick up at a warehouse or
3  the company store?
4    **A.    The company's warehouse.**
5    Q.    So, is it correct, Mr. Sanabria,
6  that you made deliveries for Belfort into
7  Washington, D.C. for almost six years three or
8  four times a month?
9    **A.    Three to four times a month.  Not**
10  **every week.**
11    Q.    Now, sir, I want to ask you a few
12  personal questions.  Please don't take offense
13  because there is some information we need for
14  the lawsuit.
15        Okay?
16    **A.    Yes.**
17    Q.    So, Number 1, do you have a
18  driver's license?
19    **A.    Yes.**
20    Q.    From what state?
21    **A.    From the State of Maryland.**
22    Q.    Do you have a commercial driver's

Page 21

1  license?
2    **A.    No.**
3    Q.    Do you have any -- have there been
4  any criminal charges against you?
5    **A.    No.**
6    Q.    Have you ever been arrested?
7    **A.    No.**
8    Q.    Have you ever gotten parking
9  tickets?
10    **A.    Yes.**
11    Q.    Have you ever gotten traffic
12  tickets for speeding, not stopping at red
13  lights, things like that?
14    **A.    The traffic tickets in Virginia**
15  **with the radar.**
16    Q.    I see.  Any tickets from the
17  District of Columbia?
18    **A.    In what time?  Which time are you**
19  **referring to?**
20    Q.    2001 to now.
21    **A.    Only one that they gave me two**
22  **months ago.  I was talking with somebody and**

Page 26

1    **A.    When we are coming with a loaded**
2  **truck, we travel on that road.**
3    Q.    And this is for which job?
4    **A.    For this, for the appliance job.**
5    MR. DeSANTIS:  I will just put on
6  the record that the answer was not responsive
7  to the question as the answer seems to
8  indicate that he was working at the time he is
9  traveling on Riggs Road.
10    BY MR. NORWIND:
11    Q.    Sir, have you ever gotten medical
12  care from a hospital in D.C.?
13    **A.    Medical treatment, no.**
14    Q.    Has a doctor ever treated you in
15  D.C.?
16    **A.    No.**
17    Q.    Have you ever been hurt on the
18  job?
19    **A.    Yes.**
20    Q.    Did you have worker's comp
21  benefits?
22    **A.    No.**

Page 27

1    Q.    Did you ever get hurt in D.C.?
2    **A.    No.  When I got hurt it was when I**
3  **was working at the warehouse in Belfort, at**
4  **Belfort.**
5    Q.    We have talked about your full
6  time jobs.  We have talked about no part time
7  work.  Do you have any personal business?
8    **A.    No.**
9    Q.    You don't sell anything.  Correct?
10    **A.    I do not sell anything.**
11    Q.    Do you shop in stores in the
12  District of Columbia?
13    **A.    No.**
14    Q.    Who were you working for in
15  January, 2006?
16    **A.    I was working for J&B Trucking**
17  **Service.**
18    Q.    What period of time did you work
19  for J&B?
20    **A.    From 2001 to 2007.**
21    Q.    Did J&B do deliveries for Belfort?
22    **A.    Yes.**

Page 28

1    Q.    So please help me understand
2  something.  For the entire time that you made
3  deliveries for Belfort, were you working for
4  J&B?
5    **A.    In Belfort?  Could you please**
6  **repeat the question?**
7    Q.    Okay.  I will try.  Let me
8  regroup.
9    When you made deliveries for
10  Belfort, is that when you were working for J&B
11  Trucking?
12    **A.    Yes.**
13    Q.    So J&B did the deliveries for
14  Belfort.  Is that right?
15    **A.    For Belfort.**
16    Q.    Like a delivery contractor?
17    **A.    Yes, like a contractor.**
18    Q.    Is that correct?
19    **A.    Yes.**
20    Q.    So you worked for J&B from 2001 to
21  2007.  Is that right?
22    **A.    Yes.**

Page 29

1    Q.    Are you a member of a union?
2    **A.    No.  A union is like a syndicate,**
3  **a workers union?**
4    Q.    Yes.
5    **A.    No, I am not a member.**
6    Q.    Sir, do you pay taxes for the
7  District of Columbia?
8    **A.    I write my taxes.  I do.**
9    Q.    To the District?
10    **A.    But I couldn't tell you -- I do**
11  **not know if it is for the District or for**
12  **where.**
13    Q.    Okay, Mr. Sanabria, you have the
14  picture showing us the Belfort truck at your
15  home.
16    **A.    It is not my home.  But it is**
17  **where I used to park the truck because I leave**
18  **late from work and it was too tiring to go get**
19  **the car to the place where I used to park it**
20  **so I would go home.**
21    Q.    Because it was a long workday?
22    **A.    Yes.**

