# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH BAILEY *et ux.*                    :
                                         :
    Plaintiffs,                     :
                                         :
    v.                              :    Case No.: 1:08-cv-00644-RMC
                                         :    Judge Rosemary M. Collyer
J & B TRUCKING SERVICES, INC., *et al.* :
                                         :
                                         :
    Defendants.                     :

## PLAINTIFFS' OPPOSITION TO DEFENDANT J&B TRUCKING SERVICES INC.'S MOTION FOR THE APPLICATION OF MARYLAND SUBSTANTIVE LAW

COME NOW the Plaintiffs, by and through counsel, and respectfully request this honorable Court to deny Defendant J&B Trucking Services Inc.'s Motion for the Application of Maryland Substantive Law. According to its own law, Maryland has no interest in this case, and under District choice-of-law jurisprudence the District's interest in the case is substantial and preponderant. As discussed below, the Defendant's Motion should therefore be denied.

## I.    Facts

The Plaintiffs, Keith and Jacqueline Bailey, are long-time residents of the District of Columbia, residing at 4837 12th St., N.E., Washington, D.C. (Compl. ¶ 7; Bailey Aff. Ex. 2 ¶ 8.) On January 7, 2006, at around 4:50 a.m., Plaintiff Keith Bailey was driving south on South Dakota Avenue, N.E., in Washington, D.C. (Compl. ¶ 19; D.C. Metropolitan Police Traffic Accident Report Ex. 1 at 2, 3; Bailey Aff. Ex. 2 ¶ 3.) He entered the intersection of South Dakota and Michigan Avenues, N.E., in compliance with a green traffic signal. (Compl. 19; Traffic Accident Report, Ex. 1 at 2, 3; Bailey Aff. Ex. 2 ¶ 4.) At approximately the same time, Onorio Cifuentes-Lopez was driving a truck westbound on Michigan Ave., N.E., when he

entered the intersection with South Dakota Avenue against a red traffic signal at a high rate of speed. (Compl. ¶ 19; Traffic Accident Report Ex. 1 at 2, 3; Bailey Aff. Ex. 2 ¶ 5; Google map Ex. 8.) Mr. Bailey suffered serious injuries as a result, including multiple fractures and brain contusions. (Compl. ¶¶ 20-21; Traffic Accident Report Ex. 1 at 4; Washington Hospital Center Discharge Summary, Ex. 3 at 1; Bailey Aff. Ex. 2 ¶ 6.) Mr. Bailey received all of his subsequent treatment for his collision-related injuries from District health care providers. (D.C. Fire & E.M.S. Report Ex. 4; Washington Hospital Center Discharge Summary Ex. 3; National Rehabilitation Discharge Summary Ex. 5.)

Shortly before the collision, Onorio Cifuentes-Lopez had stolen the truck with which he hit Plaintiff Keith Bailey. (Compl. ¶ 16; *United States v. Cifuentes*, CR-F155-06, Findings of Fact, Conclusions of Law and Order of Detention Pending Trial Ex. 6 at 1.) The truck belonged to a principal of Defendant J&B Trucking Services, Inc., and had been entrusted to one of J&B Trucking Services' employees, Defendant Sergio R. Sanabria. (Compl. ¶¶ 5, 12, 13; Sanabria Dep. Ex. 7, 18:4-21, 19:10-13, 28:9-22, May 27, 2008.) Mr. Sanabria had J&B Trucking Services' permission to bring the truck home at night in order to facilitate his deliveries the following morning. (Sanabria Dep. Ex. 7, 18:19-21, 29:13-30:12.) Both Defendants conducted business regularly in the District of Columbia. (Compl. ¶ 4; Sanabria Dep. Ex. 7, 19:20-20:10.)

Contrary to the Defendant J&B Trucking Services' representations in its instant Motion (Def.'s Mot. 2, 13), Mr. Sanabria parked the truck in a *public* area *near* his home. (Sanabria Dep. Ex. 7, 29:13-30:12.) Both now and at the time of these events, Mr. Sanabria lived at 5615 Queens Chapel Road in Hyattsville, Maryland, less than two miles from the District border. (Compl. ¶ 3; Sanabria Dep. Ex. 7, 3:12-22; Google map Ex. 8.) On the morning of January 7, 2006, Mr. Sanabria came out of his home and started the truck in preparation for making

deliveries on behalf of J&B Trucking Services, Inc. (Compl. ¶ 14; *United States v. Cifuentes*, CR-F155-06, D.C. Super. Ct., Prelim. Hr'g Tr. Ex. 9, 5:1-3, Feb. 2, 2006 (Testimony of Detective Elgin Wheeler).) He then left it unlocked and running for ten to fifteen minutes, with the keys in the ignition, to warm up while he went back into his home. (Compl. ¶¶ 14-15; Prelim. Hr'g Tr. Ex. 9, 5:2-4.) While Defendant Sanabria was in his home and the truck was unattended, Onorio Cifuentes stole the truck and drove off south on Queens Chapel Road toward the District, toward the intersection of Michigan and South Dakota Avenues, approximately 1.8 miles away, where he collided with Mr. Bailey. (Compl. ¶¶ 16-18; Findings of Fact Ex. 6 at 1; Google map Ex. 8.)

## II.    Discussion

A true conflict of law arises not simply when two jurisdictions' laws conflict, but when they each have an actual interest in the application of their laws to the dispute. No true conflict of law exists in this case, because under Maryland's doctrine of *lex loci delicti*, District law would apply to the entire dispute since the injury occurred in the District. Maryland therefore has no interest in the application of its law to this dispute. Even assuming there were a true conflict of laws here, the District's governmental interest in this case is overwhelmingly preponderant, because: the injury happened in the District; it affected long-time District residents; the alleged negligence happened within the Washington metropolitan area; the driver of the vehicle was prosecuted in the District; and the Defendants had long-time contacts with the District, contacts out of which the collision at issue arose. Therefore, even under a governmental interests analysis, the District has the prevailing interest in the application of its law to this case.

**A.    In a diversity case before this Court, a governmental interest analysis must be applied to a question of choice of law.**

"In a case like this one, in which jurisdiction is founded on the diversity of the parties citizenship, we apply the choice-of-law rules of the forum state," i.e., the District of Columbia. *Republican Nat. Committee v. Taylor*, 299 F.3d 887, 890 (D.C. Cir. 2002) (holding that the District is the forum whose choice-of-law jurisprudence applies in a diversity case before the United States District Court for the District of Columbia); *see also Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court," sitting in diversity, "must conform to those prevailing in [the forum's] state courts")). Since this Court's jurisdiction of this instant matter is based solely on the diversity of the parties, this Court must apply the law of the District of Columbia for resolving any conflict of law.

To determine which jurisdiction's law will apply in the case of a conflict, the District of Columbia applies a governmental interest analysis. *See Williams v. Williams*, 390 A.2d 4, 5 (D.C. 1978) ("The District of Columbia has followed the recent trend adopting the 'governmental interest analysis' approach to resolve choice of law questions") (*citing cases*); *see also Gaither v. Myers*, 131 U.S. App. D.C. 216, 222-23, 404 F.2d 216, 222-23 (1968) (applying governmental interest analysis to a conflict of law between the District and Maryland in an auto negligence case). The governmental interest analysis "requires first a court evaluation of the governmental policies underlying the applicable conflicting laws and then a determination as to which jurisdiction's policy would be most advanced by having its law applied to the facts of the case." *Valentine v. Elliott (In re Estate of Delaney)*, 819 A.2d 968, 988 (D.C. 2003) (*citing, inter alia, Gaither*, 131 U.S. App. D.C. at 222-23, 404 F.2d at 222-23).

"A true conflict is presented," however, only "when both states have an interest in applying their own laws to the underlying facts; in that event, *the forum law* will be applied

unless the foreign state has a greater interest in the controversy." *Kaiser-Georgetown*

*Community Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985) (emphasis added)

(*citing Biscoe v. Arlington County*, 238 U.S. App. D.C. 206, 214, 738 F.2d 1352, 1360 (1984));

*see also Valentine*, 819 A.2d at 988 ("the law of the jurisdiction with the stronger interest will

apply").  This is because

> "[t]he forum State's interest in the fair and efficient administration
> of justice" together with the "substantial savings [that] can accrue
> to the State's judicial system" when its judges are "able to apply
> law with which [t]he[y are] thoroughly familiar or can easily
> discover," tilt the balance in favor of applying the law of the forum
> state when the interests of both jurisdictions are equally weighty.

*Stutsman*, 491 A.2d at 509 n.10 (*quoting In re Air Crash Disaster Near Saigon, South Vietnam*

*on April 4, 1975*, 476 F. Supp. 521, 526 & n.11 (D.D.C. 1979); *citing Allstate Insurance Co. v.*

*Hague*, 449 U.S. 302, 326 n.14 (1981)).

    If a true conflict is found, and the court applies a governmental interests analysis, the

court conducts that analysis by considering,

> the four factors enumerated in the Restatement (Second) of
> Conflict of Laws § 145 (1971):
>
> > a) the place where the injury occurred;
> >
> > b) the place where the conduct causing the injury occurred;
> >
> > c) the domicile, residence, nationality, place of
> >    incorporation and place of business of the parties; and
> >
> > d) the place where the relationship is centered.

*Drs. Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) (*citing*

*District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995)).  The purpose of the

Restatement factors is to help identify which jurisdiction has the "most significant relationship to

the dispute." *Id.* (quoting *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 41 & n.18 (D.C. 1989).

**B.**     **The conflict between Maryland and District law on this issue is a false conflict, because Maryland has made clear through its *lex loci delicti* doctrine that the forum of the *injury* is the forum that has the sole interest in adjudicating the case.**

The Defendant argues that this instant case presents a conflict of law because, while the Plaintiffs' injuries were all suffered in the District, the alleged negligence precipitating those injuries occurred in Maryland. The Plaintiffs have alleged that Defendant Sanabria left his employer's truck unattended, near his home in Maryland, with the keys in the ignition and the engine running. (Compl. ¶¶ 12-14.) The Plaintiffs further have alleged that a thief then stole the truck while it was unattended, fled into the District, and negligently collided with Plaintiff Keith Bailey, causing Mr. Bailey serious injuries. (Compl. ¶ 15-20.) The tort complained of therefore began in Maryland but resulted in injury in the District.

**1.**     **Under Maryland law, the alleged negligence does *not* give rise to a cause of action, while under District law, it *does*.**

"Under the law of the District of Columbia," if all of these events had occurred in the District, "it is clear that, under the facts of our case, [the defendant's] action would render him liable to the victim under a theory of negligence *per se*." *Gaither*, 131 U.S. App. D.C. at 220, 404 F.2d at 220 (*citing Ross v. Hartman*, 78 U.S. App. D.C. 217, 139 F.2d 14 (1943)). The District therefore has a "strong policy" of "deterring highly hazardous motorist conduct," i.e., leaving keys in vehicles unattended, and also has a policy of "shifting the loss" caused by such conduct "from the injured victim and his creditors to the vehicle operator who, in turn, if he chooses, may procure insurance." *Id.*, 131 U.S. App. D.C. at 223, 404 F.2d at 223. "[T]his

6

compensatory policy has the greatest relevance to cases when the mishap occurs in the District

and when District residents are plaintiffs." *Id.*

"It is equally clear," however, "that under Maryland law, if the owner had left his keys in

his car in Maryland, and the thief had negligently caused the accident *in that state*, the injured

plaintiff could not recover from the owner," because Maryland, unlike the District, considers the

actions of the thief to be an independent, intervening cause that makes the owner/operator's

negligence too legally remote to support a cause of action against him. *Id.*, 131 U.S. App. D.C.

at 221, 404 F.2d at 221 (emphasis added) (*citing Liberto v. Holfeldt*, 221 Md. 62, 155 A.2d 698

(1959)). Though Maryland also has a statute, similar to the District's, that aims at auto theft

prevention, Maryland "also expresses an interest in protecting car owners from tort liability for

injury caused by car thieves." *Id.*, 131 U.S. App. D.C. at 224, 404 F.2d at 224. In the abstract,

Maryland and District case law therefore reflect opposing rules and policies.