Page 30

1    Q.   So, where is this located?  What
2  city is the house in?
3    A.   Hyattsville.
4    Q.   So, on your picture -- help your
5  lawyer understand something.  Does this truck
6  belong to J&B?
7    A.   That truck, yes, it does.
8    Q.   So it says Belfort on the truck,
9  but it is a J&B truck.  Is that correct?
10    A.   The name of Belfort, they just put
11  it as an advertisement.  But the truck belongs
12  to J&B.
13    Q.   Okay.  So, your paycheck came from
14  J&B and not from Belfort?
15    A.   Yes, my check.
16    Q.   You told us that Belfort is in
17  Chantilly or Reston.  Is that correct?
18    A.   Herndon or Reston, but I don't
19  remember exactly.
20    Q.   Tell us the route you took from
21  home to work at Belfort.
22    A.   Because we used to go to different

Page 31

1  locations, sometimes I would take 495 to
2  take -- to drop my companion off at Georgia
3  Avenue, and from there I would go home.
4  Sometimes I would end up by Frederick, but I
5  had to come down here, and then I would go
6  and -- I would either park the truck or go
7  home.
8    Q.   So, 495, you started on 495, to go
9  to work at Belfort?
10    A.   In the morning, yes.  I take 495.
11    Q.   And where do you get off of 495?
12    A.   I exit on the toll road, taking
13  the toll road, and then 28 North.  Until -- I
14  would take another road but I don't remember
15  the name exactly to get to the warehouse.
16    MR. NORWIND:  That might be all I
17  have.  Let me just regroup with my notes.  We
18  will take a short break.
19    MR. DeSANTIS:  Do you mind if I
20  clarify a couple of things while you look at
21  your notes?
22    MR. NORWIND:  No.

Page 32

1    EXAMINATION BY COUNSEL FOR DEFENDANTS
2    BY MR. DeSANTIS:
3    Q.   Have you ever lived in the
4  District of Columbia since coming from
5  Guatemala?
6    A.   No, I have not.
7    Q.   When you say you didn't know
8  whether you pay taxes to the District or
9  whoever, were you paying income taxes?
10    A.   I pay my taxes.  I know that I
11  send two letters, one for one, side one to the
12  other, but I don't know exactly.
13    Q.   When you pay taxes, is that for
14  the money that you earn?
15    A.   How is that?
16    Q.   Do you know what federal income
17  taxes are?
18    A.   No.
19    Q.   You had been asked about --
20    THE INTERPRETER:  Can I rephrase
21  it so he will understand?
22    The taxes that you pay?

Page 33

1    THE WITNESS:  They give me a form
2  from the company so I go to -- somebody does
3  the taxes for me.  I report my expenses,
4  everything that I spend, my tools and
5  everything.  And so they do the taxes for me,
6  the accountant does the taxes for me.
7    BY MR. DeSANTIS:
8    Q.   Okay.  All right.  And this Riggs
9  Road, you testified previously that you
10  traveled on Riggs Road in Washington on your
11  deliveries?
12    A.   Yes, usually we take Riggs Road.
13    Q.   I want to clarify, did you ever
14  take Riggs Road, did you ever take Riggs Road
15  leaving home or going back home after you
16  finished work?
17    THE INTERPRETER:  The interpreter
18  is going to repeat.
19    MR. DeSANTIS:  Let me rephrase.
20    BY MR. DeSANTIS:
21    Q.   Did you ever use Riggs Road in
22  D.C. other than when you were making

# EXHIBIT I

1          SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                      CRIMINAL DIVISION

3    - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA   :

5            vs.               :    Criminal Action No.

6    ONORIO T. CIFUENTES,      :          F155-06

7            Defendant. :        (Excerpt)

8    - - - - - - - - - - - - - x

9                        Thursday, February 2, 2006

10                       Washington, D.C.

11          The above-entitled action came on for preliminary
hearing, before the Honorable HIRAM E. PUIG-LUGO, Associate
12   Judge, in Courtroom 311, commencing at approximately
2:22 p.m.
13
             THIS TRANSCRIPT REPRESENTS THE PRODUCT
14           OF AN OFFICIAL REPORTER, ENGAGED BY THE
             COURT, WHO HAS PERSONALLY CERTIFIED
15           THAT IT REPRESENTS THE TESTIMONY AND
             PROCEEDINGS OF THE CASE AS RECORDED.