    2.      **Under the doctrine of *lex loci delicti*, Maryland expresses no interest in enforcing its no-liability rule, because the injury happened in the District.**

As the Defendant acknowledges (Def.'s Mot. 4), the mere fact that two jurisdictions have

laws that conflict in the abstract does not conclusively mean that the case presents a true conflict

of law. In order for there to be a conflict over which law must be applied, both jurisdictions

must also have competing policy interests in the specific case at hand. "When," however, "the

policy of one state would be advanced by application of its law, and that of another state would

not be advanced by application of its law, a false conflict appears and the law of the interested

state prevails." *Biscoe v. Arlington County*, 238 U.S. App. D.C. 206, 214, 738 F.2d 1352, 1360

(D.C. Cir. 1984); *see also Gaither*, 131 U.S. App. D.C. at 224, 404 F.2d at 224. For example, in

*Gaither*, a thief stole an unattended and unlocked vehicle from a District owner and hit a

Maryland resident, in Maryland, after fleeing the District (i.e., the geographical reverse of the facts of this instant case). *See Gaither*, 131 U.S. App. D.C. at 218, 404 F.2d at 218. The *Gaither* court observed that the common law rules in Maryland and the District conflicted, as discussed above, but nevertheless held that conflict to be a false one. *See* 131 U.S. App. D.C. at 221, 224, 404 F.2d at 221, 224. The court reasoned that Maryland's policy interest was only in protecting *Maryland operators* from liability, and not in preventing Maryland *victims* from being compensated. *See* 131 U.S. App. D.C. at 224, 404 F.2d at 224. Since the defendant operator in *Gaither* was a *District* resident and the victim was a *Maryland* resident, *Gaither* concluded that Maryland had no policy interest in protecting the negligent District operator. *See id.*

> The fact that two states have different rules where all the factors are oriented to one state does not necessarily mean that there is a 'conflict' . . . . Where there is no . . . conflict of interest in a multi-state situation, as this court and others have noted, there is a 'false conflicts' situation.

*Id.* In such circumstances, the rule of the one jurisdiction with an interest in the case is applied. *See id.* Because the *Gaither* court found a false conflict between Maryland and District policy interests, it upheld the application of the law of the District, since it alone had a policy interest in that particular case. *See id.*

The instant case also gives rise to a false conflict, but for different reasons. Maryland adheres to the rule of *lex loci delicti*, and under that rule, "Maryland law is clear that in a conflict of law situation, such as the one presented in the case *sub judice*, 'where the events giving rise to a tort action occur in more than one State, we apply the law of the State where the injury - the last event required to constitute the tort - occurred.'" *Erie Ins. Exchange v. Heffernan*, 925 A.2d 636, 648-49 (Md. 2007) (*quoting Laboratory Corp. of America v. Hood*, 395 Md. 608, 614, 911 A.2d 841, 845 (2006)). In *Hood*, the defendant was a North Carolina laboratory that negligently

misdiagnosed a fluid sample from the plaintiffs, who were Maryland residents. *See Hood*, 911 A.2d at 843. The plaintiffs suffered harm in Maryland as a result of the misdiagnosis. *See id.*, 911 A.2d at 843-44. In applying *lex loci delicti* to resolve a conflict of laws between North Carolina and Maryland, the *Hood* court observed that the "place of the wrong" is "the place where the last event necessary to make an actor liable for an alleged tort takes place," which in the *Hood* case was Maryland, where the plaintiffs lived and where they suffered the injury, not North Carolina, where the negligence was allegedly committed. *Id.*, 911 A.2d at 845.

Viewing this instant case in the light of Maryland's *lex loci delicti* doctrine, Maryland has no policy interest warranting application of its law. Though Defendant Sanabria allegedly left the vehicle unattended in Maryland, the collision and resulting injuries giving rise to this action occurred in the District. (Compl. 18-21.) Under Maryland law, because the District is "where the last event necessary to make [the defendants] liable [took] place," the District is the *locus delicti*, not Maryland. *Hood*, 911 A.2d at 845. Therefore, even if this action were brought in Maryland court, District law would *still* apply.[1] Maryland's governmental policy under *lex loci delicti* is that the only jurisdiction with an interest in a tort action is the jurisdiction "where the *injury* - the last event required to constitute the tort – occurred." *Heffernan*, 925 A.2d at 648-49 (emphasis added). Since all of the injury in this instant case occurred in the District, Maryland has no policy interest in the application of its law. The compensatory policy of the District "would be advanced by application of its law, and that of . . . [Maryland] would not be advanced by application of its law, a false conflict appears and the law of the interested state [i.e., the District] prevails." *Biscoe*, 238 U.S. App. D.C. at 214, 738 F.2d at 1360.

---

[1] Despite its insistence on the application of Maryland law to this instant case, nowhere in its Memorandum in support of its Motion does the Defendant even discuss Maryland's doctrine of *lex loci delicti*, or its practical implications for this case.

**C.**    **Even assuming that Maryland has an interest in applying it rule of no liability to this instant case, under the Restatement's Four-Factor Analysis the District's policy interest in the application of its own law would substantially outweigh Maryland's.**

Even apart from the implications of the *lex loci delicti* doctrine, the District's interests under the instant circumstances far outweigh Maryland's policy interest expressed in its no-liability rule.  District of Columbia courts "have recognized a strong local interest" in protecting plaintiffs who work or reside in the District and are injured in the District, even though they are injured by negligent acts that originated in one of the surrounding jurisdictions. *Biscoe,* 738 F.2d at 1361.  "The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there." *Id.*, 238 U.S. App. D.C. at 215-16, 738 F.2d at 1361-62 (*quoting* The Restatement (Second) of Conflict of Laws, § 146, comment e (1971)).

In *Biscoe*, the plaintiff was a Maryland resident who merely worked in the District. *See id.*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361.  He was badly injured when Arlington County police engaged in a high-speed chase that originated in Virginia but proceeded into the District. *See id.*, 238 U.S. App. D.C. at 208, 738 F.2d at 1354.  The tort began in Arlington, when an Arlington County police officer noticed a vehicle that matched the description of a car used in the get-away from a recent bank robbery. *See id.*  The Arlington County police officer followed the car into the District, and pulled the car over. *See id.*  The Arlington officer, however, did not secure the driver. *See id.*, 238 U.S. App. D.C. at 208-209, 738 F.2d at 1354-55.  While the officer was preoccupied, the driver sped off further into the District. *See id.*, 238 U.S. App. D.C. at 209, 738 F.2d at 1355.  The officer immediately gave chase, and in the course of the chase the two vehicles reached speeds of up to 80 miles per hour in the downtown area. *See id.*  At the

intersection of E and 19th Streets, the driver-suspect hit another car "and careened off into the southeast corner of the intersection, where it pinned a pedestrian, [Plaintiff] Alvin Biscoe, against a light pole" causing him severe injuries. *Id.*

"Alvin Biscoe and his wife Eleanor filed a suit for damages," in this Court, "against numerous parties, including Officer Kyle, Arlington County, and Brooks," the driver-suspect. *Id.* The plaintiffs claimed that the police officer was negligent in conducting the chase, and that Arlington County was responsible for his negligence not only under a theory of *respondeat superior*, but also under a separate theory of "negligent training and supervision," which occurred entirely in Virginia. *Id.*, 238 U.S. App. D.C. at 210, 738 F.2d at 1356. At trial, the jury found that the defendant officer had been negligent "and that his employer, Arlington County, was similarly liable on a theory of *respondeat superior*." *Id.* Additionally, the "jury also found that defendant Arlington County was negligent in its training and supervision of Kyle" and that "all defendants' acts and omissions proximately caused the injuries to the plaintiffs." *Id.* As a result, the jury awarded the plaintiffs substantial damages. *See id.* The *Biscoe* jury therefore found that, independent of its *respondeat superior* liability, Virginia defendant Arlington County had committed negligent supervision in Virginia which resulted in a high-speed chase in the District that resulted in serious injuries to the plaintiffs. *See id.*

Arlington County appealed, arguing, *inter alia*, that it was immune from suit under Virginia law, and that "proper application of the District's choice of law principles require[d] application of Virginia's rules on the immunity of its counties." *Id.*, 238 U.S. App. D.C. at 212-13, 738 F.2d at 1358-59. The D.C. Circuit, however, had "no doubt that under the District's choice of law rules, District of Columbia law applie[d] on this issue." *Id.*, 238 U.S. App. D.C. at 214, 738 F.2d at 1360. The court first observed that *Biscoe* presented a true conflict, i.e., that

Arlington County would have been liable under District law, but not under Virginia law, and Virginia had a policy interest in protecting its counties from liability, which conflicted with the District's compensatory policy. *See id.* The D.C. Circuit held, however, that the trial court's resolution of that conflict in favor of the District was proper because of the District's predominant interest in the case. *See id.*

Virginia's only substantial interest at stake in the case was "for the economic well-being of its counties," i.e., to protect them from liability. *Id.*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361. "This concern, limited to the rare tort suit arising out of acts outside Virginia, simply is not an especially compelling one, particularly given the availability of liability insurance." *Id.* "In contrast," *Biscoe* held, "the Districts interest is plainly significant." *Id.* "First, as the site of *most* of the relevant conduct and all the injury, the District has a strong interest in deterring conduct of this kind." *Id.* (emphasis added); *cf. Hood*, 911 A.2d at 845 (applying law of the state where the injury was suffered). Even though some of the negligence, i.e., Arlington County's negligent training and supervision, occurred in Virginia, the *Biscoe* court therefore held that it was in the District that most of the relevant conduct occurred. *See id.*

Second, "[T]he defendants' acts created the precise danger to District life and property that various District and Arlington County regulations sought to prevent, and liability would discourage such acts." *Id.* (internal quotations omitted). Third, and most importantly, "this court has previously recognized the special and largely unique interest of the District in protecting persons who live in the surrounding suburbs and work in the District." *Id.* Even though the *Biscoe* court recognized that the District's "compensatory policy 'has the greatest relevance to cases when the mishap occurs in the District *and when District residents are plaintiffs*,'" *id.*, (*quoting Gaither*, 404 F.2d at 223) (emphasis added), *Biscoe* held that the District's "special and

largely unique interest" in its "surrounding suburbs" warranted imposing compensatory liability

on its suburban neighbor, Arlington County, because the plaintiff at least worked in the District,

though he was a resident of the Maryland suburbs. *Id.*[2]

"In other words, when a plaintiff such as Mr. Biscoe, who is a Maryland resident working

in the District, is injured in the District, District of Columbia courts have recognized a strong

local interest in protecting that plaintiff." *Id.* The court relied on the principle enunciated in the

Restatement (Second) of Conflict of Laws § 146 comment e (1971), that "[t]he local law of the

state where the personal injury occurred is most likely to be applied when the injured person has

a settled relationship to that state, either because he is domiciled or resides there or because he

does business there." *Id.*, 238 U.S. App. D.C. at 215-16, 738 F.2d at 1361-62. The *Biscoe* court

found that, on balance, the District's policies would have been "substantially more seriously

thwarted by nonapplication of its law in this context than would those of Virginia," and as a

result the court upheld the trial court's decision to apply District law. *Id.*, 238 U.S. App. D.C. at

216, 738 F.2d at 1362.

The holding in *Biscoe* is squarely on point regarding the choice-of-law question in this

instant case, and supports application of the District's law.[3] As with the separate negligence

---

[2] In reaching its decision, the *Biscoe* court quoted extensively from its opinion in *Gaither*:

> [T]o confine the benefits of the . . . rule [of *Ross v. Hartman*] to the
> territory ceded by the states of Maryland and Virginia to form the
> Nation's Capital would be to shun the present reality of the economically
> and socially integrated greater metropolitan area. It is commonplace that
> residents of Maryland are part of the Washington Metropolitan trading
> area, and that District residents and businesses have an interest in the
> well-being of these citizens of the Free State.