16           APPEARANCES:

17           On behalf of the Government:

18           ROBERT LEIDENHEIMER, Esquire
             Assistant United States Attorney
19

20           On behalf of the Defendant:

21           MELISSA SANDOVAL, Esquire
             Public Defender Service
22           Washington, D.C.

23   DeLyssia C. Janifer, RPR        (202)879-1084
     Official Court Reporter

24

25

                                                              1

1  complainant/victim, which was traveling southbound on South

2  Dakota Avenue.

3    Q    Would you tell us again, briefly, where that truck came

4  from, what your investigation revealed with respect to the

5  origin of that truck?

6    A    The Isuzu pickup truck originated --

7        MS. SANDOVAL:  Object to relevance.  It's irrelevant to

8  the charge of aggravated assault.

9        THE COURT:  Overruled.  You may continue, Detective.

10   A    The pickup truck was --

11   Q    I'm sorry.  The pickup truck or --

12   A    Correction.  The box truck originated from the 5600

13  block of Queens Chapel Road, which is in Hyattsville,

14  Maryland.

15   Q    When you say originated there, tell us what occurred in

16  the 5600 block of Queens Chapel Road, please.

17       THE COURT REPORTER:  I'm sorry.  I can't hear you.

18       MS. SANDOVAL:  Objection; relevance.

19       THE COURT:  Overruled.

20   A    The box truck was in the custody or responsible person

21  -- person by the name -- I'm sorry, I would have to refer to

22  the notes, but it was reported stolen.  According to

23  Hyattsville report is that the one responsible for it had it

24  in front of his house, again in the 5600 block of Queens

25  Chapel Road.

1    He left the car -- he came out, started the car and

2    left the keys in there to warm it up for that morning's job,

3    which is delivering furniture.  He went back in the house

4    approximately 10-15 minutes, came out to get into the truck,

5    and the only thing he saw was the truck heading southbound

6    with no lights on, southbound on Queens Chapel Road with no

7    lights on.

8        Q    Did the police investigation uncover any information

9    about what happened between the time that truck was stolen

10   and the time that it was involved in an accident?

11       A    Yes.  I spoke with a witness who was there, who was in

12   the line of travel up to the point where the crash actually

13   occurred.

14       Q    What did you learn about -- from that witness about how

15   the truck was being driven?

16       A    According to him, the information provided by the

17   witness --

18            THE COURT:  I'm sorry.  Was this the owner or somebody

19   else?

20            THE WITNESS:  This is somebody --

21            THE COURT:  Somebody else, okay.

22            THE WITNESS:  He first made contact, visual contact,

23   with the truck in the 2400 block of Queens Chapel Road.  He

24   was traveling southbound.  And what he explains, he was in

25   the -- there's only a two-lane road.  He was in the curb lane

# EXHIBIT J

Case 1:08-cv-00644-RMC    Document 15-12    Filed 07/18/2008    Page 2 of 2



**Start** **5615 Queens Chapel Rd**
**Hyattsville, MD 20782**

**End** **South Dakota Ave NE & Michigan Ave**
**NE**
**Washington, DC 20017**

Travel **1.8 mi – about 6 mins**

Get Google Maps on your phone
Text the word "GMAPS" to 466453

# EXHIBIT K

SUPERIOR COURT

OF THE

DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on March 13, 2006

SUPERIOR COURT OF THE
DISTRICT OF COLUMBIA
CASE MANAGEMENT BRANCH

2006 MAY -9  A 4: 54

FILED

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | : | Criminal No:  2006FEL000155 |
| | : | |
| v. | : | Violation: |
| | : | 22 D.C. Code, Section 404.1, 4502; |
| ONORIO TERESO CIFUENTES | : | 22 D.C. Code, Section 406, 4502; |
| PDID: 517-191 | : | 22 D.C. Code, Section 3232(a), 3232(c)(1); |
| | : | 22 D.C. Code, Section 3215; |
| | : | 50 D.C. Code, Section 2201.04; |
| | : | 22 D.C. Code, Section 303; |
| | : | 50 D.C. Code, Section 1403.01(e) (2001 ed.) |
| | : | |
| | : | (Aggravated Assault While Armed; Mayhem |
| | : | While Armed; Receiving Stolen Property; |
| | : | Unauthorized Use Of a Vehicle; Reckless |
| | : | Driving; Destroying Property; Operating After |
| | : | Suspension) |

The Grand Jury charges:

FIRST COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes, while armed with a dangerous weapon, that is a box truck, knowingly and purposely caused serious bodily injury to Keith Bailey, Sr., or under circumstances manifesting extreme indifference to human life, Onorio T. Cifuentes intentionally and knowingly engaged in conduct which created a grave risk of serious bodily injury to Keith Bailey, Sr., and thereby caused serious bodily injury to Keith Bailey, Sr. (Aggravated Assault While Armed, in violation of 22 D.C. Code, Section 404.1, 4502 (2001 ed.))