*Gaither*, 131 U.S. App. D.C. at 223, 404 F.2d at 223.

[3] The District of Columbia Court of Appeals has subsequently cited to, and relied upon, *Biscoe* in several
cases. *See In re Estate of Delaney*, 819 A.2d at 988; *Herbert v. District of Columbia*, 808 A.2d 776, 779
(D.C. 2002); *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995) (on which the Defendant

claim in *Biscoe* against Arlington County for negligent training and supervision, the Plaintiffs in this instant case have alleged that Defendant Sanabria committed acts of negligence in a Maryland suburb of the District by leaving keys in a running vehicle unattended, and that his negligence directly caused a negligent high-speed drive into the District and a resulting collision that seriously injured the Plaintiff Keith Bailey. *See* Compl. ¶¶ 13-21; *cf. Biscoe*, 238 U.S. App. D.C. at 210, 738 F.2d at 1356. As Virginia's only interest in *Biscoe* was to protect its counties from tort liability, *see Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361, so too in this case Maryland's only interest, if any, is to protect from tort liability the Defendant vehicle owner and Defendant operator, *see Gaither*, 131 U.S. App. D.C. at 224, 404 F.2d at 224. That interest is therefore "not an especially compelling" interest, "particularly given the availability of liability insurance" *Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361. Therefore, even if Maryland had a policy interest here despite the outcome of *lex loci delicti*, that interest would not be especially compelling, particularly in light of the District's interests under the four Restatement factors.

### 1. That the District is "the place where the injury occurred" weighs heavily in favor of applying District law.

As in *Biscoe*, the District is the site of "most of the relevant conduct and all the injury." *Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361. Not only did the collision happen in the District to a District resident, but Mr. Bailey also received all of his injury-related treatment in the District, from District health care providers. (Compl. ¶¶ 18-21; Bailey Aff. Ex. 2 ¶ 6; D.C. Fire & E.M.S. Report Ex. 4; Washington Hospital Center Ex. 3; National Rehabilitation Hospital

---

relies heavily in its Motion); *Dominion Caisson Corp. v. Clark*, 614 A.2d 529, 533 (D.C. 1992). The District of Columbia Court of Appeals has never criticized or rejected the reasoning in *Biscoe*.

Ex. 5.)[4] The District's "compensatory policy 'has the greatest relevance to cases when the mishap occurs in the District and when District residents are plaintiffs.'" *Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361 (*quoting Gaither*, 404 F.2d at 223). The District's policy of "shifting the loss" caused by such conduct "from the injured victim and his creditors to the vehicle operator who . . . may procure insurance," *Gaither*, 131 U.S. App. D.C. at 223, 404 F.2d at 223, would therefore be "substantially more seriously thwarted by nonapplication of its law in this context" than would Maryland's policy. *Biscoe*, 238 U.S. App. D.C. at 216, 738 F.2d at 1362. The fact that the collision occurred in the District therefore makes the District's governmental interest in this instant case preponderant.

Moreover, as discussed above, Maryland's interest would be at its nadir precisely because the District is the site of the injury. *Cf. Hood*, 911 A.2d at 845. Under Maryland's doctrine of *lex loci delicti*, Maryland has no interest in the application of its tort law to a tort that begins with negligence in Maryland but that ends with injury in another jurisdiction. *See id.*; *see also White v. King*, 223 A.2d 763, 765 (Md. 1966) (holding that Michigan law applied to auto collision that occurred in Michigan, even though the parties were from Maryland, and the negligence began in Maryland). *White v. King* arose out of negligent fatigued driving that began in Maryland but that culminated in a collision in Michigan. *See White*, 223 A.2d at 768. A group of Maryland residents planned to drive together to Michigan. *See id.* The driver, the defendant, did virtually all of the driving from the time they left Maryland until the collision in Michigan, despite repeated offers from a passenger to share the driving. *See id.* In Michigan, the driver "apparently fell asleep at the wheel," causing a head-on collision. *White*, 223 A.2d at 765.

---

[4] The collision was investigated by District police, and prosecuted by the District U.S. Attorney in the Superior Court for the District of Columbia. *See United States v. Cifuentes*, CR-F155-06 (D.C. Super. Ct. 2006). By its own actions, therefore, the District has already demonstrated its active interest in the events of this case. Further, the State of Maryland made a conscious decision to not criminally prosecute and to defer to the District of Columbia.

Based on the rule of *lex loci delicti*, the Maryland Court of Appeals held that the law of

Michigan applied, because that was the location of the plaintiffs' injuries. *See White*, 223 A.2d

at 767. Similarly in this instant case, the location in Maryland of Defendant Sanabria's

negligence does not create any countervailing interest for Maryland in the application of its tort

law.

The Defendant nevertheless asserts that Maryland has the superior interest here because

the location of the collision in the District was a mere fortuity. (Def.'s Mot. 8-9.) In support of

its argument here and elsewhere in its Motion, the Defendant relied heavily on *Myers v. Gaither*,

232 A.2d 577, 583 (1967),[5] *Kaiser-Georgetown Community Health Plan, Inc. v. Stutsman*, 491

A.2d 502, 508 (D.C. 1985), and *Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1271

(D.C. 1987). Nevertheless, in the full context of their opinions, the *Myers*, *Stutsman*, and *Zhou*

courts' discussion of the fortuity of the location of injury was part of their rejection of the *lex loci*

*delicti* rule. *See, e.g., Myers*, 232 A.2d at 583-84 (observing that a jurisdiction has an interest in

the application of its law if the parties have sufficient contacts with the forum, such as residency

or business contacts, even though injury occurred elsewhere); *Stutsman*, 491 A.2d at 508

(rejecting *lex loci delicti*); *Zhou*, 534 A.2d at 1271 (applying District law to a District tavern

when an intoxicated customer collided with District third parties in Chevy Chase, Maryland, just

over the border). When *Myers*, *Stutsman* and *Zhou* described the location of injury as fortuitous,

---

[5] As a preliminary matter, it should be noted that *Myers v. Gaither* was a decision of the pre-1971 D.C.
Court of Appeals, which was appealed to the D.C. Circuit, and resulted in the D.C. Circuit's controlling
opinion, *Gaither v. Myers*, 131 U.S. App. D.C. 216, 404 F.2d 216 (1968), on which the instant Plaintiffs
rely. In its opinion in *Gaither v. Myers*, the D.C. Circuit affirmed the lower court's order remanding the
case for trial, but it disagreed with some of the reasoning in the lower court's decision (the decision on
which Defendant J&B Trucking relies). *See Gaither*, 131 U.S. App. D.C. at 218, 404 F.2d at 218. The
D.C. Circuit therefore ordered the case remanded for further proceedings consistent with its own opinion.
*Gaither*, 131 U.S. App. D.C. at 224, 404 F.2d at 224. *Myers v. Gaither*, 232 A.2d 577, is therefore not
controlling law.

they did not mean that it was *irrelevant*, but merely that it was not the sole decisive factor for determining choice of law, as under *lex loci delicti. See id.* For example, at the point in the *Stutsman* opinion on which the Defendant relies, 491 A.2d at 508 (Def.'s Mot. 8), the court explained:

> "Most jurisdictions have rejected the 'wooden *lex loci delicti* doctrine,' which in the past was the majority rule of decision governing choice-of-law in tort cases. Where the location of the injury may be described as 'fortuitous,' the court is not bound by the law of the place of the tort."

*Id.* Employing this principle, *Stutsman* went on to hold that the parties' connections with the District were sufficiently significant to counterbalance Virginia's interest in the action, even though *all* of the alleged negligent acts in that case occurred in Virginia. *See id.*, 491 A.2d at 509-10. In *Stutsman*, the plaintiff worked in the District, and the Defendants had corporate headquarters there as well. *See id.*, 491 A.2d at 504-505; *see also Zhou*, 534 A.2d at 1271 (defendant conducted business in the District and the plaintiffs were District residents). The holdings in *Myers*, *Stutsman* and *Zhou* on which the Defendant relies therefore do not imply that the location of injury is irrelevant or that Maryland has the greater interest in this instant case: to the contrary, those cases underscore that *all* of the events at issue, Sanabria's negligence in Maryland as well as the injury in the District, are relevant to the District's interests because of the parties' ongoing connections with the District, i.e., that the Plaintiffs live in the District and the Defendants regularly conduct business there as well.

*Stutsman* contrasted this with *Williams v. Rawlings Truck Line, Inc.*, 123 U.S. App. D.C. 121, 125, 357 F.2d 581, 585 (1965). *See Stutsman*, 491 A.2d at 508. *Williams* also arose out of an automobile accident which occurred in the District, but in which all of the parties were from New York. *See Stutsman*, 491 A.2d at 508. The only connection with the District was the

location of the accident. *See id.* As a result, the *Williams* court declined to apply District law. *See id.* The *Stutsman* court used *Williams* as a contrast to illustrate that an occurrence is relevant to the District if it implicates the interests of people who live and work *in* the District. *See id.*, 491 A.2d at 509-10. *Myers*, *Stutsman* and *Zhou* hold that a forum can apply its own law even if the injury in question occurs elsewhere; the Defendant misrepresents those holdings to mean that a forum should *not* apply its own law even if the injury *does* occur within it. Such an interpretation seriously misrepresents the significance of the in-forum location of the injury under the governmental interests test. *See Biscoe*, 238 U.S. App. D.C. at 215-16, 738 F.2d at 1361-62.

That location of injury can be fortuitous does not mean it is irrelevant. To the contrary, since the injury in this case occurred in the District, and all injury-related treatment was received in the District, the Restatement factor of "the place where the injury occurred" weighs completely in the District's favor. Restatement (Second) of Conflict of Laws § 145(a).

> **2.      The District's interest is preponderant also because the most relevant conduct giving rise to the collision occurred in the District, and *all* of the conduct occurred in the Washington metropolitan area.**

The second Restatement factor for consideration is "the place where the conduct causing the injury occurred." Restatement § 145(b). As alleged, the tort began in Hyattsville, Maryland, a short distance from the District border, and ended in a collision at Michigan and South Dakota Avenues in the District. (Compl. ¶¶ 13-20; Google map Ex. 8.) Similarly in *Biscoe*, the jury found that Arlington County's negligent training and supervision in Virginia proximately caused the high-speed chase and resulting collision in the District. *See Biscoe*, 238 U.S. App. D.C. at 210, 738 F.2d at 1356. The D.C. Circuit held that since the District was "the site of most of the relevant conduct and all the injury, the District ha[d] a strong interest in deterring conduct of this

kind." *Id.*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361. The Court's holding implies that the most relevant conduct is the conduct that immediately causes the injury. As in *Biscoe*, Defendant Sanabria's negligence in Maryland set in motion the collision in the District. The running of the red light at a high speed in the District was the most relevant conduct because it most immediately caused the collision. It was in the District that the hazardous behavior occurred, behavior against which the rule of *Ross v. Hartman* was designed to protect. Further, Defendant Sanabria's "acts created the precise danger to District life and property "that" the District regulation and Maryland statute sought to prevent by requiring motor vehicles to be locked when unattended. *See id.*

The *Biscoe* court's holding also implies that the suburban conduct was relevant to the District because the resulting injury happened to a person the District had an interest in protecting. Because of the "socially integrated nature" of the "Washington Metropolitan trading area," both *Biscoe* and *Gaither* found that tortious conduct spanning the boundary between the District and its neighboring suburbs sufficiently implicated the District's policy interests to warrant application of District law. *Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361 (*quoting Gaither*, 131 U.S. App. D.C. at 223, 404 F.2d at 223). The Defendant's claim that "the District could not have any governmental interest in the application of its laws to conduct occurring outside its borders" (Def.'s Mot. 11) is plainly contradicted by the holdings in *Stutsman* and *Biscoe*. *See Stutsman*, 491 A.2d at 507 ("[a] tort need not occur within a particular jurisdiction for that jurisdiction to be connected to the occurrence," applying District law to negligence in Virginia suburb); *Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361 (applying District law to negligent conduct that occurred in Virginia but caused injury in the District).