SECOND COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes, while armed with dangerous weapon, that is a box truck, maimed Keith Bailey, Sr.. (Mayhem While Armed, in violation of 22 D.C. Code, Section 406, 4502 (2001 ed.))

THIRD COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes bought, received, possessed, and obtained control of property of a value of $250 or more, belonging to Jose Lainez, consisting of a box truck, which had been stolen, knowing and having reason to believe it was stolen, with the intent to defraud and to deprive Jose Lainez of a right to and benefit of the property. (Receiving Stolen Property, in violation of 22 D.C. Code, Section 3232(a), 3232(c)(1) (2001 ed.))

FOURTH COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes feloniously did use and operate one certain motor vehicle, property of Jose Lainez, in the care, custody and control of Sergio Sanabria, and did operate and drive that motor vehicle for his own profit, use and purpose, without the consent of Jose Lainez, the owner of that motor vehicle or Sergio Sanabria. (Unauthorized Use Of a Vehicle, in violation of 22 D.C. Code, Section 3215 (2001 ed.))

FIFTH COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes, did operate a motor vehicle upon a highway carelessly and heedlessly in willful and wanton disregard of the rights and safety of others or without the caution and circumspection and at a speed and a manner so as to endanger and be likely to endanger persons and property. (Reckless Driving, in violation of 50 D.C. Code, Section 2201.04 (2001 ed.))

SIXTH COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes maliciously did injure, break, and destroy certain property, that is, a box truck, property of Jose Lainez, causing damage in the amount of $200 or more. (Destroying Property, in violation of 22 D.C. Code, Section 303 (2001 ed.))

SEVENTH COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes maliciously did injure, break, and destroy certain property, that is, a truck, property of Keith Bailey, Sr., causing damage in the amount of $200 or more. (Destroying Property, in violation of 22 D.C. Code, Section 303 (2001 ed.))

EIGHTH COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes maliciously did injure, break, and destroy certain property, that is, a bus stop sign and pole, property of Washington Area Metro Transit Authority, causing damage in the amount of less than $200. (Destroying Property, in violation of 22 D.C. Code, Section 303 (2001 ed.))

NINTH COUNT:

On or about January 7, 2006, within the District of Columbia, Onorio T. Cifuentes, did operate a motor vehicle during the period for which his operator's license or right to operate was suspended. (Operating After Suspension, in violation of 50 D.C. Code, Section 1403.01(e) (2001 ed.))

*Kenneth L. Wainstein / NHW*

KENNETH L. WAINSTEIN
Attorney of the United States in
and for the District of Columbia

A TRUE BILL:

*Michelle Bly*

Foreperson

# EXHIBIT L

**Superior Court of the District of Columbia**
**Criminal Division**

United States
~~District of Columbia~~

vs.                                         Criminal No. _F 155-06_

Onario Cifuentes

## WAIVER OF TRIAL BY JURY OR COURT
## UPON ENTRY OF GUILTY PLEA

**YOU ARE NOT REQUIRED TO PLEAD GUILTY.** If you do plead guilty, you will give up important rights, some of which are stated below.

**First,** you give up your constitutional right to a trial by jury or by the court. At a trial the Government would be required to present evidence to prove you are guilty beyond a reasonable doubt. You would have the right to cross-examine the government's witnesses and you could have witnesses come to court and testify for you. You also would have the right to testify if you wanted to; however, if you chose not to present testimony that decision could not be used against you. You could not be convicted at a jury trial urdess all 12 jurors agreed that the government had proved your guilt beyond a reasonable doubt. You could not be convicted in a non-jury trial unless the court found that the government had proved your guilt beyond a reasonable doubt.

**Second,** you give up the right to appeal your conviction to the Court of Appeals. This is a right you would have if you were convicted following either a jury or non-jury trial. The right to appeal includes the right to have the Court of Appeals appoint a lawyer for you and pay for the lawyer's services to represent you in the Court of Appeals if you could not afford a lawyer.

**Third,** if you are not a citizen of the United States, your plea of guilty could result in your deportation, exclusion from admission to the United States, or denial of naturalization.

**Your signature on this form means that you wish to plead guilty and give up your right to a trial of any kind, and your right to appeal. When your plea is accepted by the court, you will be convicted and the only matter left in this case will be for the court to sentence you.**

I HAVE REVIEWED THIS FORM WITH MY LAWYER AND HAVE DECIDED TO PLEAD GUILTY IN THIS CASE. I HAVE DECIDED TO GIVE UP MY CONSTITUTIONAL RIGHT TO HAVE A TRIAL AND TO GIVE UP MY RIGHT TO APPEAL.