The Defendant relies on *Zhou*, 534 A.2d at 1271 (Def.'s Mot. 9) to argue that the site of the negligence is of "greater significance than the location of the accident because...the actual site of the crash is largely fortuitous." *Id.* (*quoting Pardey v. Boulevard Billiard Club*, 518 A.2d 1349, 1352 (R.I. 1986)). In the sentence which the Defendant cites, the *Zhou* court went on to say that, "accordingly," jurisdictions "have applied the rule of liability of the state in which the [tortfeasor] committed the unlawful act." *Id.* As discussed above, Maryland would apply District law to this instant case in any event, since the injury happened in the District. *See Hood*, 911 A.2d at 845. Maryland itself therefore evinces a policy that Sanabria's conduct in this case is relevant only to the District.

That Defendant Sanabria's alleged negligent conduct occurred within the Washington metropolitan area, less than two miles over the District border in a Maryland suburb, and caused injury within the District to one of its residents, renders his negligence sufficiently close and important to the District for it to be relevant to the District's interests. *See, e.g., Gaither*, 131 U.S. App. D.C. at 218, 223, 404 F.2d at 218, 223 (observing that the collision at issue in that case occurred "about five miles from the District of Columbia line"). There can be no reasonable question that *all* of the conduct at issue in this instant case, both Defendant Sanabria's and Onorio Cifuentes's, was located within the Washington Metropolitan trading area, and that it caused injury in the District, to a District resident. Since the Washington Metropolitan trading area was "the place where the conduct causing the injury occurred," Restatement § 145(b), all of the conduct is relevant to the District.

### 3.    Residency and place of business of the parties further support the District's interests in this case.

The third Restatement factor to be considered is "the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement § 145(c). The

District's interest in this instant case differs significantly from its interests in *Biscoe* and *Gaither* in one critical respect: unlike in those cases, the Plaintiffs in this instant case were not only working in the District at the time of the collision, they were also *living* there too.  (Compl. ¶ 7.) Indeed, they have been residents of the District since well before the collision.  (Bailey Aff. Ex. 2 ¶ 8.)  *Biscoe* applied District law where the plaintiff merely *worked* in the District and *lived* in a Maryland suburb.  *See Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361.  Under the facts of this instant case, the District's interest would therefore be even greater than in *Biscoe*, since the District's "compensatory policy 'has the greatest relevance to cases when the mishap occurs in the District and when District residents are plaintiffs,'" *Biscoe*, 238 U.S. App. D.C. at 215, 738 F.2d at 1361 (*quoting Gaither*, 404 F.2d at 223), because "[t]he local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there."  *Biscoe*, 238 U.S. App. D.C. at 215-16, 738 F.2d at 1361-62 (*quoting* Restatement § 146 comment e).  The Plaintiffs' residency in the District therefore militates decisively in favor of applying District law to this instant case.

Moreover, though Defendant J&B Trucking Services is headquartered in Gaithersburg (a District suburb) and Defendant Sanabria lives in Hyattsville, their extensive business connections in the District implicate the District's interest in their conduct, even when that conduct occurs over the District boarder.  In *Stutsman*, 491 A.2d at 504, as noted above, the D.C. Court of Appeals upheld the application of District law to a medical malpractice claim brought by a resident of Arlington County, Virginia, arising out of treatment the defendants had rendered to her entirely in Springfield, Virginia.  *See id.*  The defendant health care providers argued on appeal that the trial court should have applied Virginia law, rather than District law, because the

case involved "conduct occurring entirely within the Commonwealth of Virginia and asserted by one Virginia resident against two corporate residents of Virginia." *Stutsman*, 491 A.2d at 507 (*quoting* Brief for the Appellants at 1).

The Court of Appeals held that the plaintiff's residence in Arlington was not dispositive, since she worked in the District. *See id.* Furthermore, the *Stutsman* court held that "the fact that the misdiagnosis of plaintiff's disease by employees of the defendants occurred in Virginia" did not have "controlling significance." *Id.* The court observed that "[a] tort 'need not occur within a particular jurisdiction for that jurisdiction to be connected to the occurrence. Numerous cases have applied the law of a jurisdiction other than the *situs* of the injury where there existed some other link between that jurisdiction and the occurrence.'" *Id.* (*quoting Allstate Ins. Co. v. Hague*, 449 U.S. 302, 314 & n.19 (1981)). The court found that because the plaintiff worked in the District and the defendants were headquartered there as well, there was a sufficient link between the District and the occurrence in Virginia for the District's interests in the occurrence to be predominant. *See id.*

In this instant case, the Plaintiffs' residence in the District and the Defendants' numerous contacts with the District similarly give the District a preponderant interest in Sanabria's alleged negligence in Hyattsville, Maryland. Unlike, again, the plaintiff in *Stutsman*, the instant Plaintiffs live in the District, as well as work there. (Bailey Aff. ¶¶ 8, 9, 11.) Though Defendant J&B Trucking Services is incorporated in Maryland, it conducts business regularly in the District by delivering furniture to District residents. (Compl. ¶ 4; Sanabria Dep. Ex. 7, 19:20-20:10.) For almost six years, while he worked for Defendant J&B Trucking, Defendant Sanabria made three to four deliveries of furniture a month in the District, driving J&B's delivery truck. (Sanabria Dep. Ex. 7, 19:20-20:10.) Defendant Sanabria currently makes ten to thirty-five

deliveries a week in the District, two to three times a week, for his current employer. (Sanabria

Dep. Ex. 7, 12:10-13:4) "Neither can 'claim unfamiliarity with the laws of [this] jurisdiction [or]

surprise that the . . . [District] might apply forum law to litigation in which [they are] involved.'"

*Stutsman*, 491 A.2d at 508 (*quoting Allstate*, 449 U.S. at 317-18). The Defendants' method of

business in the District further supports the District's interest in this case. This instant case arose

out of Defendant Sanabria's alleged negligent operation of J&B Trucking Service's delivery

truck. The "mere fortuity" in this case is not that the collision happened in the District, but rather

that Defendant Sanabria left the truck running and unattended in *Maryland*: he could just as

easily have done so in the *District*, while he was making a delivery in a customer's home.

Therefore, "[t]here can be no 'unfair surprise' to these defendants nor any 'frustration of

legitimate expectations' in our application of the Districts law of negligence," because both

Defendants regularly conduct business in the District of Columbia, business that regularly

involves the operation of a delivery truck. *Stutsman*, 491 A.2d at 508-509 (*quoting Allstate*, 449

U.S. at 318 & n.24). For these reasons, the District residency of the Plaintiffs and the

Defendants' business in the District give the District the prevailing interest in the occurrence.

       **4.**    **The parties' relationship, insofar as they have one, is centered on the District.**

The fourth and final Restatement factor for consideration is "the place where the

relationship is centered." Restatement § 145(d). The only reason why these parties have met is

because of the collision in the District. Unlike a malpractice action, the parties have no pre-

existing relationship with each other. They all, however, have a long-standing pre-existing

relationship with the District of Columbia. They would likely never have met if the Plaintiffs did

not live in the District; if J&B Trucking did not engage in the business of delivering goods in the

District and the Washington metropolitan area; and if Defendant Sanabria had not engaged in

making such deliveries in the District and the Washington metropolitan area. Therefore, "[t]he relationship between the parties to the instant litigation can be described as centering around the District of Columbia . . . ." *Stutsman*, 491 A.2d at 508.

All of the Restatement factors weigh in favor of the District's law being followed. The Defendant's strongest argument is that the negligence in Maryland and the Defendants' residence there give some weight to Maryland's interest. The balance is tilted, however, "in favor of applying the law of the forum state when the interests of both jurisdictions are equally weighty." *Stutsman*, 491 A.2d at 509 n.10. Even if "both states have an interest in applying their own laws to the underlying facts" as observed *supra*, "*the forum law* will be applied unless the foreign state has a greater interest in the controversy." *Stutsman*, 491 A.2d at 509 (emphasis added). Given that the injury and the Plaintiffs are located in the District, that the Defendants regularly conduct business in the District out of which this action arose-and that the Defendants are located in the Washington metropolitan area, the District's interest in this controversy far outweighs that of Maryland, especially given Maryland's complete disinterest in the controversy under the rule of *lex loci delicti*.[6] District law should therefore apply to this case in its entirety.[7]

---

[6] Throughout its Motion, the Defendant relies heavily on *District of Columbia v. Coleman*, 667 A.2d 811 (D.C. 1995), yet that case only serves to highlight by contrast the District's superior interest in this instant case. In *Coleman*, the court applied Maryland law to a case in which the decedent victim lived in Maryland, had been negligently shot in Maryland by the defendant, and died in Maryland. *See Coleman*, 667 A.2d at 817 n.10. None of the tort occurred in the District. *See id.* The only connection to the District was the defendant's residence there. *See id.*

[7] The Defendant also claims in passing (Mot. 4, 12) that Maryland law should be applied to the acts occurring in Maryland and District law to the acts occurring in the District. "[C]hoice of law involves examination of the various jurisdictional interests as applied to the various distinct issues to be adjudicated." *Coleman*, 667 A.2d at 816. As explained above, Maryland has no preponderant interest in the acts occurring in Hyattsville. The District's interests are preponderant over the entire action. Therefore, there is no basis to apply Maryland law to any "distinct issue" in this instant case.

## III.    Conclusion

For the foregoing reasons, the Defendant J&B Trucking Services instant Motion to apply

Maryland law to this action should be denied.

Respectfully submitted,


KARP, FROSH, LAPIDUS, WIGODSKY
  & NORWIND, P.A.

Steven VanGrack, Esq., D.C. Bar No. 223-339
Edward L. Norwind, Esq., D.C. Bar No. 936-393
Murray D. Scheel, Esq. D.C. Bar No. 490-012
2273 Research Boulevard, Suite 200
Rockville, Maryland 20850
Telephone: (301) 948-3800
Facsimile: (301) 948-5449

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH BAILEY *et ux.*                                   :

       Plaintiffs,                                :

       v.                                         :    Case No.: 1:08-cv-00644-RMC
                                                  :    Judge Rosemary M. Collyer
J & B TRUCKING SERVICES, INC., *et al.* :

       Defendants.                                :

## ORDER

This matter is before the Court on the Defendant J&B Trucking Services Inc.'s Motion

for the Application of Maryland Substantive Law.  Having considered the Motion, the

Opposition thereto, and the facts of the case, it is this _____ day of _____, 2008,

**ORDERED**, that Defendant J&B Trucking Services Inc.'s Motion for the Application of

Maryland Substantive Law is hereby **DENIED**.


_____

Rosemary M. Collyer, Judge
United States District Court for the District of Columbia

cc:

Steven VanGrack, Esq.
Karp, Frosh, Lapidus, Wigodsky &  Norwind, P.A.
2273 Research Boulevard
Suite 200
Rockville, Maryland 20850

Neil J. MacDonald, Esquire
Hartel, Kane, Desantis, MacDonald & Howe, LLP
101 South Washington Street
Rockville, Maryland 20850

# EXHIBIT 1

01/12/2006    11:33    GEICO DIRECT CU CLAIMS → 912026939736560B9    NO.171    703

JAN-10-2006 09:46 FROM:                                TO:17062212837    P.3/6



01/12/2006   11:33    GEICO DIRECT CU CLAIMS → 91202693973656089
JAN-10-2006 09:47 FROM:
TO:17862212037                    NO.171    P05
P.4/6



01/12/2006   11:33   GEICO DIRECT CU CLAIMS → 91202693973656089   NO.171   P02

JAN-10-2006 09:48 FROM:                           TO:17062212037   P.5/6

Page 3 of 4 Pages

Charge (Reason must support the charge): Aggravated Assault/D.U.V.

Complaint No. 06/092-835

What Traffic Signal Present? Traffic light

The offense occurred on Saturday, January 7, 2006 at approximately 0650 hours at the intersection of South

Dakota Avenue and Michigan Avenue N.E., Washington, D.C.