_____          _____
Defendant                        Attorney for Defendant

                                 APPROVED this _____28ᵗʰ_____ day of

_____          _____September_____  _2006_
Assistant U.S. Attorney or            (Date)              (Year)
Assistant Attorney General

                                 _____
                                 Judge

Form CD-2073/Mar. 99

**White - Court Jacket      Canary - USAO      Pink - Defense Attorney      Gold**



*Left margin, handwritten, read bottom to top:* Mr. Cifuentes agrees to plead guilty to one count of attempted aggravated assault. The government agrees to dismiss all remaining and greater charges. Reserves Stepback; waives any applicable enhancement papers and reserves allocution within the applicable guideline range of the DC Superior Court voluntary sentencing guidelines.

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

United States of America
  V.

ONORIO CIFUENTES

JUDGMENT IN A CRIMINAL CASE

Case Number:  2006 FEL 155
PDID No.  517191

## THE DEFENDANT:

☒ ENTERED A PLEA OF GUILTY TO COUNT (S)  1

☐ WAS FOUND GUILTY ON COUNT (S)
    AFTER A PLEA OF NOT GUILTY.

| Count | Nature of Charges | Title & Section | Date of Offense |
|-------|-------------------|-----------------|-----------------|
| COUNT 1 | ATTEMPTED AGGRAVATED ASSAULT | | 01/07/06 |

## SENTENCE OF THE COURT

AS TO COUNT 1- TWENTY EIGHT (28) MONTHS IN PRISON, FOLLOWED BY THREE (3) YEARS OF SUPERVISED RELEASE.

☒ The defendant is hereby committed to the custody of the Attorney General to be imprisoned for a total term of.
    TWENTY EIGHT (28) MONTHS      ☐ MANDATORY MINIMUM term of_____applies.

☒ Upon release from imprisonment, the defendant shall be on supervised release for a term of    three (3) years

☒ The Court makes the following recommendations to the Bureau of Prisons: MENTAL HEALTH TREATMENT. SUBSTANCE ABUSE TREATMENT. ANGER MANAGEMENT CLASSES.

Costs in the aggregate amount of $~~ORDERED TO BE DEDUCTED FROM PRISON WAGES~~    have been assessed under the Victims of Violent Crime Compensation
Act of 1996, and ☐ have  ☒ have not been paid.

December 4, 2006
_____
Date

_____
Judge

Hiram E. Puig-Lugo, Associate Judge
Name and Title of Judicial Officer

Certification by Clerk pursuant to Criminal Rule 32(d).

December 4, 2006
_____
Date

ROBIN CHAMBERS-MANGUM
Deputy Clerk



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CRIMINAL DIVISION

UNITED STATES OF AMERICA
DISTRICT OF COLUMBIA

Vs

ONORIO T CIFUENTES

Case No 2006 FEL 000155
PDID No. 517191

## ORDER ASSESSING COSTS

The defendant in the above entitled matter, having been found guilty on 09/28/2006 of

ATTEMPTED AGGRAVATED ASSAULT

is hereby on December 04, 2006, ORDERED to pay the costs assessed under the Victims of Violent Crime Compensation Act of 1981. Such costs shall be deducted from prison wages (payable at the Finance Office of the Superior Court, Room 4203).

Said amount is payable to the District of Columbia Treasurer and shall be deposited by the Finance Office to the credit of the Crime Victims' Compensation Fund.

Charge 1: $200.00

_____
Judge HIRAME PUIG-LUGO

Case: 2006 FEL 000155
DEF: FARCAN

HUNTERB 12/07/2006 1:23:47 PM

# EXHIBIT M



THE NEUROLOGY
CENTER

NEUROLOGY
David Satinsky, M.D.
V. John Blazina, M.D.
Philip D. Pulaski, M.D.
Brian H. Avin, M.D.
Kenneth W. Eckmann, M.D.
David G. Moore, M.D.
Gary W. London, M.D.
Larry M. Einbinder, M.D.
David L. Taragin, M.D.
Neal M. Kurzrok, M.D.
Kalpana Hari Hall, M.D.
Eric M. Jeffries, M.D.
Khanni N. Herzfeld, M.D.
Katherine A. Coerver, M.D., Ph.D.
Ezra D. Cohen, M.D.
C. Debbie Lin, M.D.

NEUROPSYCHOLOGY
Linda R. Sapin, Ph.D.
Melissa A. Carswell, Psy.D.