Investigation revealed that Driver #1 while operating a white 2002 Isuzu Box truck bearing MD registration

plates 83L092 at a high rate of speed westbound on Michigan Avenue N.E., passed the solid red signal at South

Dakota Avenue N.E. and struck Vehicle #2. Vehicle #2 rotated clock-wise and Driver #2, who was not wearing a

seatbelt, was ejected from the vehicle. Vehicle #1 mounted the south curb, struck Fixed Object #3 and Fixed Object

#4, before coming to rest on its passenger side in front of 1523 Michigan Avenue, N.E.

Sheryl R. Hanley

BADGE NO. IV0067   UNIT MCLU

**CONTINUATION SHEET** *(List item number of section continued with required information.)*  ▲ Complaint No. 06/002-835

Driver #1 and Driver #2 were both transported to the Washington Hospital Center Medstar Unit. Driver #2

was admitted in critical condition. Driver #1 was released from the hospital and arrested for Aggravated Assault,

U.U.V., Reckless Driving and No Permit.

A routine wales check revealed that Vehicle #1 was reported stolen from Hyattsville, Maryland on 01-07-06,

OCA # 060069.

As a result of the collision, Vehicle #1 did extensive damage to the yard belonging to Mr. John F. Guay,

located at 1523 Michigan Avenue, N.E. Home telephone number: 2/526-1854 and work telephone: 2/585-8298.

This is Special #06-01 for the year 2006.

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH BAILEY *et ux.*       :

   Plaintiffs,      :

           :

   v.         :  Case No.: 1:08-cv-00644-RMC

              Judge Rosemary M. Collyer

J & B TRUCKING SERVICES, INC., *et al.* :

           :

   Defendants.     :

## AFFIDAVIT OF KEITH A. BAILEY

1. I, Keith A. Bailey, am over the age of twenty-one, and am competent to testify.

2. I am a plaintiff in this action.

3. On Saturday, January 7, 2006, at approximately 4:50 a.m., I was driving my 1992 red Dodge pickup truck in a lawful manner southbound on South Dakota Avenue, N.E., in Washington, D.C.

4. At about that time, I entered South Dakota Avenue's intersection with Michigan Avenue, in compliance with a green traffic signal.

5. As I was passing through that intersection, a white Isuzu box truck driving westbound on Michigan Avenue entered the Michigan and South Dakota Avenue intersection and struck my vehicle.

6. As a result of the collision described above, I suffered severe injuries, including blunt force trauma to my skull.

7. I continue to suffer disabilities and to receive medical care as a result of the collision of January 7, 2006.

8.    I and my wife, Plaintiff Jacqueline Bailey, have resided together at 4837 12th St., N.E., Washington, D.C., with our four children, Jalivia, Janae, Jerrod, and Jessica, for many years.

9.    I have been employed since 1988 by W. M. Schlosser Co., Inc., a company that does building construction in the Washington metropolitan area, including in the District of Columbia.

10.    At the time of the collision I was an assistant superintendent for a construction crew on a project in Blue Plains, S.E., Washington, D.C.

11.    My wife, Plaintiff Jacqueline Bailey, has been employed since 1999 by Dr. Andrew J. Adelson, at 1145 19th St. N.W., Washington, D.C.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing Affidavit are true.

_Keith A. Bailey Sr._ _____

Keith A. Bailey

_1-17-08_ _____

Date

I hereby certify that on the __17th__ day of __July__, 2008, before me, the subscriber, a notary public of the State of Maryland, personally appeared the affiant Keith A. Bailey and made oath or affirmation in due form of law that the matters and facts set forth in the forgoing Affidavit are true.

As witness my hand and notarial seal, _Marilyn K Tippett_

My commission expires: _____**Marilyn K. Tippett**_____
                                            **NOTARY PUBLIC**
                                    **Montgomery County, Maryland**
                                    **My Commission Expires 7/1/2011**

2

# EXHIBIT 3

# WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

*13*

PATIENT: Bailey Sr, Keith A
ADMISSION DATE: 01/07/2006
DISCHARGE DATE:
ATTENDING PHYSICIAN: BIKRAM K PAUL, MD

MEDICAL RECORD NO.: 092-11-33
DOB: 05/28/1953
SSN: 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

---

PRIMARY DIAGNOSIS: Status post motor vehicle accident.

SECONDARY DIAGNOSES INCLUDE
1. Multiple mid face fractures.
2. Forehead laceration.
3. Pneumocephaly.

PROCEDURES PERFORMED: January 7, 2006: Include a STAT exam, a FAST exam, a CT of the head, a CT of the face, a CT of the chest, abdomen and pelvis and a CT of the spine. His STAT and FAST exams were negative, as was the CT of chest, abdomen and pelvis and CT of his spine were also negative. CT of the head showed pneumocephaly, CT of the face showed multiple mid face fractures and those fractures include, he has a left ZMC fracture, minimally displaced. He has a left temporal bone fracture, minimally displaced. He has a left orbital medial floor and lateral fracture and he also has a right zygomatic temporal junction fracture and these were all revealed by the CT of the face. On January 12, 2006, a lipoma excision was done. Lipoma was of the right upper quadrant. Patient had been complaining of pain and therefore a lipoma excision was performed on January 12, 2006.

CONSULTS INCLUDE: Neurology, ophthalmology, oral maxillofacial surgery, physical therapy and occupational therapy.

CHIEF COMPLAINT AND HISTORY: This patient was involved in a T-bone motor vehicle accident and ejection. He had multiple injuries. He arrived to MedStar with a Glasgow Coma Scale of 15; however, his mental status appeared to change. Therefore, he was intubated and sedated and a C-collar was maintained and was intact and in place before, during and after intubation.

PHYSICAL EXAMINATION: His physical findings include a 5-cm in length laceration above the left eye. There were no steps that were palpated. He also had a small 5-mm laceration over the upper left eyelid. He had periorbital edema of the left eye. He had some chemosis of the left eye. He also had a right knee laceration, probably about 5-cm in length. He had no other obvious lesions on the scalp. He did appear to have some dried blood in his right ear canal. Left ear showed a normal tympanic membrane. Physical exam was unable to be completely performed due to patient being intubated and sedated after his mental status started to deteriorate. His pelvis was stable to compression and his FAST exam was negative, STAT exam was negative. His CT of head showed his multiple mid face fractures that were discussed as before.

**Chart Copy**

# WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

PATIENT: Bailey Sr, Keith A
ADMISSION DATE: 01/07/2006
DISCHARGE DATE:
ATTENDING PHYSICIAN: BIKRAM K PAUL, MD

MEDICAL RECORD NO.: 092-11-33

PAGE 2

LABORATORY FINDINGS ON ADMISSION: Patient's labs are as follows: Sodium 139, potassium 3.6, chloride 103, bicarbonate 26, calcium 7.7, glucose 262 and BUN of 14, creatinine of 0.9. White blood cell count 6.06, hemoglobin 12.7, hematocrit 38.3, platelets 210. He was negative for alcohol. PTT was 26.4, PT was 14.4, INR of 1.1. Troponin of 0.051, CK-MB 1.0. Six hours later, troponin 0.00 and CK-MB of 1.0.

HOSPITAL COURSE: Patient's lacerations above his left eye were repaired by oral maxillofacial surgery on the evening of arrival. Ophthalmology noted no treatment indicated for his orbital floor fractures and recommended follow up in 1 week with the patient. He did have some subconjunctival hemorrhage in his left eye and some chemosis in his left eye. OT and PT saw the patient. OT recommended that his cognitive evaluation showed cognitive deficits and it was difficult to determine his activities of daily living strength and mobility and they recommended that the patient be discharged to an acute rehabilitation facility because he was having difficulty with problem-solving, difficulty with short and long-term memory when asked to recall items such as year of his birth or the president. He would state the president was Coleman and the previous one was Schneider. When asked to point to the window, he pointed in front of him instead of to the left, where the window actually was located (January 9, 2006 note). Physical therapy also recommended the patient's balance and functional mobility was impaired and they also recommended acute rehabilitation on January 9, 2006.

Patient began to describe pain of abdomen. Upon exam, a swelling was noted to the right of the umbilicus that was not able to be reduced. Patient was taken to the OR on January 12, 2006, and a lipoma was excised. Patient did continue to describe headache pain and some leg pains that were controlled with Percocet. Patient appeared to be drowsy and sleepy on daily exams and also noted by wife.

During exam, the patient was also unable to open his left eye completely. Patient on fingerstick glucose was elevated glucose stick and therefore was supplemented with insulin sliding scale. Patient does have a history of diabetes and was already on his regular course of diabetic control.

Patient again was consulted with OT and PT after his lipoma excision and was noted by occupational therapy on January 13, 2006, that patient tolerated sessions fairly. He did present with some decrease in cognition, decreased in ADLs and functional mobility decreased and again they recommended acute rehabilitation. Patient did have some issues with blood pressure

**Chart Copy**

# WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

PATIENT: Bailey Sr, Keith A
ADMISSION DATE: 01/07/2006
DISCHARGE DATE:
ATTENDING PHYSICIAN: BIKRAM K PAUL, MD

MEDICAL RECORD NO.: 092-11-33

PAGE 3

control while in the hospital and hydralazine was given on January 12, 2006, but after that his blood pressure remained fairly stable.

On January 15, 2006, the patient showed improved drowsiness on exam. He was awake and watching television with his wife on that date. Patient's Percocet and Vicodin had been discontinued and his pain was being controlled by Tylenol only.

Occupational therapy and physical therapy continued to recommend inpatient rehabilitation placement for the patient to help with patient's ADLs, functional mobility and cognitive improvement.

CONDITION AT DISCHARGE: Patient is stable, afebrile. Vital signs are stable. He does follow commands and memory appears to have improved from his original admission date of January 7, 2006.

DISCHARGE INSTRUCTIONS: Patient should resume his regularly scheduled medications for his hypertension and diabetes as scheduled. Use Tylenol for pain and continue to keep the left eye moist with Lacrilube and Refresh. His diet is regular, activity as tolerated and up and out of bed and ambulating as much as possible.

FOLLOW UP CARE: Patient will need to follow up with neurology 1 week after discharge, ophthalmology 1 week after discharge, oral maxillofacial surgery 1 week after discharge and trauma surgery 1 week after discharge.

FINAL DIAGNOSES: Status post motor vehicle accident and ejection, multiple nondisplaced mid facial fractures, pneumocephaly and lipoma.