CHIEF EXECUTIVE OFFICER
Sally A. Soller

BUSINESS OFFICE MANAGER
Steven R. Long

OTHER OFFICE LOCATIONS

MARYLAND
Leisureworld Plaza
Professional Building
3801 International Drive
Suite 210
Silver Spring, MD 20906
Fax: 301.598.5730

Montrose West Building
1201 Seven Locks Road
Suite 101
Rockville, MD 20854
Fax: 301.424.1565

Barlow Building
5454 Wisconsin Avenue
Suite 1720
Chevy Chase, MD 20815
Fax: 301.951.6490

ADMINISTRATION & BILLING
The Summit Building
8555 16th Street
Silver Spring, MD 20910
Fax: 301-565-6772

WASHINGTON, DC
University Medical Building
2141 K Street, NW
Suite 503
Washington, DC 20037
Fax: 202.429.8957

The DePaul Building at
Providence Hospital
1160 Varnum Street, NE
Suite 204
Washington, DC 20017
Fax: 202.526.2335

The Washington Hospital Center
106 Irving Street, NW
Physician's Office Building
South Tower Suite 412
Washington, DC 20010
Fax: 202.291.6708

February 12, 2008

Raymon K. Nelson, M.D.
1160 Varnum St., NE, #208
Washington, DC 20017-2103

RE: Keith Bailey
Account #: 288717
DOB: 05/28/53

Dear Dr. Nelson:

I had the pleasure of seeing your patient, Keith Bailey once again today. As you know, Mr. Bailey has been followed recently by my colleague Dr. David Moore, and he last saw Dr. Moore on August 27, 2007. At that time, Dr. Moore requested repeat neuropsychological testing with Dr. Sapin.

That repeat testing, dated January 21, 2008, showed gains in cognitive processing speed, naming, mental flexibility and visual memory but significant impairment in verbal memory. Given this, Dr. Sapin made some recommendations about things that he could do to help with his cognition. She also recommended consultation with a counselor to help with his mood and communication.

Today, Mr. Bailey reports that he has daily headaches and seems irritable frequently but it is getting better. He has no new complaints.

There have been no changes in his past medical history, medications, social history or family history and his review of systems is otherwise negative.

His physical examination is unchanged from previously, including exotropia of his left eye and otherwise nonfocal examination.

In summary, Keith Bailey is a 55-year-old gentleman with traumatic brain injury in January 2006. Given his irritability and daily headaches, I have started him on Zoloft and I have asked him to return to see me in six weeks' time. I have asked him to feel free to contact me in the interim should any new issues arise.

Thank you once again for involving me in the care of this patient. If you have any questions, comments or concerns, please do not hesitate to contact me.

1

2730 University Blvd. • Suite 410 • Wheaton, MD 20902 • 301.562.7200 • Fax 301.946.4150 • www.neurologycenter.com

Keith Bailey
02/12/08

PAGE TWO

Sincerely,


Eric M. Jeffries, M.D.

EMJ/mts/sns/lva

2



THE NEUROLOGY
CENTER

**NEUROLOGY**
David Satinsky, M.D.
V. John Blazina, M.D.
Philip D. Pulaski, M.D.
Brian H. Avin, M.D.
Kenneth W. Eckmann, M.D.
David G. Moore, M.D.
Gary W. London, M.D.
Larry M. Einbinder, M.D.
David L. Taragin, M.D.
Neal M. Kurzrok, M.D.
Kalpana Hari Hall, M.D.
Eric M. Jeffries, M.D.
Rhanni N. Herzfeld, M.D.
Katherine A. Coerver, M.D., Ph.D.
Ezra D. Cohen, M.D.
C. Debbie Lin, M.D.

**NEUROPSYCHOLOGY**
Linda R. Sapin, Ph.D.
Melissa A. Carswell, Psy.D.

**CHIEF EXECUTIVE OFFICER**
Sally A. Seiler

**BUSINESS OFFICE MANAGER**
Steven R. Long

**OTHER OFFICE LOCATIONS**
**MARYLAND**
Leisureworld Plaza
Professional Building
3801 International Drive
Suite 210
Silver Spring, MD 20906
Fax: 301.598.5730

Montrose West Building
1201 Seven Locks Road
Suite 101
Rockville, MD 20854
Fax: 301.424.1565

Barlow Building
5454 Wisconsin Avenue
Suite 1720
Chevy Chase, MD 20815
Fax: 301.951.6490

**ADMINISTRATION & BILLING**
The Summit Building
8555 16th Street
Silver Spring, MD 20910
Fax: 301-565-6772

**WASHINGTON, DC**
University Medical Building
2141 K Street, NW
Suite 503
Washington, DC 20037
Fax: 202.429.8957

The DePaul Building at
Providence Hospital
1160 Varnum Street, NE
Suite 204
Washington, DC 20017
Fax: 202.526.2335

The Washington Hospital Center
106 Irving Street, NW
Physician's Office Building South
South Tower Suite 412
Washington, DC 20010
Fax: 202.291.6708