**Chart Copy**

# WASHINGTON HOSPITAL CENTER
## DISCHARGE SUMMARY

PATIENT: Bailey Sr, Keith A
ADMISSION DATE:  01/07/2006
DISCHARGE DATE:
ATTENDING PHYSICIAN:  BIKRAM K PAUL, MD

MEDICAL RECORD NO.: 092-11-33

PAGE 4

DICTATED BY SAMIRA MEYMAND

Electronically Signed by
JACK SAVA, MD 02/24/2006 06:50

PHYSICIAN'S SIGNATURE _____ DATE
JACK SAVA, MD

cc:    SAMIRA MEYMAND
       BIKRAM K PAUL, MD
       JACK SAVA, MD

SR:mdi:mdi
D:01/17/2006
T:01/17/2006  1:13 P
Doc:608661
Job Number: 000046223

**Chart Copy**

# EXHIBIT 4

**CALL LOCATION** 26 MICHIGAN AVE & S. DAKOTA AV

**INCIDENT #** 02485

**DISPATCH TIME** 0935

**INSERVICE TIME**

**TODAY'S DATE** 01 07 20 05

**ENT LAST NAME** BAILEY  **FIRST** KEITH  **MI** A.  **DATE OF BIRTH** 05 28 1953  **AGE** 26  **GENDER** M

**STREET ADDRESS** 4837 12TH ST. NE  **APT #**

**CITY** WASHINGTON  **STATE** DC  **ZIP** 20017

**HOME PHONE #**

**BUSINESS PHONE #**

**SOCIAL SECURITY NUMBER** 5178 - 6181 - 9126 B

**BILL TO:** ☐ SAME AS ABOVE ☐ FEMS or MPD POD ☐ WORK RELATED?

**MEDICARE #**

**MEDICAID #** 7040

**LEGAL GUARDIAN/NEXT OF KIN**

**OTHER INSURANCE**

**INSURANCE CO & POLICY #** BC/BS X1 P9 0199 1844 P 7640

**FOR ALL NON-TRANSPORTS CHECK ONE BELOW**
☐ Assist Only
☐ Call Canceled
☐ No Patient Found
☐ PDOA
☐ RMA-SR
☐ Standby

**CURRENT MEDICATIONS** ☐ NONE ☐ BROUGHT W/PT

**ALLERGIES** ☐ NONE KNOWN

**MEDICAL HISTORY** ☐ NONE KNOWN ☐ ANGINA ☐ ASTHMA ☐ BEHAVIORAL ☐ CANCER ☐ CARDIAC/CHF ☐ CHRON. RENAL FAIL. ☐ CHRON. RESP. FAIL. ☐ CVA/TIA ☐ DIABETES ☐ DRUG/ETOH ☐ EMPHYSEMA ☐ FAMILY VIOLENCE ☐ HYPERTENSION ☐ INFECT. DISEASE ☐ MI ☐ PULM. EMBOLISM ☐ SEIZURE ☐ SPECIAL HEALTH CARE ☐ TRACHEOSTOMY ☐ TB ☐ OTH

**CHIEF COMPLAINT** HEAD INJURY

**Pain: First** ___ /10  **Pain: Last** ___ /10  **Time of Onset:** __:__

**TRANSPORT CATEGORY** ☐ 1 ☐ 2 ☐ 3

**DISPATCH CODE** ☐ A ☐ B ☐ C ☐ D

**TRANSPORTED TO: HOSPITAL #** 04

AOSTE: PT. WAS A DRIVER OF A PICK-UP TRUCK WHICH WAS STRUCK ON THE DRIVER SIDE FRONT LEFT QUARTER PANNEL THE "A POST" WAS DEFORMED AND THE DRIVER'S SIDE DOOR WAS RIPPED OPEN. PT. WAS FOUND UNCONCIOUS & UNRESPONSIVE IN THE MIDDLE OF MICH. AVE APPROX. 50FT. FROM HIS TRUCK. HIS TRUCK WAS HIT BY A LARGE PANNEL TRUCK PT. LASR. TO FOREHEAD, LASR. TO RT. KNEE PT. LUNG SOUNDS WERE EQUAL & CLEAR. CONTUSION ACROSS UPPER ABR. QUADS
NOTE: PT. VERY COMBATIVE MIDWAY INTO TRANSPORT BY O₂, I.V. X2, 18g OPEN L3, LT. AC & RT. HAND.

**(Consider using S.O.A.P. format)** If more space is required, continue on back. When complete, photocopy the back to leave with the hospital.

**INJURY CODES**
1. Abrasion
2. Amputate
3. Avulsion
4. Blunt Trauma
5. Burn (chemical)
6. Burn (thermal)
7. Fracture (Dis)
8. Gunshot Wound
9. Laceration
10. Pain
11. Paralysis
12. Puncture/Stab
13. ___
14. ___

**Pt. Received HIPAA NPP** ___ Yes ___ No ___ N/A
☐ Law enforcement disclosure on scene

| Time: | : | : | : | : |
|---|---|---|---|---|
| Position: Circle one or per column | | | | |
| B/P: | 56/P | | | |
| Pulse Rate: | 120 | | | |
| Resp. Rate: | 16↓ | | | |
| Resp. Quality: | | | | |
| 1-Normal 2-Labored 3-Increased 4-Absent | | | | |
| Rhythm: | | | | |
| Pulse Ox. | %on | %on | %on |
| Blood Glucose | mg/dl | mg/dl | mg/dl |
| ET CO₂ | | | |

**AIRWAY**
O2 **5** lpm ☐NC ☑NRB ☐Venturi ☐BVM  Oral Nasal Combi-tube  ET: Size ___ mm  ☐Oral ☐Nasal
IV Site: AC  IV Gauge: 18  IV Site: HAND  IV Gauge: 18  IV Site: ___  IV Gauge: ___

| GCS | | Time | | Skin | | Pupils | |
|---|---|---|---|---|---|---|---|
| **EYE OPEN** | | | | Normal | ✓ | ☐ UA/Ref | |
| Spontaneous | 4 | 4 | | Cool | | | |
| To Verbal | 3 | ③ | | Cold | | Normal | |
| To Pain | ② | 2 | | Hot | | Constrict | |
| None | ① | 1 | | | | Dilated | |
| **VERBAL RESP.** | | | | Normal | | Non-react | |
| Oriented | 5 | 5 | | Dry | | Capillary Refill Within normal limits | |
| Confused | 4 | ④ | | Moist | | | |
| Inappropriate | ③ | 3 | | Diaph | | | |
| Incomprehensible | 2 | 2 | | | | | |
| None | ① | ① | | | | | |
| **MOTOR RESP.** | | | | Normal | ✓ | | |
| Obeys | 6 | 6 | | Pale | | | |
| Localizes | ⑤ | ⑤ | | Mottled | | | |
| Withdraws | 4 | 4 | | Cyanotic | | A = EMT ADVANCED | |
| Flexes | 3 | 3 | | Flushed | | B = EMT BASIC | |
| Extends | 2 | 2 | | | | I = EMT INTERMEDIATE | |
| None | 1 | 1 | | | | P = EMT PARAMEDIC | |
| **GCS TOTAL** | 7 | 12 | | | | | |



**SIGNATURE AUTHORIZATION**
This constitutes my authorization for the provider of emergency medical services to me to file claims on my behalf. This authorization is to be:
Life time authorization effective _____ (Date)

**AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION AND WAIVER:**
I hereby authorize any holder of medical information about me to release to the Social Security Administration and Centers for Medicare and Medicaid Services or its intermediaries or carriers, the Washington DC Fire and EMS Department or its authorized agent/agents, or any private insurance company, any information needed for this or a related medical claim. I permit a copy of this authorization to be used in place of the original and request payment of medical insurance benefits to the party who accepts assignment.

**ASSIGNMENT OF INSURANCE AND PAYMENT AGREEMENT**
I hereby authorize payment of all insurance Benefits, including Major Medical, Title XVII Medicare, Title XIX Medicaid, or any other private insurance company to the holder of this authorization. I also acknowledge that I am responsible for all co-insurance and deductibles.

X _____
Signature of Patient or Responsible Party          Date

**(Signatures should correspond with certification numbers on data sheet.)**

| | CERT. LEVEL | ID# | COMPLETED REPORT |
|---|---|---|---|
| CREW MEMBER 1 AL. TRIMBLE 448 | P | | ☑ |
| CREW MEMBER 2 A. STYLES | A | | ☐ |
| OTHER CREW MEMBER | | ID# | ☐ |

**Specify orders received in narrative.**

**MEDICAL CONSULT NAME:** _____  **HOSP:** _____

X _Lorraine Naza_
**Signature of Person Receiving Patient**          **Date**

☐ QA/Billing

840333

RELEASE: I hereby refuse any further services offered by the Washington DC Fire and EMS Department, and I hereby release any medical personnel and institutions involved in this EMS call from any liability which may result from failure to receive further treatment. I have been informed of the risks involved, and it has been explained that receiving further treatment or transportation to a hospital would be in my best interests.

SIGNED: _____  DATE: _____

WITNESS: _____  WITNESS: _____

RENUNCIA: Yo rehuso todos los servicios ofrecidos por el Departamento de Bomberos y Servicios Medicos de Emergencia de Washington DC, y absuelvo todo personal medico y instituciones asociados en esta llamada de EMS de cualquier problemas o responsibilidad que puede resultar del fracaso de recibir mas tratamientos. Me han informado los riesgos envuelto, y se me ha explicado que recibiendo mas tratamientos o transportacion ha un hospital sera en me mejor interes.

FIRMADO: _____  DATE: _____

WITNESS: _____  WITNESS: _____

## NARRATIVE CONTINUATION

Pt. comp. beans, colludd, secures ē spider strap.
NOTE: Management of Pt's Hars during transport
occupied most of our time.

## EKG STRIP(S)

| TIME | INTERPRETATION | LEAD | BP | PULSE |
|------|----------------|------|-----|-------|

| | | | | |

BAILEY, KEITH
PAGE 2

# EXHIBIT 5

# NATIONAL REHABILITATION MEDICAL NETWORK

102 Irving Street, NW
Washington, DC 20010
202-877-1000

## DISCHARGE SUMMARY

**PATIENT NAME:** BAILEY SR, KEITH A
**MEDICAL RECORD#:** 73177
**DOB:** 05/28/1953
**DATE OF ADMISSION:** 01/17/2006
**DATE OF DISCHARGE:** 02/07/2006

**DIAGNOSIS/CONDITION:** Traumatic brain injury secondary to motor vehicle accident on the 7th of January. The patient was involved in a motor vehicle accident in which there was a T-bone type of crash.

**SIGNIFICANT COMORBIDITIES:** He sustained multiple facial fractures including a left zygomatic fracture, left temporal bone fracture, left orbital floor fracture, and right zygomatic junction fracture. He was also found to have a small amount of subarachnoid blood as well as air on his head CT. The air would signify that there was at least a basal skull fracture below the area. Other diagnoses include diabetes and hypertension. Other conditions found at the hospital center during his stay is that he had a lipoma excised on the 12th of January. He was found to have cognitive problems as well as balance problems. He was transferred to NRH on the 17th of January of this year.

**ALLERGIES:** No known drug allergies.

**MEDICATIONS:** At admission, include Amaryl 2 milligrams p.o. daily, Diovan/hydrochlorothiazide 160/25 milligrams 1 tablet daily, Avandia 4 milligrams daily, Diltiazem 300 milligrams daily, Tylenol 650 milligrams q.i.d. p.r.n., Lacrilube to left eyelid daily, artificial tears to left eye 3 times a day, and sliding scale as ordered.

**REVIEW OF SYSTEMS:** Upon coming into NRH, he had excessive thirst and polyuria that would coincide with his diabetes.

**SOCIAL HISTORY:** Lives with his wife.

**ADMISSION LABS:** He had slight increase in LFTs. They were almost normal. Hematocrit was barely within normal range. His platelets were slightly high. His CMP showed BUN of 18, creatinine 1.0, sodium 138, and again slightly increased LFTs with an AST of 61 and ALT of 64. His cholesterol was 208. His HDL was 32, triglycerides 204, and LDL measured was 161. TSH was normal.

**REHAB COURSE:** Again, the patient was admitted on the 18th of January and discharged on the 7th of February. He underwent PT, OT, and speech. Please refer to those evaluations for full details, but he actually did quite well. At time of admission, he had a complete evaluation. He was found to need contact guard for ambulation and going up and down stairs. He required close supervision for transfers

---

Report Generated: 04/11/2006 14:42:50 Eastern

Not Valid Unless Signed

and ambulation on even surfaces. He required contact guard on uneven surfaces. In regards to self-care, he required close supervision in most areas except toilet transfers which was contact guard and feeding which was min assist. At time of discharge, he was close supervision in all areas of self-care. He had advanced in mobility to be independent with bed mobility, bed chair and wheelchair transfers, and wheelchair parts. He still required distant supervision for ambulation especially on uneven and community surfaces, and required close supervision on stairs. Hematocrit is 39, BUN is 18, creatinine 1.0, sodium is 138, and K is 3.7.

**HOSPITAL COURSE:** From a medical viewpoint, we have managed his diabetes and his hypertension as well as his pain. We have managed his bowel problems. He had an ultrasound done on his lower extremities, which showed no sign of a DVT. He did have a left ptosis and ophthalmologist saw him. CT head was done and there were no new abnormalities found and we switched him to Pamelor for pain. Dr. Lu, our endocrinologist was called to manage his diabetes. The Pamelor did not seem to work as well and we switched him to trazodone on the 1st of February. On the 2nd of February we stopped the trazodone and then put him on Benadryl and Motrin and then stopped the Lovenox. The Benadryl did not work either. We then tried him on Ambien. He generally had a problem with his sleep that we never were totally able to end. He actually did quite well. He was upset about being here, wanted to get home, which is understandable. The team felt he was ready to go home, and he went home on the 7th of February with appropriate followup planned. I would see him in 6 weeks. He is to see his primary care doctor within 6 weeks, and we are available if there are any questions.