January 21, 2008

Eric M. Jeffries, M.D.
2730 University Blvd., #420
Wheaton, MD 20902

Re:     Keith Bailey
        DOB: 05/28/53
        Date of Evaluation: 01/21/08

Dear Eric:

It was a pleasure to meet with Keith Bailey for neuropsychological testing to assess interval change since baseline measures were collected in December 2006. As you know, he suffered serious traumatic brain injury in January 2006 in a motor vehicle accident. He feels that he has made some further recovery since his last neuropsychological evaluation though he still has memory difficulties and "problems with verbal expressiveness," according to his wife, and she also finds him repetitive and having difficulty following a conversation. He also struggles with daily headaches and irritability "but he pulls it off at work." However, he comes home "drained and exhausted" and has deferred much of running the household to his wife. This is in contrast to his previously sweet demeanor and sense of responsibility, though his wife now finds that she has "to take care of everything." Mr. Bailey finds that it is still harder to focus, and he is using a voice recorder and writing down information at work to help him keep track of what he needs to do.

Mr. Bailey continues to be treated for diabetes and hypercholesterolemia. He had been tried on an antidepressant but this made him groggy. There has been no change in his medications since his last visit, though he could not recall what his medications were. He is driving without complaint and he continues to work in construction but has been given a reduced load and no heavy lifting. The way he describes it, they now have him working with the safety department doing "more overseeing." Mr. Bailey is sleeping well but he is still chronically fatigued and just "lays around" at home. Prior to his accident he was very active and his energy level is still not back to baseline. Mr. Bailey worked with good effort and test results are considered to be valid. Test procedures from the last session were repeated in order to get a comparison to last year's results.

**TEST FINDINGS**

Keith Bailey presented as a pleasant and cooperative now 54-year-old right-handed man with bright affect. He demonstrated improved cognitive processing speed since his 2006 evaluation.

Bailey, Keith                                                              PAGE TWO
01/21/08

Specifically, mental flexibility has moved from the 35th to the 75th percentile in a timed
alphanumeric sequencing measure and visual tracking has increased in one measure from the 50th
percentile to the 90th percentile, and in another, from the mid average range to the upper average
range. In addition, phonemic fluency has increased from the 80th to over the 90th percentile with
conceptual fluency moving from below the 10th percentile to the 25th. Confrontation naming is
also less severely impaired, moving from below the 10th percentile to the 10th percentile. Gains
have also been seen in immediate prose recall which moved from the 19th percentile to the 32nd.
His delayed retrieval is still at the 38th percentile. Whereas initial prose recall has increased only
from the 4th to 5th percentile, still in the range of significant impairment, delayed retrieval has
increased slightly from the 12th to the 19th percentile. Verbal reasoning remains just below the
average range with slightly increased difficulty in one measure of visual attention. A clock is
drawn and set correctly.

## SUMMARY

Neuropsychological test findings were encouraging with respect to gains seen in measures of
cognitive processing speed, naming, mental flexibility and visual memory. His most significant
impairment remains in verbal memory and his dysnomia remains, though is less severe.

Mr. Bailey has shown areas of cognitive improvement, reflecting continued recovery from brain
trauma suffered in January 2006, but he is not yet back to baseline and continues to struggle with
fatigue, headaches, irritability and difficulty picking up all of his previous responsibilities at
home. With accommodations, the use of an audio cassette player and written notes, he is able to
function at work though this exhausts him and he arrives home with very low energy to do much
else for the rest of the day.

At the time of the evaluation, we discussed cognitive exercises Mr. Bailey could do at home to
strengthen cognitive stamina and concentration. This includes:

1. Picking an article or film that he and his wife can review together and discuss,

2. Purchasing the "Memory Game" and "Simon" at a toy store to help improve focus,
   vigilance and retrieval, and

3. use of a deck of cards to practice increasing memory span (as was demonstrated to the
   Baileys).

In addition, Mr. Bailey might try utilizing the "PQRST" method which involves
Previewing a paragraph or two (in a newspaper, magazine or book), Questioning himself
who, what, when, where, etc., details from the reading, Reviewing the material to get the
answers, Stating them out loud and then Testing himself to see what he can recall about
the basic elements of the article or passage.

4

Bailey, Keith                                                                              PAGE THREE
01/21/08

Also, the Baileys could benefit from consultation with a counselor familiar with the impact of
head injury on cognition, mood and communication.   I will speak again with them to help find
someone in their insurance plan when Mrs. Bailey has her provider list available.

It was a pleasure to meet again with Mr. Bailey and I would be happy to continue to follow this
pleasant gentleman along with you.