ANDREW D MCCARTHY, MD


TR:   AM /DY
D:    04/11/2006 09:38:00
T:    04/11/2006 14:41:57
JOB:  6518077 /2097015

Not Valid Unless Signed

# EXHIBIT 6

CRIMINAL DIVISION - FELONY BRANCH

UNITED STATES OF AMERICA 2006 MAR 21 P: Criminal Case No. 2006FEL000155

                    v.                    : Judge Hiram E. Puig-Lugo

ONORIO CIFUENTES                          : M.O. Return:  O4/24/06

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER OF DETENTION PENDING TRIAL

This matter came before the Court on February 2, 2006, upon the motion of the United

States to hold the defendant without bond pending his trial in 100 days pursuant to 23 D.C. Code

§ 1322(b)(1)(A).  Having considered the factors enumerated in 23 D.C. Code § 1322(e), the

Government's proffer of the defendant's prior record, the testimony of Detective Elgin Wheeler of

the Metropolitan Police Department ("MPD"), the report and recommendation of the Pretrial

Services Agency, and arguments of counsel for the defendant and the Government, in accordance

with 23 D.C. Code § 1322(g)(1), the Court makes the following findings of fact and conclusions

of law:

1.  There is a substantial probability that defendant committed the offense for which he is

before the Court, that is, aggravated assault, a crime of violence as defined in 23 D.C. Code §

1331.  The evidence presented at defendant's detention hearing established that on January 7,

2006, at approximately 4:55 a.m., defendant was the driver of a 2002 Isuzu box truck that had

been stolen just moments before from Maryland.  Defendant drove that truck at a high rate of

speed, tailgating one motorist and flashing the truck's bright lights to signal his desire to pass.

Defendant was able to pass that motorist and accelerated, running several red lights, including

that at Michigan Ave., N.E., and South Dakota Ave., N.E., in the District of Columbia.


Case: 2006 FEL 008155
DKT: CMARTINEZV 03/27/2006 11:57:09 AM

As it illegally entered that intersection, the box truck driven by defendant was traveling approximately 50 to 55 miles per hour, well in excess of the posted speed limit of 25 miles per hour. In the intersection, the box truck smashed into a pickup truck driven by the victim, Keith Bailey. As a result of the collision, Mr. Bailey was ejected from his pickup and suffered a severe blunt force trauma to his skull.

Paramedics stabilized Mr. Bailey. Both Mr. Bailey and defendant were transported to the Washington Hospital Center. As a result of that injury, Mr. Bailey suffered severe short-term memory loss and continues to suffer from that loss. Further, Mr. Bailey suffers from physical weakness. Prior to the accident, Mr. Bailey suffered from neither of these conditions.

A few hours after defendant was admitted to the hospital, Detective Michael Miller was notified by the hospital staff that defendant was released and was headed to an address in Woodbridge, Virginia. Detective Miller arranged for Yellow Cab Company to contact the vehicle transporting defendant and asked it to return him to the hospital. At the hospital, he was arrested. At the time of his arrest, defendant had in his possession a key to the box truck.

Defendant stated that he had purchased the box truck from one of his relatives; however, the owner of the box truck was not related to defendant.

The Court finds that defendant intentionally or knowingly engaged in conduct that created a grave risk of serious bodily injury to the victim.

2. In determining whether there are conditions of release that will reasonably assure the safety of any other person or the community, the Court has considered the following factors:

3

a. The nature and circumstances of the offense charged. Here, there is a substantial probability that the defendant committed the crime of aggravated assault.

b. The weight of the evidence against the defendant. The Court found the evidence strong and found that there was a substantial probability that defendant committed the offense charged.

c. The history and characteristics of the defendant, including prior convictions for Fourth Degree Burglary (MD 2006), Assault & Battery Police Officer or Firefighter (VA 2001 and 2002), and Obstructing Justice (VA 2002). In this regard, the Court notes that defendant had been released from jail in Maryland just prior to committing this crime. Further, the Court notes the government's proffer that since March 1999, defendant has been arrested 12 times: twice for assault on a police officer in Virginia, twice for obstructing justice and eluding the police in Virginia, once for escape by force when a prisoner in Virginia, once for simple assault in the District of Columbia, and once for disorderly/resisting arrest in Maryland.

WHEREFORE, having considered the provisions of 23 D.C. Code § 1322, and the factors set forth in 23 D.C. Code § 1322(e), this Court finds, by clear and convincing evidence, that there is no condition or combination of conditions, as set forth in 23 D.C. Code § 1321(c), which will reasonably assure the safety of any other person or the community. Accordingly, it is this ____ day of March, 2006,

4

MARTINEZV 03/27/2006 11:57:09 AM

ORDERED, that defendant be held without bond, pending the trial or other final disposition of this matter, for a period not to exceed one hundred calendar days until the trial or other final disposition of this matter;

AND FURTHER ORDERED that defendant be committed to the custody of the Attorney General of the United States for confinement in a facility separate, to the extent practicable, from persons awaiting or serving sentences or being held pending appeal; that the defendant be afforded a reasonable opportunity for private consultation with counsel; and that, on order of a judicial officer or request of an attorney for the government, the defendant be delivered to the United States Marshal or other appropriate person for appearance in a court proceeding.

_____March 21, 2006_____
DATE

HIRAM E. PUIG-LUGO
ASSOCIATE JUDGE
SUPERIOR COURT
DISTRICT OF COLUMBIA

cc:

Emily Miller, Esquire
Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

Melissa Sandoval, Esquire
Public Defender Service
District of Columbia
633 Indiana Avenue, N.W.
Washington, D.C. 20004

5

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


KEITH BAILEY, et al.          :

                              :

            Plaintiffs :

                              :

    vs.                       : Civil Action No.

                              : 1:08-cv-00644-RMC

J&B Trucking Service, Inc.,: Judge R. Collyer

et al.                        :

                              :

            Defendants :


                    Beltsville, Maryland

                    Tuesday, May 27, 2008


Deposition of:


        SERGIO R. SANABRIA

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the offices

of Hartel, Kane, DeSantis, MacDonald, & Howie,

LLP, 11720 Beltsville Drive, Suite 500,

Beltsville, Maryland 20705, before Renee A.

Feder, CSR, a Notary Public in and for the

State of Maryland, beginning at 1:08 p.m.,

when were present on behalf of the respective

parties:

Page 2

1  On behalf of the Plaintiffs:
2
2  BY:  EDWARD L. NORWIND, ESQ.
3       Karp, Frosh, Lapidus, Wigodsky
3       & Norwind, P.A.
4       2273 Research Boulevard, Suite 200
4       Rockville, Maryland 20850
5       (301)948-3800
5
6
7  On behalf of the Defendants:
8  BY:  MICHAEL A. DESANTIS, ESQ.
8       Hartel, Kane, DeSantis, MacDonald
9       & Howie, LLP
9       11720 Beltsville Drive, Suite 500
10      Beltsville, Maryland 20705
10      (301)486-1200
11
11
12  Also Present:  Claudine Varesi, Interpreter
12
13           + + +
14
14       C O N T E N T S
15
15  WITNESS:  SERGIO R. SANABRIA
16
17  EXAMINATION BY:          PAGE:
18  MR. NORWIND               3
19  MR. DeSantis             32
20       E X H I B I T S
21  DEPOSITION NO.    MARKED FOR IDENTIFICATION
22  None.

Page 3

1          P-R-O-C-E-E-D-I-N-G-S
2     (Thereupon, the interpreter was sworn to
3  translate the questions and answers accurately
4  and completely.)
5  Thereupon,
6          SERGIO R. SANABRIA
7  was called for examination by counsel and,
8  after having been duly sworn by the Notary,
9  was examined and testified as follows:
10     EXAMINATION BY COUNSEL FOR PLAINTIFFS
11        BY MR. NORWIND:
12     Q.   What is your name, sir?
13     A.   It is Sergio Rolando Sanabria.
14     Q.   And where do you live?
15     A.   I live in Hyattsville.  The whole
16  address would you like?
17     Q.   Please.
18     A.   5615 Queens Chapel Road,
19  Hyattsville P.G.  Zip code 20782.
20     Q.   How long have you lived there?
21     A.   I have lived there, I believe,
22  since 2003.

Page 4

1     Q.   What is your country?
2     A.   Guatemala.
3     Q.   When did you come to the United
4  States?
5     A.   I came in '99.
6     Q.   When you came to the United States
7  in 1999, where did you first live?
8     A.   The first place where I lived, I
9  lived for some time in Virginia, for some
10  months.  After that I came to Gaithersburg, to
11  live in Gaithersburg.
12     Q.   Where in Virginia did you live?
13     A.   I don't remember, to be very
14  honest.
15     Q.   What city?
16     A.   Arlington.
17     Q.   Who did you live with then?
18     A.   With some friends.
19     Q.   And then you moved to
20  Gaithersburg?
21     A.   Yes, I did move afterwards to
22  Gaithersburg.

Page 5

1     Q.   When did you move to Gaithersburg?
2     A.   I moved to Gaithersburg in -- I
3  will make a correction.  Like October of '99.
4     Q.   To Gaithersburg?
5     A.   Yes.  Gaithersburg.
6     Q.   And where in Gaithersburg did you
7  live?
8     A.   At Queen Orchard Boulevard.
9     Q.   Quince?
10     A.   Yes, Quince Orchard Boulevard.
11     THE INTERPRETER:  Mistake by
12  interpreter.
13     THE WITNESS:  I don't remember the
14  apartment number exactly.
15        BY MR. NORWIND:
16     Q.   And did you have that same address
17  in Gaithersburg until you moved to
18  Hyattsville?
19     A.   Yes.  I only lived at that place.
20     Q.   Do you have children who live with
21  you?
22     A.   No, my children are not living

Page 18

1  a photograph of the truck parked to the side.
2          MR. NORWIND: Okay. Thank you.
3          BY MR. NORWIND:
4      Q.    What kind of work for Belfort did
5  you do?
6      A.    **We delivered new furniture to the**
7  **houses.**
8      Q.    When did you work for Belfort?
9      A.    **I started working for Belfort in**
10 **2001. 2001.**
11         MR. DeSANTIS: Until when?
12         THE WITNESS: Until I started
13 working for the air conditioning company. May
14 I write it? Until 2007.
15         BY MR. NORWIND:
16     Q.    About six years?
17     A.    **That I worked for the company,**
18 **yes.**
19     Q.    Did you bring their truck home
20 with you all the time?
21     A.    **Sometimes.**
22     Q.    So, where is Belfort Company

Page 19

1  located?
2      A.    **It is route -- I am not sure if it**
3  **is --**
4      Q.    In Northern Virginia?
5      A.    **Yes, Northern Virginia.**
6      Q.    And you made deliveries for them?
7      A.    **In Virginia?**
8      Q.    Well, I am asking what type of
9  work exactly did you do for them.
10     A.    **I loaded the furniture, put it in**
11 **the truck, and I delivered to the clients.**
12     Q.    Did you drive the truck?
13     A.    **Yes, I did drive the truck.**
14     Q.    Where did you make these
15 deliveries?
16     A.    **I did these deliveries in**
17 **Manassas, Arlington, Warrenton. We went to**
18 **Southern Maryland, like La Plata. All the way**
19 **to parts of Frederick. And times we would go**
20 **into Washington. Three or four times a month**
21 **we would go to Washington.**
22     Q.    Washington, D.C. for deliveries?