Sincerely,


Linda R. Sapin, Ph.D.
Director of Neuropsychology

LRS: mts/gth/lva
14-89436


**NB:  This report may be released directly from you to patient, LRS**



Eye Doctors OF WASHINGTON

Pediatric Ophthalmology and Strabismus
Dr. John F. O'Neill   &   Dr. G. Vike Vicente

T. Clinch, MD, D. Gaasterland, MD, P. Kang, MD, D. Blumberg, MD, B. Teller, DO, M. Barbour, DO
2 Wisconsin Circle, Ste. 200; Chevy Chase, MD 20815          2114 Generals Hwy., Annapolis, MD 21401
www.edow.com          www.pediatric-ophthalmology.com                    301-215-7100

RE: Keith Bailey
DOB:  5.28.53
Date of visit:   9.11.06

Paul T. Gavaris, MD
4910 Massachusetts Avenue,  Suite 21
Washington, DC  20016

Dear Paul,

I saw Mr. Bailey for a 6 month f/u eye consultation regarding the evaluation and possible treatment of: diplopia s/p MVA 1/7/06.  Mr. Bailey has noted an increase in his diplopia.

Examination findings are:
Vision:  Right eye:   20/20   Left eye: 20/20 with -0.75 sph OU
External Exam:  left facial scars.
Hertel base 97 mm OD: 20mm, OS 18mm approx.
Ocular Motility:  4 PD  right hypertropia worse on upgaze and sidegaze.
Restricted elevation OS – mild.
Slit Lamp Exam: mild NS change.
Fundus: normal

Impression and Plan:
1.      Diplopia, vertical, binocular, on side gaze and upgaze.
        a.  Because there is mild diplopia in primary gaze I recommend prism glasses at this time.
        b.  This may affect some activities, but I believe Mr. Bailey would be able to drive safely.
        c.  The long term prognosis is uncertain, this may improve or worsen over time.
2.      Blurred vision
        a.  Due to mild myopia, wear myopic lenses PRN.
3.      F/u on a PRN basis changing diplopia.

        I hope this information is useful for your records. I appreciate the opportunity of sharing in the care for this nice patient.
Sincerely,

G. Vicente MD.

G.Vike Vicente, MD
Cc:

6

# EXHIBIT N

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH BAILEY *et ux.*                    :
                                         :
     Plaintiffs,                       :
                                         :
     v.                                :     Case No.: 1:08-cv-00644-RMC
                                         :     Judge Rosemary M. Collyer
J & B TRUCKING SERVICES, INC., *et al.* :
                                         :
                                         :
     Defendants.                       :


### AFFIDAVIT OF KEITH A. BAILEY

1.     I, Keith A. Bailey, am over the age of twenty-one, and am competent to testify.

2.     I am a plaintiff in this action.

3.     On Saturday, January 7, 2006, at approximately 4:50 a.m., I was driving my 1992 red Dodge pickup truck in a lawful manner southbound on South Dakota Avenue, N.E., in Washington, D.C.

4.     At about that time, I entered South Dakota Avenue's intersection with Michigan Avenue, in compliance with a green traffic signal.

5.     As I was passing through that intersection, a white Isuzu box truck driving westbound on Michigan Avenue entered the Michigan and South Dakota Avenue intersection and struck my vehicle.

6.     As a result of the collision described above, I suffered severe injuries, including blunt force trauma to my skull.

7.     I continue to suffer disabilities and to receive medical care as a result of the collision of January 7, 2006.

8.    I and my wife, Plaintiff Jacqueline Bailey, have resided together at 4837 12th St., N.E., Washington, D.C., with our four children, Jalivia, Janae, Jerrod, and Jessica, for many years.

9.    I have been employed since 1988 by W. M. Schlosser Co., Inc., a company that does building construction in the Washington metropolitan area, including in the District of Columbia.

10.   At the time of the collision I was an assistant superintendent for a construction crew on a project in Blue Plains, S.E., Washington, D.C.

11.   My wife, Plaintiff Jacqueline Bailey, has been employed since 1999 by Dr. Andrew J. Adelson, at 1145 19th St. N.W., Washington, D.C.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing Affidavit are true.


_Keith A. Bailey Jr._                            _1-17-08_
Keith A. Bailey                                    Date


I hereby certify that on the _17th_ day of _July_, 2008, before me, the subscriber, a notary public of the State of Maryland, personally appeared the affiant Keith A. Bailey and made oath or affirmation in due form of law that the matters and facts set forth in the forgoing Affidavit are true.

As witness my hand and notarial seal, _Marilyn K Tippett_

My commission expires: _____ **Marilyn K. Tippett** _____
**NOTARY PUBLIC**
**Montgomery County, Maryland**
**My Commission Expires 7/1/2011**


2