Page 20

1      A.    **Yes.**
2      Q.    Did you pick up at a warehouse or
3  the company store?
4      A.    **The company's warehouse.**
5      Q.    So, is it correct, Mr. Sanabria,
6  that you made deliveries for Belfort into
7  Washington, D.C. for almost six years three or
8  four times a month?
9      A.    **Three to four times a month. Not**
10 **every week.**
11     Q.    Now, sir, I want to ask you a few
12 personal questions. Please don't take offense
13 because there is some information we need for
14 the lawsuit.
15         Okay?
16     A.    **Yes.**
17     Q.    So, Number 1, do you have a
18 driver's license?
19     A.    **Yes.**
20     Q.    From what state?
21     A.    **From the State of Maryland.**
22     Q.    Do you have a commercial driver's

Page 21

1  license?
2      A.    **No.**
3      Q.    Do you have any -- have there been
4  any criminal charges against you?
5      A.    **No.**
6      Q.    Have you ever been arrested?
7      A.    **No.**
8      Q.    Have you ever gotten parking
9  tickets?
10     A.    **Yes.**
11     Q.    Have you ever gotten traffic
12 tickets for speeding, not stopping at red
13 lights, things like that?
14     A.    **The traffic tickets in Virginia**
15 **with the radar.**
16     Q.    I see. Any tickets from the
17 District of Columbia?
18     A.    **In what time? Which time are you**
19 **referring to?**
20     Q.    2001 to now.
21     A.    **Only one that they gave me two**
22 **months ago. I was talking with somebody and**

Page 26

1    A.    When we are coming with a loaded
2  truck, we travel on that road.
3    Q.    And this is for which job?
4    A.    For this, for the appliance job.
5        MR. DeSANTIS:  I will just put on
6  the record that the answer was not responsive
7  to the question as the answer seems to
8  indicate that he was working at the time he is
9  traveling on Riggs Road.
10        BY MR. NORWIND:
11    Q.    Sir, have you ever gotten medical
12  care from a hospital in D.C.?
13    A.    Medical treatment, no.
14    Q.    Has a doctor ever treated you in
15  D.C.?
16    A.    No.
17    Q.    Have you ever been hurt on the
18  job?
19    A.    Yes.
20    Q.    Did you have worker's comp
21  benefits?
22    A.    No.

Page 27

1    Q.    Did you ever get hurt in D.C.?
2    A.    No.  When I got hurt it was when I
3  was working at the warehouse in Belfort, at
4  Belfort.
5    Q.    We have talked about your full
6  time jobs.  We have talked about no part time
7  work.  Do you have any personal business?
8    A.    No.
9    Q.    You don't sell anything.  Correct?
10    A.    I do not sell anything.
11    Q.    Do you shop in stores in the
12  District of Columbia?
13    A.    No.
14    Q.    Who were you working for in
15  January, 2006?
16    A.    I was working for J&B Trucking
17  Service.
18    Q.    What period of time did you work
19  for J&B?
20    A.    From 2001 to 2007.
21    Q.    Did J&B do deliveries for Belfort?
22    A.    Yes.

Page 28

1    Q.    So please help me understand
2  something.  For the entire time that you made
3  deliveries for Belfort, were you working for
4  J&B?
5    A.    In Belfort?  Could you please
6  repeat the question?
7    Q.    Okay.  I will try.  Let me
8  regroup.
9        When you made deliveries for
10  Belfort, is that when you were working for J&B
11  Trucking?
12    A.    Yes.
13    Q.    So J&B did the deliveries for
14  Belfort.  Is that right?
15    A.    For Belfort.
16    Q.    Like a delivery contractor?
17    A.    Yes, like a contractor.
18    Q.    Is that correct?
19    A.    Yes.
20    Q.    So you worked for J&B from 2001 to
21  2007.  Is that right?
22    A.    Yes.

Page 29

1    Q.    Are you a member of a union?
2    A.    No.  A union is like a syndicate,
3  a workers union?
4    Q.    Yes.
5    A.    No, I am not a member.
6    Q.    Sir, do you pay taxes for the
7  District of Columbia?
8    A.    I write my taxes.  I do.
9    Q.    To the District?
10    A.    But I couldn't tell you -- I do
11  not know if it is for the District or for
12  where.
13    Q.    Okay, Mr. Sanabria, you have the
14  picture showing us the Belfort truck at your
15  home.
16    A.    It is not my home.  But it is
17  where I used to park the truck because I leave
18  late from work and it was too tiring to go get
19  the car to the place where I used to park it
20  so I would go home.
21    Q.    Because it was a long workday?
22    A.    Yes.

Page 30

```
1        Q.   So, where is this located?  What
2   city is the house in?
3        A.   Hyattsville.
4        Q.   So, on your picture -- help your
5   lawyer understand something.  Does this truck
6   belong to J&B?
7        A.   That truck, yes, it does.
8        Q.   So it says Belfort on the truck,
9   but it is a J&B truck.  Is that correct?
10       A.   The name of Belfort, they just put
11  it as an advertisement.  But the truck belongs
12  to J&B.
13       Q.   Okay.  So, your paycheck came from
14  J&B and not from Belfort?
15       A.   Yes, my check.
16       Q.   You told us that Belfort is in
17  Chantilly or Reston.  Is that correct?
18       A.   Herndon or Reston, but I don't
19  remember exactly.
20       Q.   Tell us the route you took from
21  home to work at Belfort.
22       A.   Because we used to go to different
```

Page 31

```
1   locations, sometimes I would take 495 to
2   take -- to drop my companion off at Georgia
3   Avenue, and from there I would go home.
4   Sometimes I would end up by Frederick, but I
5   had to come down here, and then I would go
6   and -- I would either park the truck or go
7   home.
8        Q.   So, 495, you started on 495, to go
9   to work at Belfort?
10       A.   In the morning, yes.  I take 495.
11       Q.   And where do you get off of 495?
12       A.   I exit on the toll road, taking
13  the toll road, and then 28 North.  Until -- I
14  would take another road but I don't remember
15  the name exactly to get to the warehouse.
16       MR. NORWIND:  That might be all I
17  have.  Let me just regroup with my notes.  We
18  will take a short break.
19       MR. DeSANTIS:  Do you mind if I
20  clarify a couple of things while you look at
21  your notes?
22       MR. NORWIND:  No.
```

Page 32

```
1        EXAMINATION BY COUNSEL FOR DEFENDANTS
2        BY MR. DeSANTIS:
3        Q.   Have you ever lived in the
4   District of Columbia since coming from
5   Guatemala?
6        A.   No, I have not.
7        Q.   When you say you didn't know
8   whether you pay taxes to the District or
9   whoever, were you paying income taxes?
10       A.   I pay my taxes.  I know that I
11  send two letters, one for one, side one to the
12  other, but I don't know exactly.
13       Q.   When you pay taxes, is that for
14  the money that you earn?
15       A.   How is that?
16       Q.   Do you know what federal income
17  taxes are?
18       A.   No.
19       Q.   You had been asked about --
20       THE INTERPRETER:  Can I rephrase
21  it so he will understand?
22       The taxes that you pay?
```

Page 33

```
1        THE WITNESS:  They give me a form
2   from the company so I go to -- somebody does
3   the taxes for me.  I report my expenses,
4   everything that I spend, my tools and
5   everything.  And so they do the taxes for me,
6   the accountant does the taxes for me.
7        BY MR. DeSANTIS:
8        Q.   Okay.  All right.  And this Riggs
9   Road, you testified previously that you
10  traveled on Riggs Road in Washington on your
11  deliveries?
12       A.   Yes, usually we take Riggs Road.
13       Q.   I want to clarify, did you ever
14  take Riggs Road, did you ever take Riggs Road
15  leaving home or going back home after you
16  finished work?
17       THE INTERPRETER:  The interpreter
18  is going to repeat.
19       MR. DeSANTIS:  Let me rephrase.
20       BY MR. DeSANTIS:
21       Q.   Did you ever use Riggs Road in
22  D.C. other than when you were making
```

# EXHIBIT 8

Case 1:08-cv-00644-RMU   Document 20-4   Filed 08/08/2008   Page 2 of 3



**Start** **5615 Queens Chapel Rd**
**Hyattsville, MD 20782**

**End** **South Dakota Ave NE & Michigan Ave**
**NE**
**Washington, DC 20017**

Travel **1.8 mi – about 6 mins**

Get Google Maps on your phone
Text the word "GMAPS" to 466453



# EXHIBIT 9

1           SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2                      CRIMINAL DIVISION

3      - - - - - - - - - - - - - x

4      UNITED STATES OF AMERICA   :

5             vs.                 :    Criminal Action No.

6      ONORIO T. CIFUENTES,       :        F155-06

7                  Defendant. :        (Excerpt)

8      - - - - - - - - - - - - - x

9                      Thursday, February 2, 2006

10                     Washington, D.C.

11          The above-entitled action came on for preliminary
hearing, before the Honorable HIRAM E. PUIG-LUGO, Associate
12     Judge, in Courtroom 311, commencing at approximately
       2:22 p.m.
13
                  THIS TRANSCRIPT REPRESENTS THE PRODUCT
14                OF AN OFFICIAL REPORTER, ENGAGED BY THE
                  COURT, WHO HAS PERSONALLY CERTIFIED
15                THAT IT REPRESENTS THE TESTIMONY AND
                  PROCEEDINGS OF THE CASE AS RECORDED.

16                APPEARANCES:

17                On behalf of the Government:

18                ROBERT LEIDENHEIMER, Esquire
                  Assistant United States Attorney
19

20                On behalf of the Defendant:

21                MELISSA SANDOVAL, Esquire
                  Public Defender Service
22                Washington, D.C.

23     DeLyssia C. Janifer, RPR        (202)879-1084
       Official Court Reporter

24

25

                                                              1

1   complainant/victim, which was traveling southbound on South

2   Dakota Avenue.

3       Q    Would you tell us again, briefly, where that truck came

4   from, what your investigation revealed with respect to the

5   origin of that truck?

6       A    The Isuzu pickup truck originated --

7           MS. SANDOVAL:  Object to relevance.  It's irrelevant to

8   the charge of aggravated assault.

9           THE COURT:  Overruled.  You may continue, Detective.

10      A    The pickup truck was --

11      Q    I'm sorry.  The pickup truck or --

12      A    Correction.  The box truck originated from the 5600

13  block of Queens Chapel Road, which is in Hyattsville,

14  Maryland.

15      Q    When you say originated there, tell us what occurred in

16  the 5600 block of Queens Chapel Road, please.

17          THE COURT REPORTER:  I'm sorry.  I can't hear you.

18          MS. SANDOVAL:  Objection; relevance.

19          THE COURT:  Overruled.

20      A    The box truck was in the custody or responsible person

21  -- person by the name -- I'm sorry, I would have to refer to

22  the notes, but it was reported stolen.  According to

23  Hyattsville report is that the one responsible for it had it

24  in front of his house, again in the 5600 block of Queens

25  Chapel Road.

1    ~~He left the car -- he came out, started the car and~~
2    ~~left the keys in there to warm it up for that morning's job,~~
3    ~~which is delivering furniture. He went back in the house~~
4    ~~approximately 10-15 minutes, came out to get into the truck,~~
5    ~~and the only thing he saw was the truck heading southbound~~
6    with no lights on, southbound on Queens Chapel Road with no
7    lights on.

8    Q    Did the police investigation uncover any information
9    about what happened between the time that truck was stolen
10   and the time that it was involved in an accident?

11   A    Yes.  I spoke with a witness who was there, who was in
12   the line of travel up to the point where the crash actually
13   occurred.

14   Q    What did you learn about -- from that witness about how
15   the truck was being driven?

16   A    According to him, the information provided by the
17   witness --

18        THE COURT:  I'm sorry.  Was this the owner or somebody
19   else?

20        THE WITNESS:  This is somebody --

21        THE COURT:  Somebody else, okay.

22        THE WITNESS:  He first made contact, visual contact,
23   with the truck in the 2400 block of Queens Chapel Road.  He
24   was traveling southbound.  And what he explains, he was in
25   the -- there's only a two-lane road.  He was in the curb lane